UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
—————————————————————

LAVON PARKS,

       Plaintiff,

v.                                        **COMPLAINT**

DRUG ENFORCEMENT ADMINISTRATION,

       Defendant.

—————————————————————

### *INTRODUCTION*

1.     This is an action under the Freedom of Information Act (hereinafter "FOIA", 5 USC §552) seeking injunctive and other relief; specifically the disclosure and release of certain records pertaining to Lavon Parks.

### *JURISDICTION AND VENUE*

2.     This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 USC §552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 USC §1331. Venue lies in the district under 5 USC §552(a)(4)(B).

### *PARTIES*

3.     Plaintiff's residence is located in Niagara Falls, New York within the Western District of New York.

4.     Defendant Drug Enforcement Agency is a Department of the Executive Branch of the United States Government. The DEA is an "agency" within the meaning of 5 USC §552(f).

### *PROCEDURAL HISTORY*

5.     By letter dated July 11, 2024, addressed to the DEA, and uploaded via its Public Access Link (PAL), plaintiff requested documents which referenced him in the "DAS" (Data

Analytical Services) or Hemisphere program databases, or any record of inquiries to an "HIDTA" (High Intensity Drug Trafficking Area); specifically, a copy of any written or digital request and response, the source of the request, date, content of request, and the person or position to which it was directed, and any electronic trail from receipt to response (see Letter attached as **Exhibit A**).

6.   The DEA assigned an identification number 24-00625-P to Mr. Parks' request.

7.   After notification within the portal that a DOJ-361 form ("Certificate of Identity form") was required, a duly completed form signed by Lavon Parks was emailed to Desheila S. Wallace and receipt was confirmed on August 28, 2024. (see **Exhibit B**)

8.   By letter dated September 6, 2024, the DEA denied plaintiff's FOIA request. (see **Exhibit C**)

9.   By letter dated September 12, 2024, plaintiff filed an administrative appeal with the DEA through the Office of Information Policy ("OIP") of the U.S. Department of Justice (see **Exhibit D**)

10.   The administrative appeal was received on September 12, 2024 with an assigned appeal number A-2024-02591. (see confirmation attached as **Exhibit E**)

11.   Neither the DEA nor the OIP responded to plaintiff's FOIA appeal in a timely manner and, to date, the agency has failed to make a determination on plaintiff's administrative appeal as required by 5 USC §552(a)(6)(A)(ii).

12.   Plaintiff has exhausted the applicable administrative remedies with respect to his FOIA requests.

13.   Plaintiff has a right of prompt access to the requested records under 5 USC §552(a)(3)(A).

14.   The DEA failed to conduct an adequate search for responsive records and has

wrongfully withheld agency records from plaintiff.

## BACKGROUND

### High Intensity Drug Trafficking Areas

15.    Lavon Parks was the subject of a Drug Enforcement Administration ("DEA") investigation beginning in May 2017. The investigation culminated in Lavon Parks' arrest in May 2019 and a conviction after trial in this district in December 2023.

16.    Leading up to the trial, Mr. Parks litigated the legality of the stop of a vehicle in which he was a passenger near Nashville, Tennessee. The vehicle was traveling from Houston, Texas and heading to Niagara Falls, New York. Interdiction officers for the Tennessee State Highway Patrol intercepted the vehicle and ultimately seized three kilos of cocaine found secreted in the trunk.

17.    During the suppression hearing Lavon Parks learned certain information about him had been transmitted by Tennessee State Police Officers to the Gulf Coast High Intensity Drug Trafficking Area ("HIDTA") database.

18.    The HIDTA program was created by Congress as part of the Anti-Drug Abuse Act of 1988 and divides the United States into six geographic regions. Each region has multiple areas designated as HIDTA's. There are 33 HIDTA's that have been established across all regions of the country. There are HIDTA-designated counties located in all 50 states[1].

19.    HIDTA is a "coordination umbrella" which provides funding resources to federal, state and local law enforcement agencies to conduct various joint initiatives, including enhanced intelligence sharing. See **Exhibit F** (§2.0 Program Overview)[2]. When federal officers and local

---

[1]  The National Drug Intelligence Center lists Erie County as a HIDTA. See
https://www.justice.gov/archive/ndic/pubs27/27506/appendb.htm.

[2]  The HIDTA program mission is to reduce and disrupt drug trafficking in various parts of the United States
(http://www.hidtaprogram.org/summary.php) Id. (§2.1 Mission and Goals). HIDTA initiatives include enforcement,

police jointly conduct a criminal investigation funded by the HIDTA they are acting under the law enforcement authority vested in each of them by their specific agencies.

20.    The DEA and Department of Homeland Security (DHS) are the largest participating HIDTA agencies.  DEA has more than 1,500 dedicated positions supporting the HIDTA program.

21.    HIDTA's are required to share threat assessments and criminal intelligence with partner agencies. Id (§2.4 Program Features).

22.    In each HIDTA, executive boards composed of federal, state and local law enforcement members are responsible for designating the primary "sponsoring agency" for information and intelligence sharing. The executive board also ensures that each participating agency provides the HIDTA access to its investigative databases. "Executive Boards are responsible for establishing and maintaining the capacity (e.g. hardware, software, policies, and procedures) to continuously and securely share information with other agencies participating in the HIDTA Program and law enforcement and Intelligence components". Id. ( §5.15 Intelligence and Information Sharing).

23.    In other words, HIDTA Executive Boards ensure the exchange of information and coordination of activities with all law enforcement agencies in the HIDTA region so that it is "accessible and routine" and that HIDTA's information technology infrastructure is maintained (Id. See also §5.19 (Information Technology))

24.    HIDTA's do not own data or information but simply facilitate the transfer, storage and limited control of data exchanged by participating agencies. Id. (§9.1 HIDTA IT Management Framework)

---

intelligence, support and training. Id §6.0 (HIDTA initiatives) (only the Washington-Baltimore HIDTA has a drug treatment initiative). Enforcement initiatives include "multi-agency investigative, interdiction…and prosecution activities targeting drug trafficking…" Id. (§6.1 Enforcement Initiatives)

25.     The DEA participates in the intelligence sharing component of HIDTA and criminal intelligence materials are provided to the El Paso Intelligence Center (EPIC) and the Homeland Security Information Network (HSIN) Intel portal and various law enforcement agencies. Id. §6.2.9 (Information Sharing Requirements)

26.     The Office of National Drug Control Policy ("ONDCP")[3] administers the HIDTA Program.   ONDCP is run out of the White House and provides policy direction, technical assistance and grant administration to law enforcement agencies consistent with the President's National Drug Control Strategy (See **Exhibit F**, §2.3 Program Management).

27.     Because HIDTA is funded through a grant program administered by ONDCP through the Executive Office of the President, the program has limited Congressional oversight.

28.     HIDTA funding exceeded $280 million in 2020 alone.

29.     According to the HIDTA Program Policy and Budget Guidance (updated Sept 9, 2021) published by ONDCP (see **Exhibit F**; https://www.nhac.org/PDF/Program_Policy_and_Budget_Guidance2021.pdf), HIDTA is not an "agency" and does not possess its own law enforcement authority (§2.4 Program Features)[4]

---

[3] See **Exhibit F** §3.0-3.1 (ONDCP Oversight): "The ONDCP is a component of the Executive Office of the President, created by the Anti-Drug Abuse Act of 1988. The ONDCP Director is the principal advisor to the President on drug control issues. ONDCP coordinates the drug control activities and related funding of the16 Federal Departments and Agencies and produces the *National Drug Control Strategy* which outlines Administration efforts for the Nation to reduce illicit drug use, manufacturing and trafficking…Within ONDCP, the national HIDTA Program Office (NHPO) oversees and administers the HIDTA Program." Former Buffalo Police Commissioner Gil Kerlikowski served as the Director of the ONDCP between 2009 and 2014.

[4] See also §5.4 Selection of HIDTA Grantees: "HIDTA's and their Executive Boards are not considered legal entities under Federal law and generally lack the authority to enter into contracts, hire employees or obligate Federal funds. HIDTA Executive Boards are responsible for selecting one or more grantees that, among other things, provide financial management services.".

### DEA's DATA ANALYTICAL SERVICES f/k/a HEMISPHERE

30.     While the Court is undoubtedly familiar with Edward Snowden's 2013 leaks which put the National Security Agency's bulk telephone data collection programs under the microscope, a lesser known but similar database and information aggregation program is run through a coordinated effort of AT&T, ONDCP and DEA. The program, initially known as Hemisphere was publicly disclosed by the New York Times in September 2013 and coincided with the Snowden leaks. Thereafter it was re-named and is currently known as Data Analytical Services ("DAS")[5].

31.     The Hemisphere project uses a telecom (AT&T) proprietary database that contains call detail records available in real time. While originally created to stop the flow of drugs into our country from foreign sources, it now captures and collects telephone data on nearly all Americans.

32.     It is routinely used in domestic investigations. Hemisphere's bulk data collection has been described as a dragnet surveillance program:

> "In 2013, the New York Times revealed the existence of a surveillance program in which the White House Office of National Drug Control Policy (ONDCP) pays AT&T to mine its customer's records for the benefit of federal, state, local, and tribal law enforcement agencies. According to an ONDCP slide deck, AT&T has kept, and queries as part of the Hemisphere Project, call records going back to 1987, with 4 billion new records being added every day …" *DEA Discloses Bulk Surveillance of Americans' International Phone Calls*, Patrick Toomey, Deputy Director ACLU National Security Project, January 16, 2015 *https://www.aclu.org/news/national-security/dea-discloses-bulk-surveillance*

33.     Hemisphere has facilitated access to an unprecedented volume of domestic phone records within the United States, even for individuals who are not suspected of criminal activities or, prospectively, where crimes have not yet been committed.

---

[5] For clarity, "Hemisphere" and "DAS" are referred to herein as "Hemisphere":

34.     Federal and state law enforcement investigators submit administrative subpoenas to a HIDTA point of contact requesting call detail records from the Hemisphere database which are associated with a specific target and/or phone number(s).

35.     Attached is a "Hemisphere synopsis" and slide presentation that was obtained from "Los Angeles Hemisphere" available on the internet as a result of lawsuits brought by privacy advocates. See **Exhibit G.** Both slide decks describe the Hemisphere project as a subpoena compliance program funded by HIDTA/ONDCP. A portion of DEA's budget is dedicated to the cost of utilizing and coordinating the Hemisphere project.

36.     DEA trainers promote Hemisphere's ease of use: "[A]n administrative subpoena is all that is needed to obtain Hemisphere results and work products". Id.  http://s3.documentcloud.org/documents/782287/database.pdf.

37.     The Hemisphere slide deck describes the specific capabilities of Hemisphere, including that it can be used to identify alternate numbers used by a target, obtain location data and "two levels of call detail records for one target number" (meaning the phone records of everyone who communicated with the target).

38.     HIDTA's receive police inquiries and direct them to Hemisphere. An analyst then processes the results directly to the law enforcement agency that made the request:

> "Hemisphere is a public-private partnership between the White House's Office of National Drug Control Policy and AT&T, the third-largest provider of mobile telephone services in the US. In 2013 the program was overseen by AT&T employees embedded within the Atlanta head office (two employees) and Houston and Los Angeles regional offices (one employee each) of the ONDCP's High Intensity Drug Trafficking Area (HIDTA) program; these employees' salaries are paid through the ONDCP's HIDTA program, as opposed to by AT&T.
>
> AT&T collects metadata relating to all calls routed through AT&T's exchanges, including calls made from non-AT&T handsets. The data collected include the phone numbers of the caller and recipient, the date, time and length of calls and, in some cases, a caller's location. An estimated four billion new

call detail records are created on AT&T's database every day, though it is possible for a call to be recorded more than once. As AT&T maintains records of calls placed as well as calls received, a single call may be recorded against both the caller's telephone number (as an *outgoing* call) and the recipient's telephone number (as an *incoming* call); the number of records generated for a single call depends on its length, as well as on participants' locations and whether or not they are moving. Call detail records held as part of the project date back as far as 1987.

Data are typically forwarded to investigators by email in response to administrative subpoenas, which the DEA is authorized to issue independently of the courts. As the existence of the project is officially secret, investigators are not permitted to disclose the source of any intelligence obtained through the Hemisphere Project in case reports, court filings or other documents. Official guidance instead requires all intelligence be cited as "information obtained from an AT&T subpoena". https://en.wikipedia.org/wiki/Hemisphere_Project; see also "*Hemisphere: Law Enforcement's Secret Call Records Deal with AT&T*", www.eff.org/cases/hemisphere

39.    Hemisphere has access to AT&T telecommunication switches that are used to direct and route telephone calls. Other telecom companies lease AT&T's network which then hosts their calls. This switch network allows Hemisphere to pick up local, long distance, international and cellphone calls, regardless of carrier. That includes records dating as far back as 1987, which is much further back than the records other telecoms store.

40.    Law enforcement agencies take the position that Hemisphere is not "wiretapping" or eavesdropping, which requires probable cause, because the records allegedly do not contain recordings of the content of conversations.

41.    However, the accessible "call detail records" (CDR's) provide a significant amount of information implicating individual privacy interests including: the direction of calls in or out, subscriber's names, phone numbers, dates/times of calls and cell tower coordinates indicating the approximate location of a particular phone number at a specific time. Even without the subscriber's name, Hemisphere algorithms can pinpoint the identity of users and a network of associated phone numbers.

42.     AT&T employees help run and train law enforcement officers on the Hemisphere Program and are housed within HIDTA partner law enforcement agencies, including DEA, and have their salaries paid by the White House's ONDCP.

43.     DEA, in coordination with AT&T, has collected subscriber information, mapped locations using "GEO TIME" and other software, and conducted IMEI searches since July 2012 utilizing AT&T's wireless network. The DEA began limited "pinging" for some phones in May 2013.  It also uses an algorithm to identify a target's new number once the phone is dropped or discarded and pinpoints possible replacement phones.

44.     This government initiative, in collaboration with AT&T, has raised significant legal and privacy concerns in that it allows federal, state, and local enforcement agencies to scrutinize trillions of domestic phone records.

45.     United States Senator Ron Wyden (D-Oregon), in a letter dated November 20, 2023 addressed to United States Attorney General Merrick Garland, has called for the release of information regarding the Hemisphere Project[6]. He expressed profound reservations about the program's legality, revealing that it has provided law enforcement authorities with the ability to conduct extensive searches of domestic phone records, including those of persons not convicted of crimes, without the need for warrants.

46.     The purpose of Mr. Parks' FOIA request is to further public debate about the efficacy, legitimacy and privacy implications of the program.

---

[6] "The Hemisphere Project has been supported by regular funding from the White House ONDCP since 2009, according to the attached undated white paper that ONDCP provided to my office on October 27, 2022 (Appendix A omitted). That same document reveals that White House funding for this program was suspended by the Obama Administration in 2013, the same year the program was exposed by the press but continued with other federal funding under a new generic sounding program name, "Data Analytical Service." ONDCP funding for this surveillance program was quietly resumed by the Trump Administration in 2017, paused again in 2021, the first year of the Biden Administration, and then quietly restarted again in 2022". See Letter from Senator Ron Wyden, attached as **Exhibit H**.

47.     Law enforcement's access to this information has not been publicly debated and scrutinized because of efforts to block the dissemination of data about the program.[7]

48.     Records obtained by the New York Times in 2013 included descriptions of the program's secrecy and instructions to partner law enforcement officials never "refer to Hemisphere in any official document".

49.     An entire section of the Hemisphere slide presentation (**Exhibit G**) is devoted to "protecting the program" from public view. Hemisphere explicitly warns law enforcement users to keep the program "under the radar".

50.     It is the expectation that "all Hemisphere requests will be "paralleled" with a subsequent subpoena for CDR's (call detail records) from the official carrier for evidentiary purposes. Users are warned: "**<u>DO NOT</u>** mention Hemisphere in any official reports or court documents" (emphasis in original) (see **Exhibit G**).

---

[7] Senator Wyden is a member of the Senate Select Committee on Intelligence and is a longtime advocate for bringing transparency to the government's bulk collection of American's data. Although the Hemisphere Project is paid for with federal funds, AT&T is paid through a grant program, enabling it to skip an otherwise mandatory federal privacy review. If the funds came directly from a federal agency, such as the DEA, Hemisphere would have been subjected to a mandatory Privacy Impact Assessment conducted by the Department of Justice (DOJ) Office of Privacy and Civil Liberties, the findings of which would be made public. Instead, ONDCP provides funding for the program through the Houston High Intensity Drug Trafficking Area (HIDTA), one of the 33 regional HIDTAs whose executive boards distribute federal anti-drug law enforcement grants to state and local agencies.

On January 25, 2024, Senator Wyden sent a letter to Avril Haines, Director of National Intelligence, to address the purchase of American's metadata by U.S. intelligence agencies. In his letter, Sen. Wyden requested that the government only be permitted to purchase such data if it is established it has been obtained "in a lawful manner":

> "As you know, U.S. Intelligence agencies are purchasing personal data about Americans that would require a court order if the government demanded it from communications companies. I first revealed in 2021 that the Defense Intelligence Agency (DIA) was purchasing, storing, and using domestic location data. Such location data is collected from Americans' smartphones by app developers, sold to data brokers, resold to defense contractors, and then resold again to the government. In addition, the National Security Agency (NSA) is buying Americans' domestic internet metadata."

See Wyden's full letter to the Director of National Intelligence dated January 25, 2024, attached as **Exhibit I**, with attachments (1) NSA's letter confirming the purchase of American's personal data, and; (2) a letter from Undersecretary of Defense for Intelligence and Security acknowledging the practice by Defense and Intelligence "components" of commercially available information, including location data from U.S. phones.

51.     Instead, the program recommends that the "official subpoena response" (CDR's) from the carrier should be used instead of referencing their true origin (from Hemisphere) and if the requester has any questions about how to "protect the program" or how to "connect the dots" for reporting purposes, they are instructed to call their HIDTA point of contact.[8]

52.     Federal agencies, like DEA, provide information about suspect individuals to state or local officers who then create, through a traffic stop or other ruse, the reasonable suspicion to investigate the individual or vehicle. See "*Dark Side: Secret Origins of Evidence in U.S. Criminal Cases*", Human Rights Watch , January 9, 2018; "*U.S. Directs Agents to Cover Up Program Used to Investigate Americans*", Reuters, John Shiffman & Kristina Cooke, August 5, 2013.

53.     Since the Supreme Court has held that an officer's subjective intention in pulling a car over for a traffic infraction is irrelevant to Fourth Amendment analysis (*Whren v. United States,* 517 U.S. 806 (1996)), a targeted individual may never know of the true reason for the stop.

54.     The Hemisphere slide deck specifically talks about "parallel subpoenaing" noting that Hemisphere may produce a variety of leads for an array of cases; it recommends subpoenaing the complete CDR's from the carrier to view all calls made by the target and points out that a subpoena to the carrier is the only method of obtaining the "official" subscriber information.

---

[8] See Los Angeles Hemisphere Summary attached as **Exhibit G**.

"Protecting The Program-

When a complete set of CDRs are subpoenaed from the carrier, then all memorialized references to relevant and pertinent calls can be attributed to the carrier's records, thus "walling off" the information obtained from Hemisphere. In other words, Hemisphere can easily be protected if it is used as a pointer system to uncover relevant numbers.

Exigent Circumstances-

In special cases, we realize that it might not be possible to obtain subpoenaed phone records that will "wall off" Hemisphere.

In these special circumstances, the Hemisphere analyst should be contacted immediately. The analyst will work with the investigator and request a separate subpoena to AT&T.

Official Reporting-

All requestors are instructed to never refer to Hemisphere in any official document. If there is no alternative to referencing a Hemisphere request, then the results should be referenced as information obtained from an AT&T subpoena."

55.     By subpoenaing CDR's from the carrier after first learning of the information from Hemisphere, and then attributing pertinent call information to the carrier's records rather than to Hemisphere[9], the secrecy of the program is preserved.

56.     Neither courts nor criminal defendants may ultimately know the true origins of a criminal investigation.

57.     Release of the requested records will increase transparency about the program thus allowing litigants to challenge these law enforcement tactics in court.

### Testimony about HIDTA in the federal criminal prosecution of Lavon Parks

58.     Two Tennessee Highway Patrol Officers testified at the suppression hearing in Lavon Parks' case-- Agent Brett Spivey and Trooper Jeffrey Fuller. [see 19-cr-87, transcripts at dkt. 304 (9/29/20), dkt. 332 (12/3/20), and dkt. 483 (2/4/22)].

59.     While these witnesses testified about exchanging information with the Gulf Coast HIDTA during and after the vehicle stop, they denied receiving any information from any source before they encountered Mr. Parks on November 30, 2017[10]. The DEA had been investigating Mr. Parks for approximately six months at the time of the vehicle stop.

---

[9]The training slides advise "[W]hen the mention of Hemisphere data in official documentation or court testimony is unavoidable, Hemisphere should be contacted immediately" … "Hemisphere will work with the investigator and identify the most effective way to lend proper case support while still protecting the program"… "Hemisphere analysts might advise the investigator on issues such as report writing, presentation to the prosecutor, and the trial phase". **Exhibit G** (emphasis added)

[10] The DEA initiated an investigation into Mr. Parks in May 2017 after a postal inspector in Puerto Rico alerted Buffalo DEA agents that a suspicious package had been mailed by Mr. Parks. Upon information and belief, the DEA issued an administrative subpoena for Mr. Parks' cell phone information. Mr. Parks traveled from Niagara Falls, New York to Houston, Texas in November 2017 to allegedly purchase cocaine. He was stopped by Tennessee Highway Patrol interdiction officers when the vehicle was encountered near Nashville as it headed back from Houston to Niagara Falls.

60. The Blue Lightning Operations Center ("BLOC") was Agent Spivey's point of contact within the Gulf Coast HIDTA. Daily reports were transmitted via email to Agent Spivey and other drug interdiction agents by BLOC to alert them of potential threats in their jurisdiction.

61. BLOC functioned as the interdiction unit's "dispatch". Agent Spivey contacted BLOC prior to making a formal arrest of Mr. Parks to check his criminal history, determine whether he had any outstanding warrants, and to run a license plate check on the vehicle.

62. Upon information and belief, the DEA is a member of the Gulf Coast HIDTA.

63. Further, upon information and belief, HIDTA law enforcement member agencies, including DEA, share information about ongoing investigations; specifically including geo-location information about Mr. Parks utilizing Hemisphere prior to the November 30, 2017 vehicle stop.

64. Trooper Fuller was assigned to an interdiction detail and denied having advance information about the defendants or their vehicle. He said he pulled out from his stationary position on the highway because Mr. Parks' car was traveling slightly below the speed limit, although not creating a hazard for other cars. The officer, who was white, followed the car, whose three occupants were black, for 9 miles without observing a traffic violation.

65. Despite having seen no violations, he radioed ahead to another interdiction officer, Agent Brett Spivey, and provided a description of the vehicle. Agent Spivey eventually pulled the vehicle over.

66. Upon information and belief, HIDTA provided information to the interdiction officers about vehicles which should be targeted for interdiction based on suspicion they were transporting contraband or fit a particular profile.

67.     Mr. Parks' FOIA request seeks to obtain information requested from or transmitted by either DEA, Tennessee interdiction or other law enforcement officers to/from HIDTA (which facilitates the use of Hemisphere) regarding Mr. Parks prior to his arrest.

## *DEA's DETERMINATION LETTER MISCONSTRUES THE APPLICABILITY OF CITED EXEMPTIONS TO DISCLOSURE*

68.     DEA denied plaintiff's request to provide records, relying on statutory exemptions to FOIA disclosures.

69.     However, none of the cited statutory exemptions is properly applied and therefore the defendant has failed to comply with its disclosure obligations under FOIA.

## *REQUESTED RELIEF*

Release of the DEA's records would serve FOIA's function of opening agency action to public scrutiny. Wherefore, plaintiff prays that this Court:

70.     Order defendant to conduct an adequate search for any and all responsive records to plaintiff's request and demonstrate that it employed search methods likely to lead to the discovery of records responsive to the request;

71.     Order defendant to produce, by a date certain, any and all non-exempt records responsive to plaintiff's request and a Vaughn index of any responsive records withheld under claim of exemption;

72.     Order Defendant to comply with segregability analysis;

73.     Enjoin defendant from continuing to withhold any and all non-exempt records responsive to plaintiff's request;

74.    Grant plaintiff an award of reasonable attorney fees and other litigation costs reasonably incurred in this action pursuant to 5 USC §552(a)(4)(E)(i); and

75.    Grant plaintiff such other relief as the Court may deem just and proper.


Dated: October 22, 2024
          Orchard Park, New York


                                        Respectfully submitted,


                                        */s/ Cheryl Meyers Buth*
                                        Cheryl Meyers Buth, Esq.
                                        MEYERS BUTH LAW GROUP pllc
                                        *Attorneys for Defendant LAVON PARKS*
                                        21 Princeton Place, Suite 105
                                        Orchard Park, New York 14127
                                        (716) 508-8598
                                        cmbuth@mblg.us

# EXHIBIT A



# MEYERS BUTH
LAW GROUP PLLC

**Cheryl Meyers Buth**
Attorney/Member
cmbuth@mblg.us

**Laurie A. Baker**
Attorney/Member
labaker@mblg.us

July 11, 2024

**_Sent Via Public Access Link (PAL)_**

Drug Enforcement Administration
Freedom of Information and Privacy Act Unit
Attn: Intake Sub-Unit
8701 Morrissette Drive
Springfield, VA 22152

> **RE:   United States v. Parks**
> **19-cr-87 (WDNY)**

Dear Sir/Madam:

Our office represents Lavon Parks in a matter in the United States District Court for the Western District of New York.  Pursuant to the Federal Freedom of Information Act, 5 U.S.C. §552, we request that the following be provided within 20 days (§552(6)(A)(i)).

1.    Any and all requests for information about Lavon Parks (DOB: 9/24/90) which were made to DAS, Hemisphere, or any HIDTA including a copy of any written or digital request and response; including, but not limited to, the source of the request, date, content of request, and the person or position to which it was directed, and any electronic trail from receipt to response.

We would request, if possible, the above referenced materials be provided electronically to us at jdciccarella@mblg.us.

If this request is denied, please provide written justification for such denial with reference to specific statutory exemptions you claim apply.

Sincerely,

CHERYL MEYERS BUTH

CMB/jdc

# EXHIBIT B

**Subject:** RE: Request No. 24-00625-P (re: Lavon Parks)
**Date:** Wednesday, August 28, 2024 at 2:22:15 PM Eastern Daylight Time
**From:** DEA.FOIA <DEA.FOIA@dea.gov>
**To:** Jennifer D. Ciccarella <jdciccarella@mblg.us>
**Attachments:** image001.png

Received!

Thanks,
Deshelia

---

**From:** Jennifer D. Ciccarella <jdciccarella@mblg.us>
**Sent:** Wednesday, August 28, 2024 1:38 PM
**To:** Wallace, Desheila S. <Desheila.S.Wallace@dea.gov>; DEA.FOIA <DEA.FOIA@dea.gov>
**Subject:** [EXTERNAL] Request No. 24-00625-P (re: Lavon Parks)

Good morning,

I have attached a completed DOJ-361 form which was required for our request #24-00625-P that was
entered into the portal on July 11, 2024. I was unable to upload it to the portal.  I have included the
request number at the top of the document as well.

Thank you,
Jennifer Ciccarella



Jennifer D. Ciccarella
*Paralegal*
21 Princeton Place, Suite 105
Orchard Park, New York 14127
Phone: 716-508-8598

# EXHIBIT C



**U.S. Department of Justice**
Drug Enforcement Administration
FOIA and Privacy Act Unit
8701 Morrissette Drive
Springfield, VA  22152

September 6, 2024

Case Number: 24-00625-P

Subject: Parks, Lavon

Cheryl Meyers Buth
*Sent via e-mail:* jdciccarella@mblg.us

Dear Cheryl Meyers Buth:

    This letter responds to your Freedom of Information Act/Privacy Act (FOIA/PA) request dated July 11, 2024, addressed to the Drug Enforcement Administration (DEA), FOIA/PA Unit, seeking access to information regarding the above subject.

    A determination has been made to deny your request pursuant to subsections of the FOIA, 5 U.S.C. § 552, as referenced at the end of this letter.  An enclosure with this letter explains these exemptions in more detail.  Please be advised that for each of the exemptions cited, it is reasonably foreseeable that disclosure of the information withheld would harm the interests protected by these exemptions.

    The rules and regulations of the DEA applicable to FOIA/PA requests are contained in the Code of Federal Regulations, Title 28, Part 16, as amended.  They are published in the Federal Register available to the public (see https://www.ecfr.gov/current/title-28/chapter-I/part-16).

    For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  *See* 5 U.S.C. § 552(c).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

    You may contact our FOIA Public Liaison at (571) 776-2300 for any further assistance and to discuss any aspect of your request.  Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at 1-877-684-6448; or facsimile at (202) 741-5769.

Case Number: 24-00625-P                                                   Page 2

  If you are not satisfied with DEA's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website:  https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically transmitted within 90 days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  If possible, please provide a copy of your original request and this response letter with your appeal.

  If you have any questions regarding this letter, you may contact our Requester Service Center at (571) 776-2300.

      Sincerely,

      AMBER PORTER
      Digitally signed by AMBER PORTER

      Amber Porter, Section Chief
      FOIA & Information Law Section
      Office of Chief Counsel
      Drug Enforcement Administration

Case Number: 24-00625-P                                                                                    Page 3

**APPLICABLE SECTIONS OF THE FREEDOM OF INFORMATION AND/OR PRIVACY ACT:**

| **Freedom of Information Act** | | | **Privacy Act** | |
|:---:|:---:|:---:|:---:|:---:|
| **5 U.S.C. § 552** | | | **5 U.S.C. § 552a** | |
| ( ) (b)(1) | ( ) (b)(5) | (X) (b)(7)(C) | ( ) (d)(5) | ( ) (k)(2) |
| ( ) (b)(2) | (X) (b)(6) | ( ) (b)(7)(D) | (X) (j)(2) | ( ) (k)(5) |
| ( ) (b)(3) | (X) (b)(7)(A) | (X) (b)(7)(E) | ( ) (k)(1) | ( ) (k)(6) |
| ( ) (b)(4) | ( ) (b)(7)(B) | (X) (b)(7)(F) | | |

Enclosures

## FOIA EXEMPTIONS
### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

**(b)(1):** Information that is classified to protect national security.

**(b)(2):** Information related solely to the internal personnel rules and practices of an agency.

**(b)(3):** Information that is prohibited from disclosure by another federal law.

**(b)(4):** Trade secrets or commercial or financial information that is confidential or privileged.

**(b)(5):** Privileged communications within or between agencies, including those protected by the:
(1) Deliberative Process Privilege (provided the records were created less than 25 years before the date on which they were requested); (2) Attorney-Work Product Privilege; or (3) Attorney-Client Privilege.

**(b)(6):** Information that, if disclosed, would invade another individual's personal privacy.

**(b)(7):** Information compiled for law enforcement purposes that: 7(A) Could reasonably be expected to interfere with enforcement proceedings; 7(B) Would deprive a person of a right to a fair trial or an impartial adjudication; 7(C) Could reasonably be expected to constitute an unwarranted invasion of personal privacy; 7(D) Could reasonably be expected to disclose the identity of a confidential source; 7(E) Would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or 7(F) Could reasonably be expected to endanger the life or physical safety of any individual.

**(b)(8):** Information that concerns the supervision of financial institutions.

**(b)(9):** Geological information on wells.


## PRIVACY ACT EXEMPTIONS
### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

**(d)(5):** Information compiled in reasonable anticipation of a civil action proceeding.

**(j)(2):** Material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or to apprehend criminals.

**(k)(1):** Information that is currently and properly classified pursuant to an executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods.

**(k)(2):** Investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence.

**(k)(3):** Material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056.

**(k)(4):** Required by statute to be maintained and used solely as statistical records.

**(k)(5):** Investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence.

**(k)(6):** Testing or examination material used to determine individual qualifications for appointment or promotion in federal government service, the release of which would compromise the testing or examination process.

**(k)(7):** Material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

# EXHIBIT D



**MEYERS BUTH**
LAW GROUP PLLC

Cheryl Meyers Buth
Attorney/Member
cmbuth@mblg.us

Laurie A. Baker
Attorney/Member
labaker@mblg.us

September 12, 2024

Amber Porter, Section Chief
FOIA & Information Law Section
Office of Chief Counsel
Drug Enforcement Administration
8701 Morrissette Drive
Springfield, VA 22152

RE:    **Case Number:  24-00625-P**

Dear Ms. Porter:

Please be advised we are appealing your final determination letter which we received on September 6, 2024 (see attached FOIA request and determination letter)).

You withheld the requested records but 1) failed to demonstrate that you made an adequate search and 2) inappropriately and illegally applied the exemptions under the Freedom of Information Act.

For your convenience we have attached form DOJ-361 indicating our client's consent, previously provided to you on August 28, 2024.

We have diaried this ahead for 20 business days (to October 10, 2024). In the event we do not receive a response, or you deny this appeal, we will seek judicial review at that time.

Should you wish to discuss our request for records further we invite you to contact us as soon as possible.

Sincerely,

CHERYL MEYERS BUTH

CMB/jdc
Enc.

21 Princeton Place • Orchard Park, NY 14127 • o. 716.508.8598 • www.meyersbuthlaw.group



**U.S. Department of Justice**
Drug Enforcement Administration
FOIA and Privacy Act Unit
8701 Morrissette Drive
Springfield, VA 22152

September 6, 2024

Case Number: 24-00625-P

Subject: Parks, Lavon

Cheryl Meyers Buth
*Sent via e-mail:* jdciccarella@mblg.us

Dear Cheryl Meyers Buth:

This letter responds to your Freedom of Information Act/Privacy Act (FOIA/PA) request dated July 11, 2024, addressed to the Drug Enforcement Administration (DEA), FOIA/PA Unit, seeking access to information regarding the above subject.

A determination has been made to deny your request pursuant to subsections of the FOIA, 5 U.S.C. § 552, as referenced at the end of this letter. An enclosure with this letter explains these exemptions in more detail. Please be advised that for each of the exemptions cited, it is reasonably foreseeable that disclosure of the information withheld would harm the interests protected by these exemptions.

The rules and regulations of the DEA applicable to FOIA/PA requests are contained in the Code of Federal Regulations, Title 28, Part 16, as amended. They are published in the Federal Register available to the public (see https://www.ecfr.gov/current/title-28/chapter-I/part-16).

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. *See* 5 U.S.C. § 552(c). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may contact our FOIA Public Liaison at (571) 776-2300 for any further assistance and to discuss any aspect of your request. Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, Maryland 20740-6001; e-mail at ogis@nara.gov; telephone at (202) 741-5770; toll free at 1-877-684-6448; or facsimile at (202) 741-5769.

Case Number: 24-00625-P                                                    Page 2

     If you are not satisfied with DEA's determination in response to this request, you may
administratively appeal by writing to the Director, Office of Information Policy (OIP), United
States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may
submit an appeal through OIP's FOIA STAR portal by creating an account following the
instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-
appeal. Your appeal must be postmarked or electronically transmitted within 90 days of the date
of my response to your request. If you submit your appeal by mail, both the letter and the
envelope should be clearly marked "Freedom of Information Act Appeal." If possible, please
provide a copy of your original request and this response letter with your appeal.

     If you have any questions regarding this letter, you may contact our Requester Service
Center at (571) 776-2300.

                              Sincerely,

                              AMBER   Digitally signed
                                      by AMBER
                              PORTER   PORTER

                              Amber Porter, Section Chief
                              FOIA & Information Law Section
                              Office of Chief Counsel
                              Drug Enforcement Administration

Case Number: 24-00625-P                                          Page 3

**APPLICABLE SECTIONS OF THE FREEDOM OF INFORMATION AND/OR PRIVACY ACT:**

|  | **Freedom of Information Act** 5 U.S.C. § 552 |  |  | **Privacy Act** 5 U.S.C. § 552a |  |
|---|---|---|---|---|---|
| ( ) (b)(1) | ( ) (b)(5) | (X) (b)(7)(C) |  | ( ) (d)(5) | ( ) (k)(2) |
| ( ) (b)(2) | (X) (b)(6) | ( ) (b)(7)(D) |  | (X) (j)(2) | ( ) (k)(5) |
| ( ) (b)(3) | (X) (b)(7)(A) | (X) (b)(7)(E) |  | ( ) (k)(1) | ( ) (k)(6) |
| ( ) (b)(4) | ( ) (b)(7)(B) | (X) (b)(7)(F) |  |  |  |

Enclosures

## FOIA EXEMPTIONS
## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

**(b)(1):** Information that is classified to protect national security.

**(b)(2):** Information related solely to the internal personnel rules and practices of an agency.

**(b)(3):** Information that is prohibited from disclosure by another federal law.

**(b)(4):** Trade secrets or commercial or financial information that is confidential or privileged.

**(b)(5):** Privileged communications within or between agencies, including those protected by the:
(1) Deliberative Process Privilege (provided the records were created less than 25 years before the date on which they were requested); (2) Attorney-Work Product Privilege; or (3) Attorney-Client Privilege.

**(b)(6):** Information that, if disclosed, would invade another individual's personal privacy.

**(b)(7):** Information compiled for law enforcement purposes that: 7(A) Could reasonably be expected to interfere with enforcement proceedings; 7(B) Would deprive a person of a right to a fair trial or an impartial adjudication; 7(C) Could reasonably be expected to constitute an unwarranted invasion of personal privacy; 7(D) Could reasonably be expected to disclose the identity of a confidential source; 7(E) Would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or 7(F) Could reasonably be expected to endanger the life or physical safety of any individual.

**(b)(8):** Information that concerns the supervision of financial institutions.

**(b)(9):** Geological information on wells.

## PRIVACY ACT EXEMPTIONS
## SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

**(d)(5):** Information compiled in reasonable anticipation of a civil action proceeding.

**(j)(2):** Material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or to apprehend criminals.

**(k)(1):** Information that is currently and properly classified pursuant to an executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods.

**(k)(2):** Investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence.

**(k)(3):** Material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056.

**(k)(4):** Required by statute to be maintained and used solely as statistical records.

**(k)(5):** Investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence.

**(k)(6):** Testing or examination material used to determine individual qualifications for appointment or promotion in federal government service, the release of which would compromise the testing or examination process.

**(k)(7):** Material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.



**MEYERS BUTH**
LAW GROUP PLLC

Cheryl Meyers Buth
Attorney/Member
cmbuth@mblg.us

Laurie A. Baker
Attorney/Member
labaker@mblg.us

July 11, 2024

*Sent Via Public Access Link (PAL)*

Drug Enforcement Administration
Freedom of Information and Privacy Act Unit
Attn: Intake Sub-Unit
8701 Morrissette Drive
Springfield, VA 22152

    RE: **United States v. Parks**
       **19-cr-87 (WDNY)**

Dear Sir/Madam:

   Our office represents Lavon Parks in a matter in the United States District Court for the Western District of New York. Pursuant to the Federal Freedom of Information Act, 5 U.S.C. §552, we request that the following be provided within 20 days (§552(6)(A)(i)).

   1. Any and all requests for information about Lavon Parks (DOB: 9/24/90) which were made to DAS, Hemisphere, or any HIDTA including a copy of any written or digital request and response; including, but not limited to, the source of the request, date, content of request, and the person or position to which it was directed, and any electronic trail from receipt to response.

   We would request, if possible, the above referenced materials be provided electronically to us at jdciccarella@mblg.us.

   If this request is denied, please provide written justification for such denial with reference to specific statutory exemptions you claim apply.

          Sincerely,

          CHERYL MEYERS BUTH

CMB/jdc

**REQUEST NO. 24-00625-P**    **ATTENTION: DESHELIA WALLACE**

U.S Department of Justice    **Certification of Identity**



FORM APPROVED OMB NO. 1103-0016
EXPIRES 05/31/2023

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Requests will not be processed if this information is not furnished. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] _____ Parks, Lavon D. _____

Citizenship Status [2] ___ U.S. Citizen ___      Social Security Number [3] ___ ▮▮▮ ___

Current Address ___ Northeast Ohio Correctional Facility, 2240 Hubbard Road, Youngstown, OH 44505 ___

Date of Birth ___ ▮▮▮ ___      Place of Birth ___ Niagara Falls NY 14301 ___

**OPTIONAL: Authorization to Release Information to Another Person**

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

Cheryl Meyers Buth, Esq., Meyers Buth Law Group, pllc, 21 Princeton Place, Suite 105, Orchard Park, NY 14127

**Print or Type Name**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] ___ Lavon D Parks ___      Date ___ 8-23-24 ___

[1] Name of individual who is the subject of the record(s) sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.

FORM DOJ-361

# EXHIBIT E



**U.S. Department of Justice**
Office of Information Policy
*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

September 12, 2024

jdciccarella@mblg.us

Dear Cheryl Meyers Buth:

This is to advise you that the Office of Information Policy of the U.S. Department of Justice received your administrative appeal from the action of the Drug Enforcement Administration regarding Request No. 24-00625-P on 09/12/2024.

In an attempt to afford each appellant equal and impartial treatment, OIP has adopted a general practice of assigning appeals in the approximate order of receipt. Your appeal has been assigned number A-2024-02591. Please refer to this number in any future communication with OIP regarding this matter. Please note that if you provided an email address or another electronic means of communication with your request or appeal, this Office may respond to your appeal electronically even if you submitted your appeal to this Office via regular U.S. Mail.

We will notify you of the decision on your appeal as soon as we can. If you have any questions about the status of your appeal, you may contact me at 202-514-3642. If you have submitted your appeal through Freedom of Information Act STAR, you may also check the status of your appeal by logging into your account.

Sincerely,

Priscilla Jones

Priscilla Jones
Supervisory Administrative Specialist

# EXHIBIT F



# High Intensity Drug Trafficking Areas (HIDTA) Program Policy and Budget Guidance

Office of National Drug Control Policy

September 9, 2021

**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# TABLE OF CONTENTS

1) Purpose and Authority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2) Program Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3) ONDCP Oversight. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4) HIDTA Directors Committee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

5) HIDTA Executive Boards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

6) HIDTA Initiatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

7) Financial Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

8) Property Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

9) Information Technology (IT) Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

10) Performance Management. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

11) Appendices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .68



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# 1.0 PURPOSE AND AUTHORITY

This document provides policy and budget guidance for the High Intensity Drug Trafficking Areas (HIDTA) Program, administered by the Office of National Drug Control Policy (ONDCP). This document supersedes all previous versions of the HIDTA Program Policy and Budget Guidance.[1] This document is only intended to provide additional context and background, but does not supersede the OMB Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards at 2 C.F.R. Part 200 issued August 13, 2020, or any future revision(s) released hereafter.

## 1.1 Scope

The provisions in this document apply to all designated HIDTAs and HIDTA participants.

## 1.2 Authority

This HIDTA Program Policy and Budget Guidance (PPBG) is issued pursuant to authority granted the Director of ONDCP by the SUPPORT for Patients and Communities Act (Pub. L. No. 115-271), 21 U.S.C. §§ 1701 et seq., which gives the Director of ONDCP the authority to coordinate funds and management activities in the HIDTA Program.

## 1.3 Revisions

The Director of ONDCP, or the Director's designated representative, is the sole authority for amending this document. Revisions to this document and its contents may be made at the discretion of the Director of ONDCP, in accordance with the revision process established by ONDCP and the HIDTA Directors Committee (HDC). For a detailed description of this process, see Section 3.3.

## 1.4 Additional Requirements

A HIDTA Executive Board may establish additional requirements or place greater restrictions on activities within its area of responsibility as long as the requirements contained in this guidance are not reduced or otherwise altered.

## 1.5 Non-Compliance

Failure to comply with Federal statutes, regulations, the terms and conditions of the Federal award, or the requirements established in this document may result in a reduction or delay in funding, or other action as deemed appropriate by the Director of ONDCP.

## 1.6 Effective Date

The effective date of this document is September 9, 2021.

---

[1] Unless specifically noted otherwise, all references to "HIDTAs" include the designated HIDTAs.



▬▬ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 2.0 PROGRAM OVERVIEW

The HIDTA Program is established in ONDCP under the authority of SUPPORT for Patients and Communities Act (Pub. L. No. 115-271), 21 U.S.C. §§ 1701 et seq. The HIDTA Program provides funding resources to joint initiatives of Federal, state, local, and tribal agencies in each HIDTA designated area to carry out activities that address the specific drug threats of those areas.

The purpose of the HIDTA Program is to reduce drug trafficking and drug production in the United States by:

- Facilitating cooperation among Federal, state, local, and tribal law enforcement agencies, sharing of information, and implementing coordinated enforcement activities;

- Enhancing law enforcement intelligence sharing among Federal, state, local, and tribal law enforcement agencies;

- Providing reliable law enforcement intelligence to law enforcement agencies needed to design effective enforcement strategies and operations; and

- Supporting coordinated law enforcement strategies that maximize the use of available resources to reduce the supply of illegal drugs in designated areas and in the United States as a whole.

### 2.1 Mission and Goals

The mission of the HIDTA Program is to disrupt the market for illegal drugs in the United States in support of the *National Drug Control Strategy* by assisting Federal, state, local, and tribal law enforcement entities participating in the HIDTA Program to dismantle and disrupt drug trafficking organizations, with particular emphasis on drug trafficking regions that have harmful effects on other parts of the United States. The HIDTA Program goals are as follows:

- Disrupt the market for illegal drugs by dismantling or disrupting drug trafficking and money laundering organizations; and

- Improve the efficiency and effectiveness of HIDTA initiatives.

As the grant oversight authority, ONDCP is responsible for ensuring that HIDTA funds are being allocated to achieve the goals of the HIDTA Program. Individual HIDTAs may establish additional goals and objectives to address drug threats within the designated areas. However, all HIDTAs are accountable for working to achieve the shared goals of the HIDTA Program.



OFFICE OF NATIONAL DRUG CONTROL POLICY

## 2.2 HIDTA Designation Process

The Director of ONDCP may designate any specified area of the United States as a HIDTA, as described in Appendix C. In considering whether to designate an area as a HIDTA, the Director of ONDCP shall consider, in addition to such other criteria deemed appropriate, the extent to which the following four criteria, as defined by the SUPPORT for Patients and Communities Act (Pub. L. No. 115-271), 21 U.S.C. §§ 1701 et seq., have been met:

1. The area is a significant center of illegal drug production, manufacturing, importation, or distribution;

2. State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;

3. Drug-related activities in the area are having a significant harmful impact in the area, and in other areas of the country; and

4. 4. A significant increase in allocation of Federal resources is necessary to respond adequately to drug-related activities in the area.

Petitions for designation must conform to the provisions outlined in the Federal Register on August 16, 2007, establishing the requirements and procedures for submitting a petition to designate an area as a HIDTA.

Should an Executive Board determine that a designated area (county) no longer meets the statutory requirements for HIDTA designation, per its annual review of HIDTA designated areas (see section 5.12), it shall ensure that a petition is submitted to ONDCP requesting that said designation be removed from the respective area. The petition should contain adequate information to support the removal of designation.

## 2.3 Program Management

At the national level, ONDCP provides neutral and unbiased policy direction, technical assistance, and grant administration to the HIDTA Program as the grant oversight authority. ONDCP ensures the overall program policy and budget guidance is consistent with the *National Drug Control Strategy*; the program operates in an effective and efficient manner; and all HIDTA participants are compliant with legal requirements and program policy.

At the local level, governance is conducted by Executive Boards composed primarily of Federal, state, local, and tribal law enforcement leaders. A central feature of the HIDTA Program is the discretion granted to these Executive Boards to design and implement initiatives that confront the specific drug trafficking threats found in their respective regions. Specifically, each HIDTA Executive Board assesses the drug trafficking threat in its defined area, develops a strategy to address that threat, designs initiatives to implement the strategy, and proposes funding needed to carry out the initiatives. This level of local control and discretion has ensured that each HIDTA Executive Board



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

can tailor its strategy and initiatives closely to local threats and can respond quickly to changes in those threats as they are identified.

## 2.4 Program Features

A HIDTA is a coalition of Federal, state, local, and tribal law enforcement agencies from a specific geographic area that have joined together to apply for and to receive Federal grants to address specific drug threats. A HIDTA does not possess its own law enforcement authority.  The Federal, state, local, and tribal law enforcement agencies that form the HIDTA each have their own respective law enforcement authority under Federal, state, local, and tribal law. When Federal officers and local police jointly conduct a criminal investigation funded by the HIDTA, they are acting under the law enforcement authority vested in each of them by their specific agencies.

A HIDTA is not an agency.  Likewise, a HIDTA is not an agent of ONDCP, the Executive Office of the President (EOP), or any other Federal, state, local, or tribal agency.  Each HIDTA participant has a responsibility to avoid actions that imply or otherwise suggest that he/she is an agent of, or is otherwise acting on behalf of ONDCP or the EOP.

The HIDTA Program is regionally-based, locally managed, and tied to a national mission. HIDTA program funds enhance and promote regional strategies. The HIDTA Program serves as a coordination umbrella for Federal, state, local, and tribal law enforcement agencies in designated areas, enabling them to combine and leverage resources and capabilities to address drug trafficking and drug-related crime. Individual HIDTAs provide resources, facilitate and enhance coordination of participating agencies' drug control efforts, and improve communication between these agencies.

Under the control and direction of the HIDTA Executive Boards, participating agencies work together to implement the Boards' strategies.  Although they may have different missions, participating agencies share the same objective of reducing drug trafficking and its harmful consequences.  As each agency adds its expertise, new ideas and innovative approaches create opportunities for new inroads in counterdrug activities.

The interaction of Federal, state, local, and tribal representatives on the Executive Boards is continued at the operational level. HIDTA-funded enforcement initiatives are collocated and jointly-staffed law enforcement task forces led by a local, state, tribal, or Federal agency. These multi-agency initiatives carry out the investigative, interdiction, and prosecution activities to implement the Board's strategy in their region.

The HIDTA Program emphasizes the sharing of intelligence and information. It is viewed with such importance that a standing HIDTA Intelligence Committee of selected Executive Directors works to develop and support intelligence and information sharing policies and practices for the entire Program. Each Executive Board must ensure the development of at least one primary intelligence initiative or investigative support center (ISC). The ISC is designed to develop intelligence, share information, and provide analytical and technical support to the enforcement initiatives. Ancillary intelligence initiatives, where applicable, may be used to augment the ISC's work. The ISC is staffed by representatives of participating agencies who have direct onsite access to their agencies' information databases.  The HIDTA Program's emphasis on information sharing goes beyond an

**6**



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

individual HIDTA's initiatives. HIDTAs are required to share their threat assessments, criminal intelligence products, and deconfliction processes with other HIDTAs and appropriate partner agencies.

HIDTA Program funds are also invested in training and related activities. Training makes a significant contribution to drug law enforcement, treatment, and prevention initiatives, and it is made available not only to agencies participating in the HIDTA Program, but also to all law enforcement agencies in the respective regions.

In addition, HIDTAs support drug treatment and prevention activities to the extent authorized by statute. These activities, while using a relatively small portion of HIDTA funds, constitute a significant part of those individual HIDTAs' strategies. ONDCP is currently expanding the prevention aspect of the HIDTA Program. Each Executive Board is encouraged to develop a prevention initiative that will increase collaboration between HIDTA law enforcement initiatives and the demand reduction and/or public health community. All HIDTAs are encouraged to engage community-based coalitions (e.g., Drug Free Communities), prevention programs, and/or public health stakeholders to ensure evidence-based or evidence-informed prevention activities, strategies, and/or programming are implemented in the community.

The HIDTA Program emphasizes performance and accountability. Each Executive Board's strategy is submitted to ONDCP in the form of an Annual Budget Request (ABR), and includes both standardized and individualized performance measures in the initiative proposals.[2] ONDCP will annually assess performance against targets established at the beginning of each program year using these measures as reported through the HIDTA Performance Management Process (PMP) system.  Accountability is ensured through internal reviews, reviews by ONDCP, and external performance and financial audits.[3]  Results of these assessments are considered when determining future funding levels.

---

[2] Refer to section 3.2.1 for a detailed description of the ABR.
[3] Refer to section 3.2 for additional information on the HIDTA Program's accountability framework.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 3.0 ONDCP OVERSIGHT

The ONDCP is a component of the Executive Office of the President, created by the Anti-Drug Abuse Act of 1988. The ONDCP Director is the principal advisor to the President on drug control issues. ONDCP coordinates the drug control activities and related funding of 16 Federal Departments and Agencies, and produces the *National Drug Control Strategy*, which outlines Administration efforts for the Nation to reduce illicit drug use, manufacturing and trafficking; drug-related crime and violence; and drug-related health consequences. ONDCP also leads the development of the consolidated Federal drug control budget.

### 3.1 National HIDTA Program Office

As the grant oversight authority for the HIDTA Program ONDCP is responsible for ensuring the proper administration of the HIDTA Program, and the accountable use of Federal grant funds. Within ONDCP, the National HIDTA Program Office (NHPO) oversees and administers the HIDTA Program. The NHPO is led by the National HIDTA Director.[4] NHPO's responsibilities include, but are not limited to:

- Setting program priorities;
- Issuing program and policy guidance;
- Allocating funds to the HIDTA grantees and administering the disbursement of grant funds;
- Publishing regulations;
- Developing and applying performance standards;
- Reviewing annual budget requests submitted by Executive Boards;
- Reviewing petitions from interested law enforcement agencies for designation as a HIDTA area, and developing recommendations for the Director of ONDCP for designating areas as HIDTAs and removing HIDTA designation from areas that no longer meet statutory requirements;
- Conducting program reviews and contracting with external agencies for required audits;
- Coordinating with the HDC regarding oversight of the National HIDTA Assistance Center (NHAC); and
- Determining compliance with HIDTA Program requirements.

Various components within ONDCP coordinate directly with the NHPO to ensure that the functions above are performed in accordance with Federal laws and regulations, to include the Office of General Counsel (OGC), the Office of Legislative Affairs (OLA), and the Office of Performance and Budget, Internal Budget Division (IBD).[5]

### 3.2 Program Accountability

ONDCP monitors and evaluates the success of individual HIDTAs to ensure the accountability of the HIDTA Program. The accountability framework has evolved to include three primary elements: the

---

[4] All mentions of ONDCP throughout this document refer to NHPO, unless otherwise stated.
[5] The IBD was formerly known as the Financial Managers Office (FMO).



OFFICE OF NATIONAL DRUG CONTROL POLICY

annual reporting processes, risk-based audits conducted by independent auditors, and periodic program reviews.

ONDCP staff ensure that oversight procedures and accountability functions are aligned with applicable grant laws, and that audit functions are consistent with regulations and established guidelines governing Federal grant programs, including the Generally Accepted Government Auditing Standards (GAGAS). By consistently applying standardized guidance within the framework, ONDCP is able to assess progress towards achieving the HIDTA Program's goals.

### 3.2.1 Annual Budget Request

The HIDTA Program's authorizing statute requires HIDTA Executive Boards to provide an annual budget request for funding to address drug trafficking threats in their respective designated areas. Each HIDTA submits an ABR that includes an annual threat assessment and initiative description and budget proposals (IDBPs).[6] ABRs must be submitted to ONDCP no later than June 15 of each year.[7]

The annual threat assessment is intended to guide a HIDTA's Executive Board as it develops a strategy for the coming calendar year. Threat assessments must be developed in accordance with the annual reporting requirements (ARRs),[8] and submitted to ONDCP for review prior to publication. The AARs are updated at the beginning of each fiscal year (FY), and can be accessed through the HIDTA Resource Management System (HRMS).[9]

Based on the threat assessment, Executive Boards determine the initiatives that will be funded to address the threat. Descriptions and budget requests for each initiative are submitted to ONDCP through the PMP system in the form of IDBPs.[10] The IDBPs—one for each initiative—contain detailed information about each initiative, including performance targets and prior-year outputs, the budget request, a compliance checklist, waivers, and verification of methamphetamine laboratory reporting as required by statute. Each IDBP also associates the initiative with the specific drug trafficking threat(s) it is designed to address.

ONDCP reviews each IDBP, and may request additional documentation, clarification on policy waivers, or adjustments to expected performance targets. Prior to granting final approval, HIDTAs are given the opportunity to respond to questions or comments from ONDCP, or to provide additional information that clarifies performance outputs and reported data.

Following final approval of the ABR by the National HIDTA Director, ONDCP issues formal notification through the PMP system authorizing each HIDTA to obligate the grant funds through the

---

[6] The specific requirements pertaining to the preparation and submission of the ABR, as well as applicable deadlines, can be referenced in the AARs issued by ONDCP at the beginning of each FY, and accessible on HRMS (see URL below).

[7] In years when June 15 falls on a weekend, the ABR will be due on the following Monday.

[8] ARRs are issued annually by ONDCP, and posted on HRMS.

[9] HRMS can be accessed at: http://portal.hidta.net

[10] Additional requirements pertaining to the preparation and submission of IDBPs can be found in the PMP User Guide and in the AARs posted on HRMS.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

Financial Management System (FMS). IDBPs may be updated throughout the FY to reflect changes in the initiative structure, or for out-of-cycle waiver requests.

### 3.2.2 Desk, Financial, and Performance Audits

Each year, ONDCP oversees a series of desk, financial, and performance audits of individual HIDTAs. These audits are conducted by independent auditors who follow protocols and standards outlined in the GAGAS.

The desk audits are conducted before any payment is made to a grantee to ensure that all payments to grantees are for actual costs incurred. The audits must be completed before any payment is made to a grantee. These steps are in place to minimize the likelihood of improper payments and are supported by receipts corroborating the claim. In addition, this helps to ensure that all payments are covered within the spending plan as established in the grant agreements. The accuracy and propriety of the requests are reviewed by ONDCP's desk audit contractor.

The financial audit determinations are risk-based and are conducted at the fiduciary level. Following initial document reviews, financial auditors spend approximately two weeks onsite examining financial statements and assessing internal controls. The audit findings and recommendations for each HIDTA are delivered to ONDCP and communicated to the HIDTA and its fiduciaries.[11]

Performance audits focus on three aspects of the HIDTA's performance reporting: the reliability of PMP data, the quality of internal controls, and compliance with the PPBG and PMP User Guide. On-site reviews are conducted for 3 to 5 days, and culminate in a final report submitted to ONDCP and the HIDTA, followed by a management letter containing recommendations to enhance the quality and consistency of the HIDTA's performance management.[12]

Following the financial and performance audits, ONDCP personnel work directly with each HIDTA to ensure that any deficiencies are addressed, and that recommended corrective actions are implemented in a timely manner. Program-level observations are shared with the HIDTA Directors' Committee (and subcommittees, as appropriate) which advises the HIDTA community and ONDCP on necessary improvements to performance reporting systems and requirements.

### 3.2.3 HIDTA Program Reviews

ONDCP conducts periodic program reviews of individual HIDTAs to ensure compliance with HIDTA grant requirements and other relevant guidance at the initiative level to identify strengths and weaknesses across the HIDTA Program. ONDCP develops recommendations that are delivered to HIDTA Executive Boards in the form of final reports or corrective action plans.

ONDCP conducts two types of program reviews: standard reviews, and comprehensive reviews. Typically, standard program reviews follow the completion of both financial and performance audits, and are the most basic form of program review. These reviews are designed to ensure that the HIDTA has fully implemented audit recommendations or other corrective actions recommended by auditors or ONDCP, identify best practices, and recommend improvements to the HIDTA's

---

[11] For additional information on financial audits, refer to section 7.30.
[12] For additional information on performance audits, refer to section 10.9.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

Executive Board. Standard reviews may address other aspects of the HIDTA as deemed necessary by ONDCP, or determined in consultation with the Executive Director and/or the Executive Board.

ONDCP may conduct comprehensive reviews of a HIDTA when ordered by the Director of ONDCP or the National HIDTA Director.[13] These reviews may be disciplinary in nature, and are intended to address specific matters of non-compliance at the initiative level and/or potential misuses of grant funds. Comprehensive reviews may span several months and trigger additional financial and performance audits. These reviews typically culminate in required corrective actions delivered to the HIDTA's Executive Board, and may result in the reimbursement of grant funds from the HIDTA to ONDCP, a partial award, the complete withholding of future grant funds, and/or significant changes to the HIDTA's initiatives.

### 3.3 Revisions to the PPBG

The Director of ONDCP shall approve revisions to the PPBG as deemed necessary. The review and approval of proposed revisions shall be managed by the National HIDTA Director, in partnership with the HDC. The review process shall include the following steps:

1. Initial submission of proposed revisions by ONDCP to the HDC, or by the HDC to ONDCP
2. ONDCP drafts the revision(s), and disseminates to the Executive Directors through the HDC for a 30-day comment period
3. ONDCP will conduct a thorough legal review, and submit the final proposed revision(s) to the Director of ONDCP for approval and signature
4. An updated version of the PPBG, along with a memo describing the revisions, will be disseminated to the HIDTA community
5. Related grant guidance or other documentation will be updated and disseminated as deemed necessary

The current version of this document will be posted to HRMS, along with any supporting materials pertaining to the proper implementation of the grant requirements. Memoranda and other notifications of changes to the PPBG will be circulated to the HIDTA community by ONDCP, and posted to HRMS.

### 3.4 ONDCP Approval for Conferences

All HIDTAs and the National HIDTA Initiatives are required to seek pre-approval from ONDCP for conferences.[14]

### 3.5 Waivers

A HIDTA Executive Board may request that ONDCP waive requirements contained in this guidance. ONDCP will only consider waiver requests submitted by a HIDTA in the IDBP for the initiative requesting the waiver.  The waiver request must:

- Identify the policy requirement for which the waiver is requested;
- Explain why the policy requirement cannot be met;

---

[13] Comprehensive reviews also may be requested by an Executive Director or an Executive Board Chair.
[14] Refer to section 7.19 for conference proposal submission requirements.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- Describe the impact if the waiver is not granted; and
- Demonstrate that the Executive Board has approved the waiver request.

Waiver requests will be considered on a case-by-case basis.  ONDCP will grant waivers only in extenuating circumstances and for a limited duration, typically no greater than one calendar year. The granting of a waiver in one instance does not guarantee similar waivers will be granted in the future. Legal requirements will not be waived.



OFFICE OF NATIONAL DRUG CONTROL POLICY

## 4.0 HIDTA DIRECTORS COMMITTEE

The HDC consists of elected representatives from each of the six HDC regions. One of these elected representatives is selected to serve as the HDC Chair. The HDC is governed according to bylaws that are updated periodically and reviewed by ONDCP.  Both the HDC and its sub-committees (see section 4.2) are subject to the provisions of the bylaws.

### 4.1 HDC Functions

The HDC is responsible for each of the following:

- Serving as a forum for the Executive Directors to discuss programmatic aims, policies, operations, and other issues affecting and/or pertaining to the HIDTA Program.
- Providing a mechanism for Executive Directors to exchange information concerning HIDTA Program policies and budget guidance, reporting requirements, and day-to-day management concerns, and facilitating timely identification of issues affecting multiple HIDTAs and/or regions.
- Establishing standing and ad hoc sub-committees to examine topical areas of interest and specific issues requiring HDC resolution or implementation.
- Providing oversight of the NHAC.[15]
- Facilitating the sharing of information and open communication with ONDCP on all matters of mutual interest related to management of the HIDTA Program.
- Representing the HIDTA Program through service on interagency committees, boards, and other bodies at the request of ONDCP.

Other responsibilities and functions may be determined by the HDC on an ad-hoc basis to meet the needs of the HIDTA Program.

### 4.2 HDC Sub-committees

The HDC may, at its discretion, establish sub-committees to address topical and substantive matters in the interest of the HIDTA Program. These committees may be standing or ad-hoc, and advise the HDC and ONDCP on matters related to management and oversight of the HIDTA Program. Similarly, the HDC may directly oversee or establish committees and advisory bodies to oversee the National HIDTA Initiatives and programs.

HDC sub-committees may also, in coordination with special working groups or other advisory bodies, develop additional guidance documents such as handbooks, guidelines, standards, and checklists to assist HIDTA personnel in implementing the PPBG and adopting best practices. The HDC is required to submit such documentation to ONDCP for review and approval prior to the release or dissemination of such guidance to ensure alignment with the PPBG and other Federal regulations pertaining to grantees and the use of grant funds.

---

[15] The HDC provides oversight of the NHAC in coordination with ONDCP, which oversees the contractual obligations of the NHAC's Finance Unit.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

The HDC is required to notify ONDCP of any additions, removals, or changes to the sub-committees. ONDCP shall have representation on each of the sub-committees, and the National HIDTA Director shall be invited to participate in HDC meetings.

## 4.3 Oversight of the National HIDTA Assistance Center

The HDC, in coordination with ONDCP, provides oversight of the NHAC. The NHAC supports the National HIDTA Program by providing direct assistance to all HIDTAs. The NHAC also coordinates regional and national meetings and conferences and supports national coordination projects.

Additionally, the NHAC offers training (see Section 4.3.2 below) and multimedia support, maintains the HRMS platform for sharing information within the HIDTA Program, and the public-facing HIDTA Program website.[16] All HIDTAs are able to request multimedia services, which include graphics, video, mapping, and support. The NHAC also maintains FMS and the Clearance Management System (CMS).

### 4.3.1 National HIDTA Initiatives

The NHAC provides administrative support and oversight for the following national initiatives:

- The Domestic Highway Enforcement (DHE) program assists the HIDTAs with market disruption through a coordinated Nationwide Highway Enforcement Strategy;
- The National Emerging Threat Initiative (NETI) is a poly-drug national trends, intelligence, and best practices-sharing initiative that addresses all aspects of the illegal drug supply, including the diversion of legal drugs;
- The National Marijuana Initiative (NMI) is a law enforcement support initiative whose mission is to improve the capabilities of the regional HIDTA programs in carrying out the National Drug Control Strategy objectives of disrupting domestic trafficking and production of and reducing demand for marijuana and derivative products.

### 4.3.2 NHAC Training Responsibilities

Under the direction of ONDCP, the NHAC will serve as the central training information clearinghouse and coordination element for the HIDTA Program by:

- Developing and maintaining a catalog of training sources, and evaluating and recommending sources of training;
- Assisting training coordinators in coordinating and facilitating training, including assisting in contracting for training courses;
- Developing training courses in areas where they are not available or developing the course in-house if it would be more cost-effective than using other available training resources;
- Collecting two-month follow-up survey data for all persons attending HIDTA-funded training and entering that information into the PMP database; and
- Conducting training for the HIDTA Program, such as HIDTA management, financial management, and performance management.

---

[16] The HIDTA Program website can be accessed at http://www.hidtaprogram.org/



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

The NHAC will also be responsible for supporting ad-hoc training events at the direction of ONDCP or the HDC. These events may include orientation for new Executive Directors, or training to support the implementation of a new policy or grant requirement.[17]

### 4.3.3 The NHAC Executive Director

The HDC shall, in coordination with ONDCP, select and oversee the Executive Director of the NHAC.[18] The HDC will also work with the appropriate grantee to coordinate the hiring, compensation, and oversight of the Executive Director of the NHAC, as well as the NHAC's other management and staff.[19]

---

[17] Additional requirements pertaining to training initiatives can be found in section 6.6.
[18] The hiring and notification procedures for the Director of the NHAC are subject to the same notification requirements for all HIDTA Executive Directors as noted in section 5.6.
[19] Excludes contractual obligations subject to ONDCP oversight.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 5.0 HIDTA EXECUTIVE BOARDS

The ONDCP Reauthorization Act requires each area designated as a HIDTA to be governed by an Executive Board.[20] The Executive Board shall ensure the designation of a chair, vice chair, and any other committees or officers that the Executive Board determines are necessary. In addition to the requirements contained in this document, all HIDTA Executive Boards are responsible for providing direction and oversight to the HIDTA, managing funds, reviewing and approving all funding proposals in the ABR, and conducting periodic internal reviews. Executive Boards may further delineate responsibilities and functions in addition to those listed above, but that do not supersede or undermine the requirements contained herein.

### 5.1 Executive Board Representation and Voting Requirements

None of the funds obligated to a HIDTA grantee or Federal agency may be expended if the HIDTA Executive Board does not apportion an equal number of votes between representatives of participating Federal agencies and representatives of participating state, local, and tribal agencies. Where it is impractical for an equal number of representatives of Federal agencies and state, local, and tribal agencies to attend a meeting of an Executive Board in person, the Executive Board may use a system of proxy votes or weighted votes to achieve the voting balance required by this paragraph.  The system used by the Executive Board to meet this requirement (e.g., weighted votes or proxy votes) must be included in the written standard operating procedures (SOPs).

### 5.2 Executive Board Membership

With the exception of Federal, state, and local prosecutors, only those agencies with a staff member assigned full time in a HIDTA initiative may be a voting member of the Executive Board. Each agency's representative to the Executive Board shall be the local head of the participating agency or a permanently-designated, high-ranking official of the agency who has the authority to commit the agency's resources to HIDTA initiatives and to make decisions on behalf of his/her agency.

The Executive Director shall be a permanent non-voting member of the HIDTA's Executive Board.  In addition, Executive Boards may include representatives of non-participating agencies or associations as non-voting members of the Executive Board.

Each HIDTA Executive Board must ensure that its composition complies with the requirements of the ONDCP Reauthorization Act.  The certification must be transmitted to ONDCP and provide details regarding the composition of the Executive Board through the ABR.

### 5.3 Executive Board Chair and Vice Chair

Each HIDTA Executive Board must designate a chair and a vice chair and any other officers to the Executive Board that it determines are necessary.  A representative of a participating state, local, or tribal agency shall fill one position and a representative of a participating Federal agency shall hold the other.

---

[20] In the case of the NHAC, oversight is provided by the HDC in lieu of an Executive Board (see section 4.3.3).

16



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 5.3.1 Terms and Limitations

The chair and a vice chair shall each serve one-year terms and both positions shall alternate annually between a state, local, or tribal representative and a Federal representative. No agency shall be represented in these positions (i.e., chair and vice chair combined) for more than two years consecutively.

### 5.3.2 Responsibilities

The chair of the Executive Board chairs the Executive Board meetings and is the principal spokesperson for the Executive Board.  The vice chair shall assume the duties of the chair in his/her absence.

## 5.4 Selection of HIDTA Grantees

HIDTAs and their Executive Boards are not considered legal entities under Federal law and generally lack the authority to enter into contracts, hire employees, or obligate Federal funds.  HIDTA Executive Boards are responsible for selecting one or more grantees that, among other things, provide financial management services.  Those grantees will hire employees, issue contracts, manage property, and expend HIDTA Program funds as necessary to carry out the grant activities approved by the Executive Board.  The grantees are accountable for the use of HIDTA Program funds and must comply with all applicable Federal statutes and regulations governing Federal grants.

The use of those funds is subject to the respective grantee's policies and procedures pertaining to property management, employment, procurement, and financial management.  The Executive Board is responsible for selecting grantees whose established policies and procedures are consistent with Federal grantee regulatory requirements (*See* Title 2 C.F.R. Part 200).  Grantees must have the requisite financial and management capabilities to carry out these functions.

## 5.5 Bylaws and Standard Operating Procedures

The Executive Board must ensure the establishment of written bylaws and SOPs (or other administrative, financial, or operational guidelines) where needed to ensure compliance with Federal grant regulations and HIDTA Program requirements, and to provide guidance regarding the HIDTA's activities.  These bylaws and SOPs shall be consistent with the established policies of participating agencies.  Each Executive Board is required to post its bylaws and SOPs to HRMS, and ensure that the posted versions are the current versions of these documents.

## 5.6 Selection of the Executive Director

Each Executive Board shall ensure the selection of an individual to serve as the Executive Director. The Executive Board, in consultation with the hiring grantee, shall ensure the drafting of a position description, statement of work, or other document(s) that provide sufficient guidance, authority, and resources to the Executive Director to fulfill the duties and responsibilities outlined in this document. The Executive Board shall also ensure the determination and establishment of the compensation and benefits for the Executive Director within limits established for executive compensation.[21]

---

[21] Refer to section 5.8 for requirements associated with compensation and benefits.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

That individual will be an employee or contractor of a grantee and will be subject to all employment, contracting, and other conditions established by that grantee. The Executive Board shall ensure the Director of ONDCP is notified in writing before the individual is retained. The Executive Board, in consultation with the grantee, may remove an Executive Director or significantly limit his/her authority. The Executive Board shall ensure the notification of ONDCP in writing prior to removing an Executive Director or significantly limiting his/her authority.

### 5.7 Oversight of the Executive Director

It is the sole responsibility of the Executive Board, in coordination with the hiring grantee, to provide oversight of the Executive Director. In addition to the roles and responsibilities outlined in this document, Executive Boards may assign other duties and responsibilities that do not conflict with or otherwise limit the fulfillment of the requirements pertaining to the Executive Director and the HIDTA Program mission.[22] However, the position of Executive Director is considered a full-time position, and any other duties must not detract or otherwise diminish the Executive Director's ability to oversee and administer the HIDTA.

### 5.8 Compensation and Benefits for HIDTA-funded Positions

Each Executive Board, in coordination with the appropriate grantee(s), shall ensure the establishment of compensation and benefits for all positions funded by the HIDTA, subject to the requirements associated with compensation limits and fringe benefits established by ONDCP.[23]

### 5.9 Board Meetings

Each HIDTA Executive Board shall ensure they meet at least four times a year. Minutes of each meeting must be prepared and provided to ONDCP. The minutes shall be retained by the Executive Director for a minimum of 3 years.

### 5.10 Advisory Bodies

HIDTA Executive Boards may establish subordinate advisory bodies to assist the Board in carrying out its duties. Executive Boards of multi-state HIDTAs may establish subordinate advisory bodies in each state within their respective HIDTAs.

### 5.11 Approval of ONDCP-Required Documents

The Executive Board shall review and approve the ABR prior to submission to ONDCP.

---

[22] The qualification requirements and duties of the Executive Director are described in section 6.3.1 below.
[23] Refer to section 7.10.2 for requirements associated with compensation and benefits that apply to HIDTA management and support staff.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 5.12 Annual Review of HIDTA Designation

As part of their annual assessment of the regional drug threat, HIDTA Executive Boards shall ensure the review of those areas in their region that are currently designated as part of the HIDTA to ensure that each area continues to meet the statutory requirements for such designation. This review is essential to prioritize resources to meet the constantly changing drug trafficking threat. Each HIDTA's ABR must indicate in the appropriate IDBP that this review has occurred and that designated counties continue to meet the statutory criteria for inclusion in the Program.

## 5.13 Initiative Formation and Performance

Each Executive Board shall ensure the proposal of enforcement and intelligence initiatives in the ABR that are based on the most recent threat assessment, articulate how each initiative's funding request directly addresses the threat(s), and establish specific and realistic performance targets. Other proposed initiatives must clearly support the HIDTA Program mission and goals.

## 5.14 Annual Initiative Evaluation

The Executive Board shall ensure the establishment of an ongoing initiative review program, for both financial and programmatic issues, in order to determine each initiative's effectiveness.  This review must be done at least annually to determine whether the initiative is:

1. Complying with HIDTA Program requirements;
2. Effectively implementing the Executive Board's strategy;
3. Achieving negotiated performance targets; and
4. Sufficiently productive to warrant continued HIDTA Program funding.

Initiative reviews shall be documented, and records shall be maintained for a period of 3 years and made available to ONDCP upon request. The initiative review program shall ensure the advancement of the collective HIDTA initiative effort, making certain that joint initiatives do not merely support otherwise existing agency operations or supplant agency budgets. The Executive Board is responsible for terminating or revising initiatives that are no longer productive, no longer address an identified threat, or do not comply with HIDTA Program requirements.

## 5.15 Intelligence and Information Sharing

Executive Boards are required to establish an ISC, which serves as the HIDTA's primary intelligence initiative. Executive Boards may, at their discretion, establish ancillary intelligence initiatives that advance the HIDTA mission.

The Executive Board is responsible for designating the primary sponsoring agency for the ISC, and ensuring that each participating agency shall provide the HIDTA's intelligence initiatives(s) access to its investigative databases. Executive Boards are responsible for establishing and maintaining the capacity (e.g., hardware, software, policies, and procedures) to continuously and securely share information with other agencies participating in the HIDTA Program and law enforcement and



■■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

intelligence components. HIDTA Executive Boards shall also ensure the establishment of guidelines for disseminating information directly to other HIDTAs and law enforcement agencies that may benefit from the information.

Executive Boards shall seek to ensure the exchange of information and the coordination of activities with all law enforcement agencies in the HIDTA region is accessible and routine.

### 5.16 Deconfliction

The Executive Board shall ensure participating agencies use the Nationwide Deconfliction Pointer System (NDPS), even for those investigations not funded by HIDTA, and shall ensure the invitation of non-participating agencies in the designated areas to use the NDPS.[24]

### 5.17 Financial Administration

Each HIDTA Executive Board shall ensure the establishment of oversight protocols and procedures to ensure that all reprogramming requests pertaining to HIDTA funds comply with administrative and financial requirements of participating agencies, and with all HIDTA Program requirements established by ONDCP. Executive Boards shall also ensure that fiduciaries maintain internal controls to reduce the risk of fraud, waste, and abuse.

### 5.18 Training

Each Executive Board shall ensure the establishment of a training initiative.  If training is requested as part of a non-training initiative, the amount of funds and the expected training outputs from the initiative must be specifically identified in the IDBP for that initiative. The Executive Board shall ensure the designation of a Training Coordinator who will report to the Executive Director, or the Executive Director's designee.

### 5.19 Information Technology

Executive Boards are responsible for ensuring that the HIDTA's information technology (IT) infrastructure, including capabilities, equipment, and services, are sufficient to support the activities of the HIDTA in fulfillment of the HIDTA's mission. It is also the responsibility of the Executive Board to ensure the HIDTA's IT systems and policies are compliant with the applicable policies and standards set forth by the HIDTA's participating agencies. In instances where applicable policies and standards may conflict, it is the Executive Board's responsibility to resolve the conflict with the respective agencies.

---

[24] Refer to section 6.2.8 for a description of the NDPS; consult the glossary for the definition of a participating agency.



OFFICE OF NATIONAL DRUG CONTROL POLICY

## 5.20 Setting Performance Targets

Executive Boards must establish performance targets for each performance measure in the IDBPs submitted to ONDCP as part of the ABR.  The targets should reflect the sum of what all HIDTA initiatives expect to accomplish in the upcoming program year, as stated in the IDBPs. In the IDBP, each initiative must project what it expects to accomplish in the upcoming year.

In determining an appropriate performance target, the target projections should consider the annual average for the previous three years and adjust that figure according to changes in the initiative's budget, staffing, non-HIDTA resource levels, and any changes to the initiative's priorities or drug trafficking conditions in the HIDTA.

The HIDTA Executive Board shall ensure that each HIDTA initiative establishes annual performance targets. ONDCP will review the proposed performance targets during the review of the HIDTA's budget submission.  If necessary, ONDCP will negotiate revised performance targets for the program year with each HIDTA. To ensure that the performance expectations are clearly understood, ONDCP will notify each Executive Director of the approved annual performance targets as part of the annual budget review and approval process.

Extenuating circumstances may require Executive Boards to review and revise performance targets initially approved by ONDCP.  Such changes must be approved by ONDCP.

Finally, Executive Boards receiving supplemental or discretionary funding from ONDCP may be required to revise their performance targets accordingly.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# 6.0 HIDTA INITIATIVES

Encouraging and facilitating collaboration between and among Federal, state, local, and tribal law enforcement is a central role of the HIDTA Program. To promote this collaboration, HIDTA enforcement initiatives must be multi-agency efforts composed of Federal, state, local, and tribal law enforcement personnel who are collocated and commingled. This section describes those requirements.

All initiatives must be designed to address the drug trafficking and money laundering threats most significantly impacting the HIDTA designated area(s). Currently, the HIDTA Program recognizes seven distinct types of HIDTA initiatives:

- Enforcement
- Intelligence
- Management
- Prevention
- Support
- Training
- Treatment

All HIDTAs are required to have enforcement, intelligence, management, and training initiatives. Prevention and support initiatives are at the discretion of the Executive Board; only the Northwest and Washington-Baltimore HIDTAs are permitted to have treatment initiatives. Each initiative type is defined in the relevant sections (see below). HIDTAs must observe the guidelines for correctly labeling and uploading IDBPs for each initiative type found in the PMP User Guide.

## 6.1 Enforcement Initiatives

Every HIDTA is required to maintain at least one enforcement initiative designed to disrupt and dismantle drug trafficking and/or money laundering organizations in the designated areas. Enforcement initiatives include multi-agency investigative, interdiction, fugitive, and prosecution activities targeting drug trafficking and money laundering organizations, drug production organizations, drug gangs, drug fugitives, and other serious crimes with a drug nexus.

### 6.1.1 Threat Basis

All HIDTA enforcement initiatives must be designed to address a specific threat, or multiple threats, facing the HIDTA designated areas. The threat focus of each enforcement initiative must be based on the most recent HIDTA threat assessment. The IDBP must denote which threat(s) the initiative is designed to address.

### 6.1.2 Multi-Agency Participation

Multi-agency participation means full-time Federal and full-time state, local or tribal (optimally both state and local or tribal) agency personnel participating in an initiative and within any single or multiple subcomponent of an initiative (e.g., task force, squad, group, or unit) under a single initiative supervisor. Any participating Federal, state, local or tribal agency may lead an initiative.



■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

Full-time participation means agency personnel are assigned to the initiative as their exclusive work assignment. A liaison position does not meet the requirement for full-time participation.

Except where indicated otherwise in this document, initiatives that combine single-agency squads, groups, or units do not meet the requirement for full-time, multi-agency participation unless the IDBP provides a clear explanation of how these separate entities cooperate and coordinate their activities under a unified command structure. This justification must detail the expected benefits from combining these entities and explain how the combination will improve enforcement. ONDCP may require the separation of these entities into different initiatives or place reprogramming or other restrictions on such initiatives.

### 6.1.3 Collocation and Commingling of Participants

All full-time Federal, state, local, and tribal law enforcement personnel assigned to law enforcement initiatives must be collocated and commingled. Collocation means working in or from the same facility, preferably with a shared or contiguous workspace. Commingling means that all participants in an initiative have free and open access and interaction with other participants in the same initiative. Whenever possible, multiple initiatives should be housed together in a central location and a space without barriers that could hinder the interaction and commingling among participants of the various initiatives.

### 6.1.4 Supervision of Enforcement Initiatives

Enforcement initiatives must be supervised by a representative of a Federal, state, local, or tribal participating agency.

## 6.2 Intelligence Initiatives

Each HIDTA is required to operate at least one ISC, which serves as the HIDTA's primary intelligence initiative. Participation in the ISC and intelligence initiatives is a core condition of HIDTA participation and grant funding. Executive Boards may establish ancillary intelligence initiatives that fulfill the HIDTA mission at their discretion.

### 6.2.1 Intelligence and Information Sharing Functions

At a minimum, the ISC provides analytical case support to all of the HIDTA's initiatives, develops and disseminates intelligence products, and supports information sharing activities, including deconfliction services within the HIDTA-designated areas.

- <u>Analytical Case Support:</u>  At a minimum, HIDTA ISCs or ancillary intelligence initiatives shall provide analytical case support to all HIDTA-funded cases that request this assistance, and to non-HIDTA-funded cases as appropriate;

- <u>Intelligence Production:</u>  HIDTA ISCs shall seek to produce tactical, operational, and strategic intelligence products in cooperation with the participating agencies and in fulfillment of the HIDTA mission and goals. All of a HIDTA's intelligence initiatives are



OFFICE OF NATIONAL DRUG CONTROL POLICY

required to support the production of an annual threat assessment, as appropriate;[25] and

- Information Sharing:  HIDTA ISCs and any ancillary intelligence initiatives are required to perform basic information sharing activities in coordination with the participating agencies, including:

  - Performing event and investigative data deconfliction through the Nationwide Deconfliction Pointer Solution (NDPS);[26]

  - Obtaining and maintaining access to, and properly utilizing law enforcement, proprietary, and public databases containing information owned by the participating agencies;

  - Sharing drug-related information and intelligence products with other ISCs and national intelligence centers including (but not limited to) the El Paso Intelligence Center (EPIC), the Organized Crime Drug Enforcement Task Forces (OCDETF) Fusion Center, the Financial Crimes Enforcement Network (FinCEN), the Crime and Narcotics Center (CNC), State and Local Fusion Centers, Joint Terrorism Task Forces (JTTFs), Regional Information Sharing System (RISS) Centers, and other Federal, state, local, and tribal law enforcement agencies.[27]

ISCs may support other activities or provide additional services at the discretion of the Executive Board and under the supervision of the Executive Director, so long as they remain consistent with the HIDTA mission. Ancillary intelligence initiatives may provide some or all of these services, and perform additional support functions that are consistent with the HIDTA mission and deemed appropriate by the Executive Board.

## 6.2.2 Product Markings and Classification

Adherence to the appropriate safeguarding of unclassified but official or law enforcement sensitive (LES) information is imperative to maintaining the level of trust and systems integrity necessary to retain access to participating agencies' information systems and agency-owned information, thereby preserving a robust information sharing environment. ISCs and ancillary intelligence initiatives are required to apply the standards published by the Drug Enforcement Administration (DEA) or the Federal Bureau of Investigation (FBI) for classifying and marking all intelligence products. Systems maintained by the HIDTA to share unclassified or LES information and intelligence products must be compliant with applicable standards for the safeguarding of such information.

---

[25] See section 6.2.6 for requirements pertaining to the preparation of the annual threat assessment.
[26] See section 6.2.8 for requirements pertaining to event and target/investigative data deconfliction and a description of the NDPS.
[27] Information to support sharing with Federal partners can be found in the ARRs issued by ONDCP at the beginning of each FY, and posted on HRMS.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 6.2.3 Multi-Agency Participation

Multi-agency participation means full-time Federal and full-time state, local or tribal (optimally both state and local or tribal) agency personnel participating in an initiative and within any single or multiple subcomponent of an initiative (e.g., task force, squad, group, or unit) under a single initiative supervisor. Full-time participation means agency personnel are assigned to the initiative as their exclusive work assignment. A liaison position does not meet the requirement for full-time participation.

Only the ISC must fulfill the requirements for multi-agency participation and full-time commitment. However, each intelligence initiative must have at least one sponsoring agency from among the HIDTA's participating agencies.[28]

Except where indicated otherwise in this document, initiatives that combine single-agency squads, groups, or units do not meet the requirement for full-time, multi-agency participation unless the IDBP provides a clear explanation of how these separate entities cooperate and coordinate their activities under a unified command structure. This justification must detail the expected benefits of combining these entities and explain how the combination will improve intelligence and information sharing. ONDCP may require separation of these entities into different initiatives or place reprogramming or other restrictions on such initiatives.

### 6.2.4 Collocation and Commingling of Participants

All full-time Federal, state, local, and tribal law enforcement personnel assigned to ISC or ancillary intelligence initiatives must be collocated and commingled.  Collocation means working in or from the same facility, preferably with shared or contiguous workspace.  Commingling means that all participants in an initiative have free and open access and interaction with other participants in the same initiative. Whenever possible, multiple initiatives should be housed together in a central location and in a space without barriers that could hinder the interaction and commingling among participants of the various initiatives.

### 6.2.5 Oversight and Management of the ISC

Executive Boards establish and provide direction to the ISC and any ancillary intelligence initiatives, while the Executive Director provides routine oversight of these initiatives. The ISC must be sponsored by at least one participating law enforcement agency to ensure compliance with all applicable Federal regulations and standards pertaining to intelligence and information sharing.[29]

Executive Boards shall ensure appropriate supervision of the ISC(s) by an ISC Manager who reports to the Executive Director. The ISC Manager is responsible for ensuring compliance of the ISC with applicable grant requirements and may, at the discretion of the Executive Board, provide supervision of the ancillary intelligence initiatives. The ISC Manager may be an employee of a

---

[28] See Appendix B: Glossary of Terms for a definition of sponsoring agency.
[29] For the definition of a sponsoring agency, refer to Appendix B.



▬▬ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

participating Federal, state, local, or tribal agency, or a contractor employed by a participating agency. ISC Managers must obtain and maintain, at minimum, a Top-Secret security clearance.

### 6.2.6 Preparation of the Annual Threat Assessment

As part of the annual budget request, each HIDTA must submit an annual threat assessment to the Executive Board and ONDCP for review.[30] The threat assessment provides a 12-month forecast of drug trafficking and money laundering activities in the region, serves as the basis for the annual budget request, and guides the Executive Board's allocation of resources through the initiatives. ISCs and ancillary intelligence initiatives are required to support the production of the annual threat assessment, as appropriate.

### 6.2.7 Participating Agencies

A representative of the DEA is required to participate in the ISC, per the SUPPORT for Patients and Communities Act (Pub. L. No. 115-271), 21 U.S.C. §§ 1701 et seq.  Other participating agencies that do not assign full-time staff to the primary ISC must make defined commitments to the HIDTA's intelligence initiative(s).  This could include using HIDTA funds to support agency personnel, assigning personnel on a part-time basis, or assigning a designated point of contact for ISC coordination.  If HIDTA funds are used to support an agency position, the incumbent of that position must have direct access to the agency's criminal information systems.

HIDTA criminal intelligence components shall maintain working relationships with the criminal intelligence and information sharing components of the participating agencies and other law enforcement agencies in the HIDTA region (to include state and regionally operated fusion centers operating in the HIDTAs' designated areas).

### 6.2.8 Deconfliction

The HIDTA ISC and any ancillary intelligence initiatives must adopt and maintain access to an established deconfliction system that is part of the NDPS. The NDPS is an event and target/investigative data deconfliction pointer system that interfaces with existing event, target, and investigative data systems to determine whether any participating agency has an interest in the same event, or investigative target and investigative data. When a match occurs, NDPS provides select information to the agents and officers who own the information that caused the match.

Event deconfliction services must be provided by each HIDTA around-the-clock (24/7) with an immediate response capability to all law enforcement in the HIDTA region.  Executive Boards shall ensure the adoption of an established system that provides target/investigative data deconfliction with other HIDTAs and law enforcement agencies.

---

[30] Requirements pertaining to the preparation and dissemination of the annual threat assessment can be found in the ARRs posted on HRMS.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

All HIDTA initiatives shall use the HIDTA's ISC and/or ancillary intelligence initiative(s) for event and target/investigative data deconfliction of all enforcement and operational activities. All HIDTAs are required to conduct deconfliction through the NDPS, in accordance with the following definitions:

- Event deconfliction is the process of determining when law enforcement personnel are conducting an event in close proximity to one another at the same time.  Events include law enforcement actions such as raids, undercover operations, surveillance, or executing search warrants. When certain elements (e.g., time, date, and location) are matched between two or more events, a conflict results. Immediate notification is then made to the affected agencies or personnel regarding the identified conflict.

- Target/Investigative Data deconfliction is the process of determining when law enforcement personnel are conducting an investigation that involves the same investigative data.[31] When investigative elements match, immediate notification is then made to the affected agencies or personnel regarding the identified conflict.

The Executive Director and ISC Manager must ensure that all deconfliction activities are tracked consistent with PMP guidelines and definitions outlined in the most recent version of the PMP User Guide.

Participating agencies shall use the NDPS, even for those investigations not funded by HIDTA, and shall invite non-participating agencies to use the NDPS. A mechanism shall be established for informing law enforcement agencies within the HIDTA region of the capabilities of the HIDTA's ISC and ancillary intelligence initiatives.

### 6.2.9 Information Sharing Requirements

The HIDTA Program serves as an ambassador and trusted custodian of information owned by its participating agencies and facilitates appropriate sharing of said information.  As such, HIDTAs engaged in facilitating agency-owned, law enforcement sensitive information sharing must adhere to applicable Federal, state, and local statutes and agency-specific policies and procedures governing the use of law enforcement sensitive information, in coordination with the ISC's sponsoring agency.  This includes, but is not limited to, all sharing of case-related information or data as governed by the agency that owns the information and its rules for disclosure and sharing. Such information sharing on non-government or non-approved law enforcement websites, social medial websites, or un-approved email domains is prohibited.

Applicable Federal, state, or local laws, regulations, or policies regarding the collection, storage, and dissemination of investigative information will govern the operation of HIDTA ISCs and ancillary intelligence initiatives.  Components of ISCs and ancillary intelligence initiatives will disseminate intelligence to participating agencies, subject to legal restrictions, using the following guidelines:

---

[31] NDC bylaws as of August 7, 2019.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- Requests from a law enforcement agency about a criminal organization/enterprise shall be handled in accordance with agency policies, established information sharing agreements, information system policies, and 28 C.F.R. Part 23.

- Criminal intelligence materials produced by a HIDTA ISC or ancillary intelligence initiative with a nexus to ongoing cases conducted by a HIDTA initiative shall be disseminated to the agency or agencies having the investigative/operational interest.  Additional dissemination of the product will be at the approval of those agencies.

- Criminal intelligence materials produced by HIDTA ISC or ancillary intelligence initiatives with no specific agency operational or investigative equities shall be disseminated to HIDTA initiatives and participating agencies and, when appropriate, to non-participating law enforcement agencies.  ISCs shall use the HRMS as a repository for informational products such as threat assessments, strategies, or administrative documents and manuals.  Criminal intelligence products shall be provided to EPIC, the Homeland Security Information Network (HSIN) Intel portal, and law enforcement agencies with a need to know, as appropriate.

### 6.2.10 Security Requirements

HIDTA security requirements for intelligence initiatives encompass three distinct aspects of the HIDTA: facilities, personnel, and information. The following outlines the specific requirements pertaining to each of these aspects.

- <u>Facilities</u>: All intelligence and information sharing facilities shall meet the security requirements of the sponsoring agency, in accord with the level of information collected or stored at the facility.  The costs of upgrading the facility to meet these requirements shall be an allowable use of HIDTA funds.

- <u>Personnel:</u> Personnel with a requirement to access national security information or secure areas of the ISC must have sufficient security clearance to allow such access.  ISC Managers and Supervisors must have security clearances at a level to permit them access to all areas of the ISC facility.  Federal agencies with joint management responsibility for ISCs shall assist in obtaining the appropriate clearance level for personnel assigned to an intelligence initiative.  The costs for obtaining this clearance shall be an allowable use of HIDTA funds.

- <u>Information:</u> All personnel are required to store all files, documents, and data storage disks in compliance with information classification and handling restrictions of the agency that originated the document or material or the sponsoring agency for the intelligence initiative, whichever has the more secure standard.  Safeguarding and handling of classified information shall comply with Executive Order 12968. Information systems security policies must be established that meet or exceed the minimum security requirements of the participating agencies.

When appropriate, the HIDTA must also ensure, in coordination with the participating agencies, that the sharing of information is compliant with the Criminal Justice Information Sharing (CJIS)



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

information security requirements, guidelines, and agreements for protecting the sources, transmission, storage, and generation of criminal justice information (CJI).[32]

### 6.2.11 Training

Each Executive Board shall ensure they make available appropriate training for personnel assigned to the HIDTA ISC and any ancillary intelligence initiatives and for the participating agencies. If possible, this training shall be extended to non-participating law enforcement agencies.

### 6.2.12 Product Dissemination

Each HIDTA shall provide a copy of any drug threat assessment that is produced for its region to ONDCP for review and approval prior to any further dissemination. ONDCP will review and approve HIDTA threat assessments on a rolling basis; however, the deadline to submit the threat assessment shall be June 15 of each year.[33]

The Executive Board has the discretion to share any threat assessment more broadly, following ONDCP approval, subject to the limitations imposed by the product's national security classification or law enforcement sensitivity. At a minimum, HIDTAs must submit their annual threat assessment and any other intelligence product to EPIC and the HSIN Intel portal.[34]

## 6.3 Management Initiatives

Every HIDTA is required to maintain at least one management initiative to administer the affairs of the HIDTA, and to ensure the accountability of HIDTA funding and activities. Management initiatives provide the overall coordination and integration of initiatives, and fund basic overhead (e.g., salaries and fringe benefits for the Director, Deputy Director, and other administrative staff positions approved by the Executive Board; rent; and facilities charges for administrative staff).

### 6.3.1 Qualifications and Responsibilities of the Executive Director

Each HIDTA Executive Board shall ensure the selection of an Executive Director. Executive Directors must have extensive experience in the criminal justice profession at the Federal, state, local, or tribal level. At a minimum, the Executive Director is responsible for the successful implementation of the Executive Board's strategy, and compliance with all grant requirements.

The principal responsibilities of the Executive Director shall be to:

---

[32] For additional information on CJIS standards, refer to the latest version of the CJIS Security Policy.
[33] The June 15 deadline is aligned with deadline to submit the ABR. See section 3.2.1 for more detailed information on ABR submission. In years when June 15 falls on a weekend, the ABR will be due on the following Monday.
[34] Detailed instructions on submitting the annual threat assessment and other intelligence products can be found in the most recently published ARRs available on HRMS.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- Provide day-to-day administrative, financial, and program management for the operations of the HIDTA;
- Facilitate and encourage the development of innovative approaches to drug law enforcement;
- Ensure that HIDTA initiatives comply with HIDTA Program requirements; and
- Advise the Executive Board concerning the performance of HIDTA initiatives.

In addition to the above principal responsibilities, the Executive Board establishes the basic requirements for the Executive Director position in coordination with the grantee(s), as well as compensation and benefits.[35] The position of Executive Director is a full-time position, and any collateral duties must not detract from or otherwise inhibit the fulfillment of the grant requirements or the HIDTA Program mission. Additional roles and responsibilities may be defined by the HIDTA Executive Board, subject to the conditions herein.[36]

### 6.3.2 Executive Director Security Clearance

Upon assuming the position, the Executive Director must obtain and retain, at minimum, a Top-Secret national security clearance. The costs for obtaining this clearance shall be an allowable use of HIDTA Program funds.

### 6.3.3 Liaison with ONDCP

The Executive Director serves as the point of contact between the Executive Board and ONDCP on all HIDTA matters, keeps the Executive Board apprised of ONDCP policies and requirements, and represents the HIDTA at national forums.

As part of this liaison responsibility, ONDCP may request the Executive Director to engage in activities that benefit the HIDTA Program.

### 6.3.4 ONDCP-Required Documents

The Executive Director is responsible for coordinating the preparation of the ABR, submitting these documents to the Executive Board for its approval, and submitting the approved ABR to ONDCP.

### 6.3.5 Oversight of HIDTA Financial Management

The Executive Director, in conjunction with the applicable grantee, shall be responsible for ensuring compliance with HIDTA PPBG and other applicable financial rules and regulations.  The Executive Director, with the approval of the Executive Board, exercises reprogramming authority as described in Section 7.  The Executive Director is the grantee's point of contact for assistance and resolution of HIDTA-related financial issues.

---

[35] For information on requirements related to compensation, refer to section 7.10.2.
[36] Refer to section 5.0, which defines the role of the Executive Board.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 6.3.6 Property Control

The Executive Director, in conjunction with the applicable grantee, shall ensure that the property management requirements established in Section 8 of this guidance are met.

### 6.3.7 Intelligence and Information Sharing

Executive Directors must ensure that all initiatives and participating agencies receive relevant information and intelligence products in a timely fashion.

### 6.3.8 Information Technology and Cybersecurity

Executive Directors must ensure the HIDTA has taken appropriate measures to safeguard information, secure systems and networks, and protect HIDTA-purchased equipment. Since HIDTAs do not own data, the Executive Director must ensure that HIDTA data management and information sharing systems are compatible with the requirements of the participating agencies, and that the IT infrastructure of the HIDTA is sufficient to sustain HIDTA activities and support the overall HIDTA mission. Decisions regarding IT management and cybersecurity, including procurements, must be made in consultation with the IT Manager, other staff (as appropriate), participating agency representatives (as appropriate), and the Executive Boards.

### 6.3.9 Performance Measures

The Executive Director shall ensure initiatives establish adequate performance measures (as described in Section 10.2) and shall establish a process to verify that the reported performance data is accurate and entered in the PMP on a quarterly basis.  In addition, the Executive Director is responsible for ensuring that PMP training and updated PMP refresher training is provided annually.

### 6.3.10 Review of HIDTA Initiatives

Each Executive Director shall establish and participate in an annual internal review process, or self-inspection, to determine whether each initiative is being implemented as described in the budget submission to ONDCP, complies with all HIDTA Program requirements, and is achieving its performance targets.

The Executive Director shall ensure the findings of this internal review are provided in writing to the initiative supervisors and the Executive Board.  Upon request, the internal review shall be provided to ONDCP. The results of these annual reviews must be retained for three years.

### 6.3.11 Control and Coordination of HIDTA Initiatives

At the discretion of the Executive Board, an Executive Director may supervise all initiatives other than the enforcement initiatives.[37] The Executive Director must ensure that all initiatives report the

---

[37] Refer to Section 6.1.4 for information pertaining to the supervision of enforcement initiatives.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

information necessary to oversee and administer the initiatives, including financial, inventory, and performance data.

The Executive Director shall develop a process for facilitating the coordination and flow of information between and among initiatives and participating agencies. This process, which may include meetings or conference calls involving initiative supervisors, must be conducted at least semi-annually.

### 6.3.12 Reprogramming HIDTA Funds

Per the requirements and procedures established by the HIDTA Executive Board, all reprogramming requests must be submitted to ONDCP by the Executive Director using the HIDTA FMS. Each request for a reprogramming shall include sufficient detail to enable ONDCP to assess the request; e.g., a request to reprogram funds into equipment must include a list of equipment to be purchased.

### 6.3.13 Orientation Process

The Executive Director shall establish an orientation process for new Executive Board members, new participating agencies, and new initiative supervisors that addresses the specific responsibilities of each and the general requirements of the HIDTA Program.

### 6.3.14 Other Duties

The Executive Director shall perform other duties as designated in the agreement with the grantee or as assigned by the Executive Board. Additional duties must be consistent with HIDTA Program requirements and must contribute to the operation of the HIDTA Program.

### 6.3.15 Acting Director

In the absence of the Executive Director, the Deputy Director may assume the Director's responsibilities. If the Deputy Director position is vacant, the HIDTA does not have a Deputy Director position, or the Executive Board opts to designate an individual in lieu of the Deputy Director, the Executive Board shall ensure the appointment of an individual to serve as the Director until the position can be filled using appropriate procedures. A Deputy Director or other person expected to serve as an Acting Director for an extended period must have the same security clearances required for a Director.

### 6.3.16 HIDTA Administrative Offices

Each HIDTA shall have a management initiative staffed by the Executive Director, a financial manager, and, at the discretion of the Executive Board, a Deputy Director and other administrative positions approved by the Board. The Executive Board may identify individuals to fill these positions or may delegate this function to the Executive Director. Those individuals must currently be or must become employees or contractors of a HIDTA grantee and will be subject to all employment, contracting, and other conditions established by that grantee.



The total salaries and fringe benefits for these positions shall not exceed 20 percent of the HIDTA Program funds awarded to a HIDTA without prior approval from ONDCP.[38] Funding requests for management initiatives will be reviewed by ONDCP annually and should include adequate information to support each funded position.

### 6.3.17 Other HIDTA Staff

HIDTA Executive Boards may authorize additional staff positions as necessary. Persons filling these positions must currently be or become employees or contractors of a HIDTA grantee and will be subject to all employment, contracting, and other conditions established by that grantee.

### 6.3.18 Sexual Harassment Training

HIDTA leadership staff are required to complete sexual harassment training every 2-years. Required participants include HIDTA Executive Directors, Deputy Directors and other leadership staff including, but not limited to, Investigative Support Center (ISC) managers, financial managers, Performance Management Process (PMP) managers, training coordinators, National Initiative Coordinators and relevant initiative staff, and Overdose Response Strategy members. The HIDTA Executive Director must maintain current certification of sexual harassment training and affirm completion of certification through the HIDTA annual budget review process. Certificates of completion for required participants must be maintained by individual HIDTAs in the event individual proof of participation is needed for auditing purposes.

## 6.4 Prevention Initiatives

Executive Boards may, at their discretion, establish prevention initiatives that collaborate with community-based organizations and community coalitions. HIDTAs are only permitted to fund evidence-based and evidence-informed prevention programs in their area of responsibility.

All HIDTA prevention initiatives are designed to facilitate coordination and collaboration between law enforcement and the prevention community to reduce drug use and its consequences and prevent drug-related crime.  Collaboration may include reaching out to or partnering with school systems, student leaders, parent groups, medical and health professionals, faith-based organizations, religious leaders, drug prevention agencies, public health agencies, and coalitions dedicated to reducing substance abuse.  Prevention initiatives can also enable law enforcement personnel to participate in community-based drug prevention programs.

### 6.4.1 Financial Limitations on Treatment and Prevention Initiatives

Due to limitations enacted in the SUPPORT for Patients and Communities Act, the ONDCP Director must ensure that not more than five percent of the Federal funds appropriated for the Program are expended for the establishment of substance use disorder treatment and drug prevention programs.  *See* 21 U.S.C. § 1706(f). The five percent cap for prevention and treatment is program-

---

[38] Refer to additional requirements in section 7.10.2 for HIDTA-funded positions.



■■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

wide and does not apply to an individual HIDTA. The cap also includes funds expended by the Washington-Baltimore HIDTA and Northwest HIDTA for treatment initiatives.

The ONDCP annual HIDTA funding notification to Congress provides a definitive plan for how each of the HIDTAs intends to spend the fiscal year grant funds allocated to their region. Therefore, once a HIDTA allocates funds for a drug prevention or treatment initiative, funds cannot be increased or decreased by reprogramming those funds to a non-prevention or non-treatment initiative during the fiscal year the funds were allocated.  The grant funds may be reallocated to a non-prevention or non-treatment initiative in subsequent fiscal year funding.

### 6.4.2 Evidence-Based and Evidence-Informed Prevention Initiatives

HIDTA prevention initiatives build community coalitions and partnerships that bring together law enforcement, educational, social service, and community organizations to provide science-based prevention programs. These initiatives must support evidence-based and evidence-informed prevention programs that focus on stopping drug abuse before it begins and promote positive change in communities by increasing public awareness of the dangers of drug use.

Examples of evidence-based and evidence-informed initiatives include programs conducted in schools, communities, and in partnership with community coalitions, civic organizations, and faith-based organizations. Other activities include information sharing sessions, symposiums, public forums, and prevention conferences held for law enforcement professionals and their coalition partners to improve prevention practices within their respective communities.  Executive Boards may also fund targeted, local media campaigns that advertise on television, Internet, radio, newspapers, cinemas, buses, bus shelters, and strategically placed billboards on travel corridors to promote anti-drug messaging.

## 6.5 Support Initiatives

HIDTAs may establish additional support initiatives to oversee activities beyond the core management, enforcement, intelligence, and training initiatives to include crime and forensic labs, resource support (shared expenses such as leases, copiers, and landlines), and information technology, among other possibilities. Support initiatives exist to provide Executive Boards flexibility in meeting the needs of the HIDTA participating agencies and fulfilling the HIDTA Program mission.  Support initiatives may be subject to other grant requirements, such as reporting information to PMP (e.g., training initiatives), but are not required to meet the requirements for collocation and commingling of participants.

## 6.6 Training Initiatives

Every HIDTA is required to maintain at least one training initiative. The HIDTA Program training mission derives from the HIDTA Program goal to "improve the efficiency and effectiveness of HIDTA initiatives."  Selective training opportunities, provided in support of HIDTA initiatives and law enforcement agencies within the HIDTA Program, will contribute directly toward accomplishing this goal.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

One of the HIDTA Program's goals is to improve the efficiency and effectiveness of HIDTA initiatives. Some Executive Boards invest significant funding in training and related activities that contribute to accomplishing this goal, which, in turn, enhances the ability of participating agencies to disrupt and dismantle drug trafficking organizations (DTOs). This section describes program requirements for the use of HIDTA funds for training.

HIDTA-sponsored and HIDTA-facilitated training shall be reported in PMP, per the applicable requirements stated in the most recent edition of the PMP User Guide.

### 6.6.1 Oversight and Funding of Training Coordinators

Training coordinators report directly to the Executive Director, or the Executive Director's designee. If funding is required for the Training Coordinator position, it shall be requested in the Training Initiative.

### 6.6.2 HIDTA Training Resources

First priority for HIDTA Program training funds will be for participants of HIDTA initiatives. Any remaining spaces in HIDTA-funded training courses may be used for (in priority order): (1) HIDTA participating agencies; and (2) other law enforcement agencies.
HIDTA-funded training is designed to enhance the skills of the law enforcement agencies across the HIDTA region and must be directly related to drug enforcement or other HIDTA initiative-related duties of the individuals receiving training. HIDTA funds may also be used for other costs related to training (such as travel costs to readily established training course locations) when the law enforcement agency is not able to provide the required funding.

## 6.7 Treatment Initiatives

With the exception of the Washington-Baltimore HIDTA and the Northwest HIDTA, HIDTAs are prohibited from expending Federal funds appropriated for the HIDTA Program for the establishment or expansion of drug treatment programs.



■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

# 7.0 FINANCIAL MANAGEMENT

This section describes major financial management requirements, including limitations on the use of funds, for the HIDTA Program. It is primarily intended for use by HIDTA Executive Boards, Executive Directors, financial managers, and senior representatives of grantees who need to be familiar with Federal grant management requirements. This section is not intended to be a substitute for more detailed financial management requirements and guidelines established by the Office of Management and Budget: Title 2, Part 200 Code for Federal Regulations (C.F.R.)–Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards revised August 13, 2020.

## 7.1 HIDTA Grant Awards

ONDCP uses a threat-driven process that requires each HIDTA Executive Board to assess the drug trafficking activities in its region, design a strategy to attack those activities, plan initiatives to carry out the strategy, and develop a budget that is sufficient to carry out the planned initiatives. ONDCP awards funds to designated grantees based on a review and assessment of the ABRs that each HIDTA Executive Board submits to ONDCP.

HIDTAs are not legal entities under Federal law, but rather a coalition joined together to receive HIDTA funds to coordinate drug-related law enforcement activities of Federal, state, local, and tribal law enforcement agencies in designated areas. Such designation enables participating agencies to combine and leverage resources and capabilities to address drug trafficking and drug-related crime.

Consequently, ONDCP must provide HIDTA Program funds to one or more legal entities, such as a state, local, or tribal agency, an institution of higher education, or a non-profit organization to act as the grantee(s) for agencies participating in the HIDTA Program. In this role, the grantee is accountable for the use of HIDTA funds and must comply with all applicable Federal statutes and regulations and with its own regulations and policies. As a result, proper vetting and risk analysis is required prior to selection.[39]

## 7.2 Sub-awards

Sub-awards must be monitored by the award recipient as outlined in 2 C.F.R. § 200.332 and/or 200.333. In addition, the award recipient must ensure accurate reporting in the Federal Sub-award Reporting System (FSRS) as required by 2 C.F.R. Part 170.[40]

## 7.3 Non-Federal Entities

HIDTAs are defined geographic regions within the United States that meet certain statutory criteria allowing for the obligation of Federal grant funds to coordinate counter-drug activities in those designated regions. Consequently, ONDCP must provide HIDTA Program funds to at least one non-

---

[39] Refer to the risk assessment tool available on HRMS.
[40] Assistance in determining the nature of a sub-award or contractual relationship can be found at 2 CFR 200.331. In addition, the Contractor vs. Sub-recipient Checklist is available on HRMS.



OFFICE OF NATIONAL DRUG CONTROL POLICY

Federal entity (NFE), such as a state, local, or tribal government agency, an institution of higher education, or a nonprofit organization to carry out the Federal award as a recipient. The NFE receiving HIDTA Program funds is accountable for the use of the funds and must comply with all applicable Federal statutes and regulations governing Federal grants. As a result, proper vetting and risk analysis is required prior to selection.[41]

## 7.4 Federal Entities

Federal agencies receiving HIDTA funds from ONDCP shall sign a Memorandum of Agreement (MOA) with ONDCP prior to the transfer of HIDTA funds. The MOA establishes requirements pertaining to the scope of the initiatives, reprogramming of funds, reporting requirements, and financial management standards. The signed MOAs will be posted in FMS by ONDCP.

## 7.5 Supplanting of Funds

HIDTA funds must be used to supplement existing activities and must not replace (supplant) funds that have been appropriated for the same purpose. ONDCP will review all HIDTA budget submissions for potential supplanting. If there appears to be supplanting, ONDCP shall require the grantee to supply a written certification through the Executive Director, stating that Federal funds will not be used to supplant state or local funds. ONDCP will also review for supplanting of state, local, and tribal funds during on-site monitoring and financial audits.

## 7.6 Internal Controls

The non-Federal entity must establish and maintain effective internal control over the Federal award that provides reasonable assurance that the non-Federal entity is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. Further guidance and best practice suggestions are available in Section 200.303 of the Uniform Administrative Requirements, the "Standards for Internal Control in the Federal Government" (Green Book) issued by the US Comptroller General or the "Internal Control Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

## 7.7 Grant Award Budget Period and Extensions

ONDCP awards HIDTA Program funds to a state, local, or tribal government agency, an institution of higher education, or a nonprofit organization (non-Federal entities) in the form of two-year grants, and to Federal agencies in the form of inter-governmental/non-expenditure fund transfers for two years. The two-year period for Federal transfers commences on October 1st of the Federal FY for which the funds are appropriated; for non-Federal entities, the two-year period commences on January 1st within the Federal FY for which funds are appropriated. However, an Executive Director may request an extension of the period of performance on behalf of the grantee. The extension request with supporting justification must be submitted in the HIDTA FMS at least 10 calendar days

---

[41] Refer to the risk assessment tool available on HRMS.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

before the end of the budget period specified in the award.  A request must demonstrate meaningful rationale for the underlying extension.  Any additional extension requests will be closely scrutinized and carefully considered and approved on a case-by-case basis.

A grantee may charge to the award only allowable costs incurred during the budget period. The Uniform Guidance defines "budget period" as "the time interval from the start date of a funded portion of an award to the end date of that funded portion during which recipients are authorized to expend the funds awarded."[42]  With respect to a grantee's use of Federal grant funds, the term "obligations"  means "a recipient's or subrecipient's use of funds under a Federal award, means orders placed for property and services, contracts and subawards made, and similar transactions that require payment."[43] ONDCP will permit the total cost of a contract to be charged against a grant award even if some of the contract services will be performed after the period of performance ends.[44] ONDCP has the discretion to approve or deny obligations that extend beyond the two-year period of performance provided the costs are reasonable, allocable and otherwise meet the requirements of 2 C.F.R. § 200.403. ONDCP will evaluate obligations that extend beyond the period of performance on a case-by-case to determine whether such obligations are reasonable.

## 7.8 Documentation for Grants

Grantees must submit a Standard Form (SF)-424, "Application for Federal Assistance," and the associated certifications and representations, through the Executive Director to the NHAC along with the IDBPs submitted by an Executive Board for ONDCP approval.  ONDCP will not authorize the release of funds for disbursement until the completed SF-424 and award letter are received by the NHAC.

ONDCP executes approved funding requests or grant modifications to grantees by issuing a Grant Agreement.  The grant recipient must sign a copy and return as instructed in the grant agreement. The grant agreement contains general provisions that describe requirements that apply to all Federal grants, and special conditions that apply specifically to that grant. ONDCP may impose additional reporting or monitoring requirements, or require prior approval of certain actions to grantees that fail to comply with these requirements.

## 7.9 Government-Wide Grant Requirements

The HIDTA PPBG incorporates The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200 (the "Uniform Guidance"), as adopted and implemented by ONDCP in 2 C.F.R. Part 3603. The Part 200 Uniform Guidance supersedes, among other things, the provisions of 28 C.F.R. Parts 66 and 70, as well as those of 2 C.F.R. Parts 215, 220, 225 and 230, and corresponding circulars.

---

[42] Refer to section 2 C.F.R. § 200.1.

[43] Refer to section 2 C.F.R. § 200.1.

[44] For example, the cost of a contract, such as a long-term lease or extended warranty is allowable even if the terms of the lease or warranty extend beyond the grant period as long as it is consistent with Uniform Guidance cost principles and the full amount is obligated within the grant period.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

Grantees and HIDTA Financial Managers must keep apprised of changes in relevant government-wide regulations and Office of Management and Budget (OMB) circulars. The general terms and conditions, as well as archives of previous versions of the general terms and conditions, are available online at: https://www.whitehouse.gov/ondcp/.

## 7.10 HIDTA-Funded Positions

Grantees may use HIDTA funds to hire employees or to enter into contracts with individuals to manage and staff the HIDTA.  Whether as an employee or contractor, the hiring agency's employment and contracting rules and regulations apply to those positions. Individuals in HIDTA-funded positions cannot be compensated with both HIDTA funds and other funds to perform identical duties. If an individual receives compensation from both HIDTA and another source, the individual's duties and compensation should be clearly defined and properly allocated.

### 7.10.1 Hiring Agency Certification

Each agency that uses HIDTA funds to support positions within that agency must submit a certification to the Executive Director on agency letterhead. These certifications must be signed by a supervisory official from the employee's agency having first-hand knowledge of the work performed by the employee. Each certification shall be maintained at the Executive Director's office and shall be made available to ONDCP upon request. Hiring agencies must provide certifications for employees that are supported, wholly or in part, by HIDTA funds, and submit updated certifications whenever changes in positions occur.

The certification must attest, verbatim, to each of the following statements:

1. The [number and title of position(s)] does not supplant any part of the [name of agency] budget. HIDTA funds for this position(s) do not replace funds that have been appropriated for the same purpose.
2. Each of these positions is exclusively dedicated to one or more HIDTA initiatives, and a position description is on file and will be made available on request available.
3. There is no alternative funding available to support the salary(ies) and benefits for these positions.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 7.10.2 Compensation for Non-Law Enforcement Positions

ONDCP will reimburse compensation for Executive Directors in accordance with the pay scale for members of the Senior Executive Service (SES),[45] up to but not exceeding 110 percent of the maximum allowable salary in the pay scale, and no less than the minimum compensation established by the pay scale. The Executive Board shall establish the Executive Director's salary within these limits, ensuring the salary is both reasonable and commensurate with like positions in the locality.[46] ONDCP will reimburse fringe benefit packages, or compensation in lieu of fringe benefits, for the Executive Director in an amount not to exceed 30 percent of the salary for that position unless required by law, grantee-employee agreement, or an established policy of the grantee. Car allowances, cell phone allowances, and liability insurance premiums are not considered compensation or fringe benefits, and must be listed separately from compensation or fringe benefits in the ABR submitted to ONDCP.

In addition to the Executive Director position, HIDTA funds may be used to support other positions that an Executive Board determines are necessary for the efficient functioning of the HIDTA's operation. These positions must directly and exclusively support the HIDTA's operation. ONDCP will reimburse all other compensation for HIDTA-funded positions (e.g., Deputy Directors, ISC Managers, Financial Managers, IT Managers, PMP Coordinators, Training Coordinators, Program Analysts, Intelligence Analysts, etc.) according to the General Schedule (GS), including locality adjustment.[47] Salaries for these positions are established by the Executive Board, within the limits provided, and must be reasonable and commensurate with like positions in the locality. ONDCP will reimburse fringe benefit packages, or compensation in lieu of fringe benefits, for a position other than Executive Director in an amount not to exceed 30 percent of the salary for that position unless required by law, grantee-employee agreement, or an established policy of the grantee. Car allowances, cell phone allowances, and liability insurance premiums are not considered compensation or fringe benefits for these positions, and must be listed separately from compensation or fringe benefits in the ABR submitted to ONDCP.

Charges to Federal awards for salaries and wages must be based on records that accurately reflect the work performed. These records must:

- Be supported by a system of internal control that provides reasonable assurance that the charges are accurate, allowable, and properly allocated;
- Be incorporated into the official records of the grantee;
- Reasonably reflect the total activity for which the employee is compensated by the grantee;

---

[45] Executive Director salaries are subject to the SES standards for certified appraisal systems; the applicable standard can be determined by whether the fiduciary does or does not meet the standard for a certified appraisal system. Current SES pay scales may be accessed at www.opm.gov.
[46] Compensation totals are also subject to applicable initiative funding caps (see section 6.3.16).
[47] A grantee may apply a compensation scale other than the GS scale, however, the amount of compensation cannot exceed the total amount allowable in the GS scale (including locality adjustment). The current GS scale may be accessed at www.opm.gov.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- Encompass both Federally-assisted and all other activities compensated by the grantee on an integrated basis, but may include the use of subsidiary records as defined in the grantee's policy;
- Comply with the established accounting policies of the grantee; and
- Support the distribution of the employee's salary or wages among specific activities or cost objectives if the employee works on more than one Federal award, a Federal award and non-Federal award, an indirect cost activity and a direct cost activity, two or more indirect activities that are allocated using different allocation bases, or an unallowable activity and a direct or indirect cost activity.

Hiring agencies must document the policies and procedures for all personnel administration issues, including compensation and advancement, for all HIDTA-funded positions.

### 7.10.3 Law Enforcement and Prosecutorial Positions

HIDTA initiatives that propose using Program funds to pay all or part of the salary of a state or local law enforcement officer, a prosecutor, or prosecutorial support staff must submit a detailed justification explaining why it is necessary to use HIDTA funds for this purpose. ONDCP reviews of such requests will consider the number and salaries of the positions to be supported, the total amount of HIDTA funds requested for this purpose, the number of officers in the agency that will be reimbursed, and other factors. If ONDCP does not approve such a request, the grantee will be notified in writing of the reasons for the disapproval. If the request is approved, ONDCP approval remains in effect unless the approved conditions change, at which time an updated justification must be submitted for review.

## 7.11 Relocation Costs

ONDCP will not reimburse for relocation costs of employees.

## 7.12 HIDTA Overtime Reimbursement

Generally, only state, local, and tribal law enforcement officers and uniformed Federal agents (e.g., uniformed Customs and Border Protection and U.S. Forest Service) are eligible for HIDTA-funded overtime. In unusual circumstances, non-law enforcement personnel may receive HIDTA-funded overtime if the overtime is performed exclusively for a HIDTA-funded activity. For information on overtime funding for OCDETF cases, refer to section 7.20.2.

HIDTA funds shall be used to pay overtime only if the participant is eligible for such compensation by his/her parent agency and the overtime was performed in support of a HIDTA-designated enforcement or intelligence initiative.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 7.12.1 Unauthorized Overtime

HIDTA funds shall not be used to pay overtime related to training attendance, financial management, drug treatment, drug demand reduction or prevention, or non-investigative-related administrative work.

### 7.12.2 Maximum Overtime Amounts

HIDTA-funded annual overtime for individual state, local, and tribal law enforcement officers and uniformed Federal agents shall not exceed the lower of: (1) applicable state, local, and tribal regulations of officer's parent agency; or (2) 25 percent of the Federal GS-12, Step 1 level pay scale for "Rest of U.S." in the law enforcement general schedule (GS) in effect at the beginning of the calendar year (CY), the parent agency's FY, or other 12-month period selected by the parent agency.

In addition, this reimbursable overtime rate is the maximum that an officer can receive during the CY, FY, or other 12-month period from all Federal funding sources combined. As the cap on overtime from all Federal sources is imposed by other Federal agencies, including the Department of Justice (DOJ) and Department of Homeland Security (DHS), ONDCP has no authority to waive or increase Federal overtime authorized for HIDTA task force officers who will exceed the limit.

For non-law enforcement officers, the maximum amount shall be the lower of: (1) the applicable state, local, and tribal regulations of the agency hiring or contracting with the individual; or (2) 25 percent of the Federal GS-12 step 1 level pay scale in the GS ("Rest of U.S.") in effect at the beginning of the calendar year, the parent agency's FY, or other 12-month period selected by the parent agency.

### 7.12.3 Responsibilities for Overtime Compliance

The participating agency or initiative supervisor of the personnel receiving HIDTA-funded overtime shall ensure overtime is tracked, the maximum allowable amounts are not exceeded, the overtime is for HIDTA initiative-related activities, and the individual does not receive overtime compensation from another funding source for the same hours worked.

### 7.12.4 Overtime Non-Compliance

ONDCP shall require repayment by the participating agency if overtime payments to an individual exceed the maximum limit or if the hours charged to overtime are found not to be for HIDTA initiative-related activities. If ONDCP finds that a parent agency's recordkeeping is deficient, ONDCP may impose additional reporting requirements on that agency.

### 7.13 Vehicles

Vehicles leased or purchased with HIDTA funds shall be used only for official HIDTA-related business in accordance with parent agency regulations. For each HIDTA-funded vehicle, the agency or



■■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

initiative using the vehicle must document its assignment in support of HIDTA initiative-related activities and provide a copy of the documentation to the Executive Director on an annual basis.

### 7.13.1 Eligible Uses of HIDTA Funds for Vehicles[48]

HIDTA funds may be used to (1) pay the purchase price of special purpose vehicles, such as a surveillance van, for a participating agency; (2) provide a vehicle allowance to a participating agency to lease or purchase a vehicle; and/or (3) provide a vehicle allowance for the use of privately-owned vehicles.

Participating agencies that choose to apply a vehicle allowance toward the purchase of a vehicle shall ensure the vehicle is assigned to investigators working full-time in a HIDTA initiative and is used exclusively for HIDTA initiative-related activities. That portion of vehicle costs furnished by the entity that relates to personal use by employees (including transportation to and from work) is unallowable as fringe benefits or indirect costs.

HIDTA funds may be used to purchase, lease, or provide a vehicle allowance only for the Executive Director, Deputy Director, and state, local, and tribal law enforcement officers assigned full-time to a HIDTA initiative and who are on 24-hour recall status. HIDTA funds may be used to provide vehicles or a vehicle allowance for other positions with prior approval from ONDCP.

### 7.13.2 Federal Agency Prohibition for Vehicles

HIDTA funds shall not be used to purchase or lease vehicles, aircraft, or watercraft for assignment to federal agency personnel, and shall not be used for fuel, repair, and maintenance for vehicles purchased, leased, or otherwise acquired by federal agencies.

## 7.14 Liability Insurance

HIDTA funds may be used to purchase liability insurance for the Director, Executive Board, and the HIDTA staff where necessary and appropriate.  The coverage purchased with HIDTA funds shall be limited to the typical coverage provided for a public official in the HIDTA region.

HIDTA funds may be used to supplement existing liability insurance if that insurance is inadequate. In such cases, HIDTA funds may be used to acquire only the additional coverage needed to provide typical coverage for a public official in the HIDTA region.

If HIDTA funds are used to purchase liability insurance, the cost of that insurance shall be listed as a line item expense in the budget submission for the HIDTA's management initiative.

---

[48] The following information contains portions of direct excerpts from 2 C.F.R. § 200.431(f). Adherence to the complete citation of the regulation is required.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 7.15 Costs Related to Prosecutions

HIDTA funds may not be used for the salaries of attorneys, paralegals, or other staff involved in prosecuting criminal offenders or providing other legal assistance unless the activity clearly contributes to HIDTA initiatives.

### 7.16 HIDTA Travel Costs

Travel costs are the expenses for transportation, lodging, subsistence, and related items incurred by employees and/or contractors who are in travel status on official HIDTA business.  Travel funded with HIDTA appropriations must clearly benefit the HIDTA Program.[49]

#### 7.16.1 Non-Federal Travel

Travel costs for a non-Federal participant may be charged on an actual cost basis, on a per diem or mileage basis in lieu of actual costs incurred, or on a combination of the two, provided the method used is applied to an entire trip and not to selected days of the trip, and results in reasonable charges consistent with those normally allowed in like circumstances in the grantee's non-Federally-funded activities and in accordance with the non-Federal entity's written travel reimbursement policies.[50]

In the absence of an acceptable, written grantee agency policy regarding travel costs, the rates and amounts established under 5 U.S.C. §§ 5701-11, ("Travel and Subsistence Expenses; Mileage Allowances"), or by the Administrator of General Services, or by the President (or his/her designee) pursuant to any provisions of such subchapter must apply to travel under Federal awards.[51]

Costs incurred by employees and officers for travel, including costs of lodging, other subsistence, and incidental expenses, must be considered reasonable and otherwise allowable only to the extent such costs do not exceed charges normally allowed by the grantee in its regular operations as the result of the grantee's written travel policy.

#### 7.16.2 Federal Agency Travel

Travel expenses incurred by a Federal participant that are funded by a HIDTA award must be compliant with the travel requirements of the Federal agency receiving the HIDTA award.

#### 7.16.3 Foreign Travel Costs

HIDTA funds may not be used for foreign travel costs by non-Federal participants without the prior approval of ONDCP.  Each separate foreign trip must receive such written approval.  Requests for foreign travel need not contain "law enforcement sensitive" information; the case number, a summary of the investigative purpose, and roster of personnel required to travel is sufficient.  For purposes of this provision, "foreign travel" includes any travel outside Canada, Mexico, the United

---

[49] Refer to section 7.18.1 for requirements associated with OCDETF travel costs.
[50] Reference 2 C.F.R. § 200.475 for applicable regulations pertaining to travel costs.
[51] Reference 48 C.F.R. § 31.205-46(a) for additional information.



■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

States, and any United States territories and possessions.  Federal agencies must ensure other Federal resources are not available prior to using HIDTA funds for the international travel of Federal employees.

## 7.17 Organized Crime Drug Enforcement Task Force (OCDETF) Requirements

HIDTA initiatives and task forces routinely coordinate with OCDETF strike forces, and support investigations of OCDETF cases. Special provisions apply to the use of HIDTA funds for travel and overtime in support of OCDETF cases.

### 7.17.1 OCDETF Travel Costs

Once an investigation receives OCDETF designation, the OCDETF Program should pay for travel costs.  While there is no absolute prohibition on the use of HIDTA funds for travel related to OCDETF cases, HIDTA funds shall not be the first source of travel for OCDETF cases.

### 7.17.2 OCDETF Overtime

Once an investigation receives OCDETF designation, the OCDETF Program should pay for overtime. While there is no absolute prohibition on the use of HIDTA funds for overtime related to OCDETF cases, HIDTA funds should not be the first source of overtime for OCDETF cases.

## 7.18 Conferences

All HIDTA conferences require pre-approval from ONDCP. A "conference" includes a meeting, seminar, symposium, or workshop which has as its primary purpose "the dissemination of technical information beyond the NFE and is necessary and reasonable for successful performance under the Federal award."[52]

Conference hosts must exercise discretion and judgment in ensuring that conference costs are appropriate and necessary and are managed in a manner that minimizes costs to the Federal award. Conference approval requests shall consist of an initial request, followed by a conference plan. The initial request submitted to ONDCP shall include:

1. A description of its purpose;
2. A proposed location (city and state), proposed dates, and the estimated number of attendees.

Following approval of the initial request, the hosts/sponsors shall prepare and submit to ONDCP a more detailed conference plan to include the following:

1. A tentative outline of the conference agenda;

---

[52] Reference 2 C.F.R. § 200.432 for the complete definition and additional cost considerations pertaining to conferences.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

2. A detailed statement of costs to the award, including the estimated cost of employee or contractor travel to and from the conference;
3. The methodology used to determine costs related to the conference.

The conference plan must be submitted to ONDCP for review and approval prior to the expenditure or commitment of any HIDTA grant funds.

## 7.19 Prohibited Uses of HIDTA Funds

The Uniform Guidance (2 CFR Part 200) contains regulations governing the expenditure of Federal funds. In addition to the disallowable items listed in the regulations, ONDCP will not reimburse funds expended for the following items or purposes:

- Clothing or clothing allowances, except for items purchased for the safety of HIDTA personnel; such expenses must comply with each of the following the Government Accountability Office (GAO) guidelines:
    1. the item must be "special" and not part of the ordinary and useful furnishings an employee may reasonably be expected to provide for himself;
    2. the item must be for the benefit of the government, that is, essential to the safe and successful accomplishment of the work, and not solely for the protection of the employee; and
    3. the employee must be engaged in hazardous duty
- Food and beverage items; except for investigative or operational purposes allowed under specific circumstances, such as undercover operations;
- Personal hygiene or medication items, except for: (1) items such as toilet paper, hand towels, soap, and other items that are standard supplies for an office; and (2) special hygiene products for the mitigation of risks from contact with communicable pathogens or hazardous substances that arise from tasks performed by HIDTA participants (e.g., disinfectant wipes and liquids used after handling persons, evidence, seized materials, or executing a search warrant), first aid kit, cleaning products for office, facial tissue, tactical gloves;
- Promotional or representational items (e.g., hats, pins, T-shirts, or other memorabilia);
- Gifts, except for plaques and other commemorative items not exceeding $150 awarded to recognize service to a HIDTA initiative(s) or the HIDTA Program;
- Real property;
- Weapons and weapon accessories to include but not limited to weapon holsters for body and vehicles, riflescopes, red dot sights, night vision, gun storage, tactical vehicle weapon locking racks, and ammunition;
- Standard issue departmental-type equipment and uniforms including raid/tactical gear;
- Telecommunications or video surveillance equipment or services produced or provided by an entity that the Secretary of Defense, in consultation with the Director of National Intelligence (DNI) or the Director of the FBI, reasonably believes to be an entity owned or controlled by, or otherwise connected to, the government of a covered foreign country;[53]

---

[53] See John S. McCain National Defense Authorization Act of 2019, Pub. L. No. 115-232, § 889(b)(2), 132 Stat. 1613, 1917 (2018) . "Covered telecommunications equipment or services" include equipment manufactured



OFFICE OF NATIONAL DRUG CONTROL POLICY

- Professional association or bar dues; and
- Funeral expenses.

### 7.19.1 Common Use Items

Common use items not listed in Section 7.19 are allowable[54].  Common use items may include, but are not limited to kitchen appliances, such as refrigerators, microwaves, water coolers, and commercial coffee makers. Equipping the workplace with these items is reasonably related to the efficient performance of grant-funded activities and provides other benefits to the agency, including the assurance of a safe workplace.  However, these equipment items cannot be designated for the sole use of an individual, and must be located in only common areas accessible to all personnel.

### 7.20 Reprogramming HIDTA Grant Funds

ONDCP awards funds based on a review and assessment of the ABR submitted to ONDCP.  HIDTA Program funds must be used by recipients to carry out activities in support of the *National Drug Control Strategy*. All budget-related changes in the objective or scope of a project require prior approval using the FMS.

Any movement of funds between initiatives and grants is considered a reprogramming of those funds. There are two levels of reprogramming:  Level A reprogramming, which requires approval from ONDCP before the proposed reprogramming can be executed; and Level B reprogramming, which can be approved by the Executive Director subject to procedures established by the HIDTA's Executive Board.  Only ONDCP and Executive Directors are authorized to approve a reprogramming. Participating agencies and initiative supervisors do not have approval authority for reprogramming of HIDTA funds.

### 7.20.1 Level A Reprogramming

Changes to the grant or transfers of totals moving between any Federal agency or non-Federal entity to another Federal agency or non-Federal entity is considered a Level A Reprogramming and requires pre-approval by ONDCP. Such reprogramming may require an amendment to the total amount of funds awarded to a grantee or the amount of funds transferred to a Federal agency. Because both of these actions require changes to account balances established by ONDCP, any such reprogramming, regardless of the amount involved, must be approved by ONDCP.

Substantial changes to initiative budgets are also subject to review and pre-approval by ONDCP when the following conditions apply:

---

by or services provided by corporations and subsidiaries owned, controlled by, or otherwise connected to the government of the People's Republic of China.  132 Stat. at 1918.

[54] Also refer to the chart of accounts available on HRMS.



■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

1. Initiatives with budgets of $100,000 or more – Approval from ONDCP is required for any reprogramming of an amount equal to or greater than 20 percent of the initiative's currently approved budget.

2. Initiatives with budgets of less than $100,000 – Approval from ONDCP is required for any reprogramming of an amount equal to or greater than 35 percent of the initiative's currently approved budget.

### 7.20.2 Level B Reprogramming

Executive Directors, subject to procedures established by the Executive Board, may approve any reprogramming not subject to the requirements for a Level A reprogramming.

### 7.20.3 Submission of Reprogramming Requests to ONDCP

All reprogramming requests must be submitted to ONDCP by the Executive Director using the HIDTA FMS. Each request for a reprogramming shall include sufficient detail to enable ONDCP to assess the request; e.g., a request to reprogram funds into equipment must include a list of equipment to be purchased.

### 7.20.4 Federal Reprogramming Deadline

Requests to reprogram funds from one Federal agency to another or between a Federal agency and a non-Federal entity will be collated and processed on September 30th, December 31st, and March 31st. The final deadline for such reprogramming is March 31st of the final year following the appropriation of the funds. In other words, if the award is a 2-year award, the reprogramming must be submitted by March 31st of the second year of the award. Requests for an unexpected or urgent reprogramming will be considered by ONDCP.

## 7.21 Terminated Initiatives

If an Executive Board terminates an initiative that has not expended all funds budgeted for that initiative, the Executive Director shall reprogram the remaining funds within 90 days of the termination. The IDBP for that initiative must reflect any outputs that were accomplished by the initiative before it was terminated for the remainder of the reporting period. Reprogramming of funds of terminated initiatives shall be considered Level A reprogramming.

## 7.22 Financial Limitations on Treatment and Prevention Initiatives

Due to limitations enacted by the SUPPORT Act, no more than 5 percent of Federal funds appropriated for the HIDTA Program will be expended for substance use disorder treatment programs and drug prevention programs.[55] The five percent cap for substance use disorder treatment programs and drug prevention programs is program-wide and does not apply to an

---

[55] Refer to 21 U.S.C. § 1706(f)



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

individual HIDTA. Since this threshold cannot be exceeded, budget and/or reprogramming submissions are subject to rejections.

## 7.23 Asset Forfeiture Proceeds

Asset forfeiture proceeds generated by the HIDTA-funded initiatives shall not be considered as program income earned by HIDTA grantees or resource recipients.  ONDCP encourages HIDTA Executive Boards to establish procedures for using asset forfeiture proceeds generated by HIDTA activities to supplement HIDTA-funded activities.

## 7.24 Confidential Payments

HIDTA Program funds may be used by participating agencies for the confidential purchase of services, evidence, and information, subject to the requirements of this subsection.  These provisions apply to all grantees or resource recipients involved in the use of HIDTA grants for confidential funds.

Confidential funds are those monies allocated under the following categories:

- Purchase of Services (P/S) – This category includes travel or transportation of an informant; the lease of an apartment, business front, luxury-type automobiles, aircraft, or boats, or similar effects to create or establish the appearance of affluence; and/or meals, beverages, entertainment, and similar expenses (including buying money and flash rolls, etc.) for undercover purposes, within reasonable limits.

- Purchase of Evidence (P/E) – This category is for the purchase of evidence and/or contraband (e.g., narcotics and other dangerous drugs, firearms, stolen property, counterfeit tax stamps, documents) required to determine the existence of a crime or to establish the identity of a participant in a crime.

- Purchase of Specific Information (P/I) – This category includes the payment of monies to an informant for specific information.  All other informant expenses would be classified under P/S and charged accordingly.

### 7.24.1 Written Procedures

Special accounting and control procedures should govern the use and handling of HIDTA Program funds for confidential expenditures.  Expenditures must be accurately reported as PE/PI/PS to properly account for spending and provide accurate forecasts of projected needs.  Each agency authorized to disburse confidential funds must develop and follow written procedures that incorporate the elements listed below. This information must be made available to the Executive Director, his/her representatives, or to representatives of ONDCP upon request. If an agency does not have such procedures, the Executive Director is responsible for working with that agency to develop adequate procedures.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

Transaction records must clearly reflect:

- Case identifier;
- The date of payment(s) of confidential funds;
- The purpose for which the funds were used;
- Informant number or other non-sensitive identifier;
- Adequate explanation to allow an auditor to determine that the funds were properly categorized; and
- The names and signatures of the payer, the witness to the payment, and the person approving the payment. These must be three separate individuals.

### 7.24.2 Documentation

Purchase of Services expenditures, when not endangering the safety of the officer or informant, must be supported by canceled tickets, receipts, lease agreements, etc.  If not available, the office head or his immediate subordinate must certify that the expenditures were necessary and justify why supporting documents were not obtained.

HIDTA grantees and resource recipients must document informant identities, actual receipts, and other information that the agency deems appropriate.  These records may be maintained as sensitive and for agency use only.

## 7.25 Financial Reporting

Officials requesting HIDTA funds must assist in coordinating the administration of HIDTA funds with their agency's administrative offices, the Executive Director, the NHAC, and ONDCP.

### 7.25.1 Federal Financial Report

HIDTA grantees are required to electronically submit, via the Department of Health and Human Services' (HHS) Payment Management Services (PMS) website, Federal Financial Reports (FFR) on a quarterly basis within 30 days after the reporting period.  The FFR consists of two reports: the Federal Cash Transaction Report (previously PSC-272) and the Federal Financial Report (previously SF-269 or Federal Status Report).  Failure to submit these reports on a timely basis will result in suspension of payment approvals.

Online access to the PMS website is required to complete both FFRs.  Proper internal controls are necessary to ensure that authorized officials from the grantee organization (as described in 200.415) are tracked, and perform separate duties in preparing and certifying financial reports.

### 7.25.2 Request for Reimbursement or Advance

Grantees are required to submit a Detailed Expenditure Worksheet (DEW), at least quarterly, to request reimbursement. Similarly, details specifying the need for the advance must accompany an advance request.  Documentation of how the advance was spent must be submitted within 21 days



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

of use of funds and prior to another advance or reimbursement request.  Requests for reimbursement or advances shall be submitted through the Executive Director to the NHAC.  All other provisions for submission of Requests for Reimbursement are contained in the Attachment to the Grant Agreement.

### 7.25.3 Federal Agency Quarterly Expenditure Reporting

In accordance with the HIDTA MOA, Federal agencies are required to submit a quarterly report of initiative obligations and expenditures to the Executive Directors and the National HIDTA Director.

### 7.25.4 Financial Management

The following information contains portions of direct excerpts from 2 C.F.R. § 200.302(a).  Adherence to the complete citation of the regulation is required.

Each State must expend and account for the HIDTA award in accordance with state laws and procedures for expending and accounting for the state's own funds.  In addition, states and other non-Federal entity's financial management systems, including records documenting compliance with Federal statutes, regulations, and the terms and conditions of the Federal award, must be sufficient to permit the preparation of reports required by general and program-specific terms and conditions; and the tracing of funds to a level of expenditures adequate to establish that such funds have been used according to the Federal statutes, regulations and the terms and conditions of the Federal award.

### 7.25.5 Financial Management System (FMS)

The HIDTA FMS serves as a data collection and tracking system for ONDCP.  It is not the system of record for grantees.  Grantee's system of record should meet the requirements listed under 2 C.F.R. § 200.302 (b).  The HIDTAs and ONDCP are required to use the automated HIDTA FMS to perform the following tasks:

- Budgeting
    - o Prepare and submit budget requests
    - o Review and approve budget requests
    - o Adjust and track all spending associated with budget requests
- Managing disbursements and grant balances
    - o Record and approve reimbursements and advances: HIDTAs that have outstanding discrepancies between FMS and DPM balances shall provide to ONDCP a timeline for reconciling the differences.
- Recording reprogramming entries
    - o Submit, review, and approve reprogramming entries.
- Processing grant extensions
    - o Submit, review, and approve requests for grant extensions.
- Tracking grant balances
    - o Create summary reports for internal use.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- Grant closure
  - Approve grant closure

## 7.25.6 Grant Closure and Record Retention

Upon the conclusion of administering the HIDTA grants, proper grant close out and record retention are required. Submit closeout documents and complete closeout requirements within 90 days after the end of the grant, including final financial reports like the Federal Cash Transaction Report (FCTR) and Federal Financial Report (FFR), compliance with all special conditions, financial reconciliation, and submission of all required deliverables. Upon completion of the closeout requirements, approval of grant closure within the FMS system is necessary to complete the grant file and generate the closeout letter.

All reporting and records should be retained for a period of three years from the day the grantee submits its final expenditure or audit, whichever is later.

## 7.25.7 Payment Management System

Agencies must use the PMS to request payment of grant funds. PMS is managed by the Division of Payment Management Services of the HHS. Immediately after requesting payments in the PMS, and again after the reimbursements are received, agencies or HIDTAs must record the disbursement details in the HIDTA FMS to ensure a current grant balance.

Proof of spending or refunds of payments should be sent back to the HHS-PMS within three days. Refer to Remittance instructions provided within the award document.

## 7.26 Conflicts of Interest

Grantees must disclose in writing any potential conflict of interest to ONDCP or the pass-through entity. This disclosure must take place immediately for applicants as well as those with an active ONDCP award. The ONDCP conflict of interest policies apply to sub-awards, as well as contracts, and are as follows:

- As a non-Federal entity, a grantee must maintain written standards of conduct covering conflicts of interest and governing the performance of grantee's employees engaged in the selection, award, and administration of sub-awards and contracts.

- None of a grantee's employees may participate in the selection, award, or administration of a sub-award or contract supported by a Federal award if he or she has a real or apparent conflict of interest. Such a conflict of interest would arise when the employee, officer, or agent, any member of his/her immediate family, his/her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from an organization considered for a sub-award or contract. The officers, employees, and agents of the non-Federal entity must neither solicit



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

nor accept gratuities, favors, or anything of monetary value from sub-recipients or contractors or parties to sub-awards or contracts.

- If a grantee has a parent, affiliate, or subsidiary organization that is not a state government, local government, or Indian tribe, the grantee must also maintain written standards of conduct covering organizational conflicts of interest. Organizational conflicts of interest means that because of relationships with a parent company, affiliate, or subsidiary organization, the grantee is unable or appears to be unable to be impartial in conducting a sub-award or procurement action involving a related organization.

## 7.27 Mandatory Disclosures

Grantees or applicants must disclose, in a timely manner, in writing to ONDCP all violations of Federal criminal law involving fraud, bribery or gratuity violations potentially affecting the Federal award.  Non-Federal entities that have received a Federal award that includes the term and condition outlined in 2 C.F.R. Part 200, Appendix XII "Award Term and Condition for Recipient Integrity and Performance Matters," are required to report certain civil, criminal, or administrative proceedings to the System for Award Management (SAM).  Failure to make required disclosures can result in remedies such as: temporary withholding of payments pending correction of the deficiency, disallowance of all or part of the costs associated with noncompliance, suspension, termination of award, debarment, or other legally available remedies outlined in 2 C.F.R. § 200.338 "Remedies for Noncompliance".

## 7.28 Remedies for Non-Compliance

The following information contains portions of direct excerpts from the Uniform Guidance. Adherence to the complete citation of the regulation is required.

If a grantee fails to comply with Federal statutes, regulations, or the terms and conditions of the award, ONDCP may impose additional conditions pursuant to 2 C.F.R. § 200.208.  If ONDCP determines that noncompliance cannot be remedied by imposing additional conditions one or more of the following actions may occur under 2 C.F.R. § 200.339 (a) – (f):

1. Temporarily withhold cash payments pending correction of the deficiency;
2. Disallow the use of funds for all or part of the activity or action not in compliance;
3. Wholly or partly suspend or terminate the Federal award;
4. Initiate suspension or disbarment proceedings as authorized under 2 C.F.R. Part 180;
5. Withhold further awards for the project or program; or
6. Take other action that may be legally available.

## 7.29 Financial Audits

Financial audits express an opinion on a grantee's statements of costs claimed in an effort to provide reasonable assurance that said statements are free from material misstatement.   Financial audits provide independent review and reasonable assurance on whether a grantee's financial



OFFICE OF NATIONAL DRUG CONTROL POLICY

information is presented fairly, its internal controls are adequate, and the grantee complies with laws and regulations. Specifically, an auditor's opinion evaluates whether (1) financial information is presented in accordance with established criteria, (2) the grantee has adhered to specific financial compliance requirements, and (3) the grantee's internal control structure over financial reporting and safeguarding assets is suitably designed and implemented to achieve the control objectives.

### 7.29.1 Single Audit

This type of audit is commonly referred to as a Single Agency Audit. A non-Federal entity that expends $750,000 or more during the non-Federal entity's FY in total Federal awards must have a single or program-specific audit conducted for that year in accordance with the provisions of 2 C.F.R. Part 200.

Within the limitations established in 2 C.F.R. § 200.425 a reasonably proportionate share of the costs of audits required by, and performed in accordance with, the Single Audit Act Amendments of 1996 (31 U.S.C. §§ 7501-7507), are an allowable use of HIDTA funds.

### 7.29.2 Report Copies

Unless restricted by Federal law or regulation, the auditee must make report copies available for public inspection via the Federal Audit Clearinghouse (FAC). Auditees and auditors must ensure that their respective parts of the reporting package do not include protected personally identifiable information. Failure to submit report copies may result in an increased risk assessment. Courtesy copies may be provided to ONDCP, but are not mandatory.

### 7.30 ONDCP Financial Audits

In order to obtain information needed to administer the program, ONDCP may fund additional fiscal audits of HIDTA grants. ONDCP-funded audits will comply with applicable Federal statutes and regulations and will meet Federal auditing standards.

The ONDCP-contracted audits (ONDCP audits) often identify opportunities for improving operations and governance. The auditee is responsible for follow-up and corrective action on all audit findings. Audits can also identify strategies to reduce costs and strengthen controls intended to safeguard assets. These varying scopes and objectives will therefore present many different types of findings and recommendations. It is ONDCP's goal that every audit have a positive result, and audit findings and recommendations present both the grantee and the HIDTA with the opportunity to take positive action and document their efforts to improve operations.

### 7.30.1 Audit Response

The grantee's written response to an audit summarizes its position concerning the draft findings and recommendations. Near the end of the audit, the ONDCP auditor will provide the grantee with a copy of the draft audit report. The auditor will also, as a general rule, schedule a discussion with



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

appropriate officials to go over the tentative findings and recommendations contained in that draft audit report.  The grantee will have 30 days from the date the audit report is provided to respond.

The audit response is incorporated in the final report.  If the grantee submits a response letter, the auditor will evaluate the response and determine if a finding or recommendation can be removed or modified.  The grantee's response will be embedded into the final audit report and corrections to the report will be made where appropriate.

Draft reports without a response:  If the grantee does not submit a response letter, ONDCP's auditor will release the final audit report with a statement in the opinion letter and a notation after each finding that the grantee did not submit a written response within the time required.

### 7.30.2 Financial Audit Corrective Action Plan (CAP)

All grantees that receive audit reports with recommendations should file a CAP with ONDCP.  When preparing the plan, each corrective action should be described in sufficient detail to describe clearly what corrections have occurred or are planned.  For planned actions, the plan should include contact information on who is responsible for implementation and the expected date of completion.  The audit response may be used to satisfy this requirement if the response includes clearly labeled corrective actions to be taken.

A CAP shall be sent as an email attachment to ONDCP.

### 7.31 General Provisions for Public Statements

Pursuant to the Consolidated Appropriations Act, 2021, Pub. Law 116-260, Div. E, Tit. VI, § 633, when issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with federal money, all grantees receiving Federal funds included in this act, shall clearly state:

> (1) the percentage of the total costs of the program or project which will be financed with Federal money;

> (2) the dollar amount of Federal funds for the project or program; and

> (3) percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# 8.0 PROPERTY MANAGEMENT

HIDTA grantees or resource recipients, Executive Directors, participating agencies, and initiative participants share responsibility for ensuring that equipment purchased with HIDTA funds is used to the maximum benefit of HIDTA initiatives and that its use complies with all ONDCP requirements pertaining to equipment management. This section describes the minimum standards for meeting those requirements.

## 8.1 General Requirements

The requirements established in this section apply to all tangible, nonexpendable, personal property having a useful life of more than one year and an acquisition cost of $5,000 or more per unit at the time of purchase.  Each HIDTA grantee or resource recipient that acquires or holds HIDTA-purchased equipment must have a property management system to ensure adequate safeguards to prevent loss, damage, or theft of the property.  Any loss, damage, or theft must be investigated.

If a HIDTA grantee does not have an adequate system for meeting the requirements of this section, the Executive Director shall work with the grantee to develop a system that meets these requirements before any equipment can be purchased with HIDTA funds. HIDTA-purchased equipment shall be retained at the initiative for which it was purchased, unless there are compelling reasons to do otherwise.  The Executive Director must be notified in writing by the initiative supervisor of the off-site storage of any equipment purchased with HIDTA funds.

## 8.2 Use of HIDTA-Purchased Equipment

Equipment purchased with HIDTA funds is intended for use in HIDTA-funded initiatives.  Grantees may authorize the use of such equipment in non-HIDTA activities if those activities are consistent with the Executive Board's strategy, do not interfere with the work of HIDTA initiatives, and do not become the primary use (or permanent user) of the equipment.

Executive Directors are required to coordinate with grantees to establish a mechanism for sharing HIDTA-purchased equipment among HIDTA initiatives and for tracking the location of shared equipment.

If a grantee acquires equipment with HIDTA funds and later ceases to participate in the HIDTA, this equipment must be made available to the HIDTA's Executive Board for use by other HIDTA participants. Additional information regarding the handling of equipment purchased with HIDTA funds can be found in 2 C.F.R. § 200.313.

## 8.3 Equipment Tracking System

Each HIDTA grantee that acquires or holds HIDTA-purchased equipment must maintain a tracking system to account for all HIDTA-purchased equipment, vehicles, and other items valued at $5,000 or more at the time of purchase.  Grantees may include lower-cost items in this tracking system that may have a high-risk of theft or loss.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 8.4 Required Information

Grantee property records shall include for each piece of HIDTA-purchased equipment:

- A description of the property;
- A serial number or other identification number;
- The source of the property (manufacturer) and the model or series;
- The source of the funding for the property [including the Federal Award Identification Number (FAIN)];
- Title holder (purchasing agency);
- The acquisition date and the cost of the property (from invoice);
- The percentage of the purchase price that came from HIDTA funds;
- The location, use, and condition of the property;
- Any reported loss, damage, or theft of the equipment; and
- Any ultimate disposition data including the date of disposal and sale price of the property.

## 8.5 Depreciation

Consistent with the above, HIDTAs are encouraged to use the same schedule of depreciation as their fiduciaries for property entered into inventory either because of cost or risk.

## 8.6 Identification of Equipment Purchased with HIDTA Funds

All equipment purchased with HIDTA funds must be clearly marked as such and have a unique identifier that links the equipment to the HIDTA's inventory tracking system(s).  Grantees or resource recipients may use their own systems to mark and identify equipment to the extent it meets these requirements, and is consistent with the HIDTA's inventory tracking system(s).

## 8.7 Inventory Requirements

Grantees that use HIDTA funds to purchase equipment must maintain a current inventory of HIDTA-purchased equipment and must provide that inventory to the Executive Director or an ONDCP employee upon request.

Executive Directors must be able to provide a copy of each such inventory upon request.
Each HIDTA grantee must conduct a 100-percent physical inventory of HIDTA-purchased equipment at least every two years and provide a copy of that inventory to the Executive Director.

As part of the HIDTA's annual internal review, the Executive Director shall perform a physical inventory of a sample of equipment purchased by each HIDTA grantee.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

## 8.8 Disposition of Equipment

Grantees must notify the Executive Director prior to disposing of HIDTA-purchased equipment. Grantees or resource recipients shall document the disposition of any HIDTA equipment and provide that documentation to the Executive Director.[56]

## 8.9 Protection of Sensitive Equipment

Initiative supervisors shall ensure that all sensitive information is removed from the hard drives of a computer before it leaves the premises for repair or disposal.  Removal of the data on the hard drive should be consistent with Department of Defense (DOD) standard 5220.22M or National Institute of Standards and Technology (NIST) Publication 800-88.

## 8.10 Accountability for Equipment

Initiative supervisors shall immediately report any item that is lost, stolen, or otherwise unaccounted for to the respective grantee or resource recipient and the Executive Director.  The grantee's procedures shall be followed to investigate the loss or theft of any equipment. Documentation of the investigation shall be provided to the Executive Director.

## 8.11 Equipment Maintenance

Grantees must develop adequate maintenance procedures to keep equipment in good condition.

## 8.12 Supply Chain Security

Each HIDTA must implement protocols and procedures to ensure HIDTA funds are not used to purchase equipment or services from prohibited foreign vendors, per Section 7.20. HIDTA inventory management must include the capture of sufficient information to verify, upon request, compliance with applicable regulations pertaining to supply chain security and foreign vendors, to include (but not limited to) guidance or requirements issued by the NHPO.

---

[56] Instructions for proper disposition of equipment can be found in 2 C.F.R. § 200.313.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# 9.0 INFORMATION TECHNOLOGY (IT) MANAGEMENT

Each HIDTA is required to maintain and secure the IT necessary to fulfill the HIDTA mission. HIDTA Executive Boards, Executive Directors, IT managers, and the participating agencies share the responsibility of maintaining and securing the HIDTA's IT infrastructure.

## 9.1 HIDTA IT Management Framework

HIDTAs are not agencies, and therefore do not own data or information. However, each HIDTA is responsible for ensuring its initiatives are able to operate efficiently and effectively, and must provide the necessary infrastructure—as deemed appropriate by the Executive Board—for HIDTA activities. This may include the transfer, storage, and limited control of data and information exchanged by participating agencies.

In general, HIDTA IT functions and support fall into the following categories:

- Operational Support
- Information Sharing
- Security
- Privacy

Other support functions may be determined by the Executive Board. However, additional requirements or tasking must not supersede or otherwise limit a HIDTA's ability to support activities required herein.

### 9.1.1 Operational Support

Each HIDTA must provide the necessary IT infrastructure to support the initiatives, as well as the administrative and accountability functions of the management initiatives. This may include building and sustaining IT infrastructure in coordination with participating agencies. Generally, IT operational support functions fall into two broad categories: administrative functions and information management.

Administrative functions consist of the HIDTA's ability to communicate, access required databases (e.g., FMS and PMP), and engage in file sharing, among other activities. These functions are necessary for the proper administration of the grant including, at minimum, oversight of the initiatives, performance reporting, and financial transactions.

Information management includes the HIDTAs participation in, and facilitation of information exchanges by HIDTA initiatives. This may include providing access to portals or other mechanisms for transferring information to/from HIDTA participating agencies, and temporarily storing or controlling access to information. Such activities may be subject to regulations and legal restrictions pertaining to such activities and information exchanges. It is each HIDTA's responsibility to ensure that its information management support activities are compliant with the applicable regulations and legal restrictions.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 9.1.2 Information Sharing

All HIDTA participating agencies are required to share data and information with other HIDTA participating agencies, and in some instances, non-participating agencies. Handling of that information is subject to applicable rules/standards/regulations governing such information, as well as any restrictions applied by the participating agency/agencies. HIDTAs must be able to support and sustain the sharing of information between initiatives and participating agencies, as well as non-participating agencies operating within their regions.[57] Specifically, each HIDTA must ensure that the ISC and ancillary intelligence initiatives are capable of fulfilling applicable grant requirements.

### 9.1.3 Security

HIDTAs are a trusted entity within the law enforcement community and must ensure that their equipment, systems, networks, and information are protected against cyber-attack and other vulnerabilities. HIDTAs are expected to coordinate with partner agencies to periodically conduct risk-based assessments of the IT infrastructure, and develop the appropriate plans to respond quickly and effectively to security incidents.

### 9.1.4 Privacy

Every HIDTA must be committed to ensuring the privacy of law enforcement personnel and the public. HIDTAs are required to develop or otherwise adopt privacy policies and maintain current versions to protect sensitive personal identifying information (PII), which may include the HIDTA support staff and members of participating agencies.

## 9.2 Roles and Responsibilities

Each HIDTA must designate an IT manager to oversee the HIDTA IT functions and activities. This includes oversight of the HIDTA's IT infrastructure—which may include HIDTA-purchased equipment—and implementation of the appropriate policies, procedures, and protocols for the IT functions. At a minimum, the IT manager is responsible for ensuring that all applicable grant requirements are met, and facilitating the necessary cooperation and coordination among the participating agencies to meet those requirements.

IT managers may be contractors or employees of a grantee, and shall report to the Executive Director or their designee. Additional roles, responsibilities, and minimum qualifications are established by the Executive Board, in coordination with the participating agencies.

---

[57] For more information on the types of required information sharing activities that require dedicated HIDTA support, refer to section 9.1.2.



OFFICE OF NATIONAL DRUG CONTROL POLICY

## 9.3 Compliance with Applicable Regulations, Protocols, and Standards

Each HIDTA is required to be aware of, and in compliance with, the applicable Federal, state, and local regulations regarding IT operations, security, procurements, privacy protections, and data management. HIDTAs may also be subject to regulations or other requirements issued by their fiduciaries and participating agencies, and must coordinate with partners to ensure compliance.[58]

HIDTAs must ensure that information system(s) security policies are established or adopted that meet or exceed the minimum-security requirements of the participating agencies. When appropriate, HIDTAs will ensure, in coordination with participating agencies, that the sharing of information is compliant with all applicable standards and guidelines, such as (but not limited to) the Criminal Justice Information Services (CJIS) standards and/or the NIST special publications.

## 9.4 Handling of Classified and Sensitive Material

All personnel are required to store all files, documents, and data storage devices in compliance with information classification and handling restrictions of the agency that originated the document or material or the sponsoring agency for the intelligence initiative, whichever has the more secure standard.  Safeguarding and handling of classified information shall comply with applicable Executive Orders, and information systems security policies must meet or exceed the minimum security requirements of the participating agencies.

LES data in digital transit between electronic systems shall be encrypted per the NIST encryption standards when practicable. At a minimum, LES information shall only be transmitted to trusted parties on trusted systems that ensure the security of the data. The removal of sensitive information from commercial systems must also be consistent with applicable standards.[59] Commercial systems must comply with NIST Special Publication 800-53 in order to store or process LES data.  Examples of commercial systems include, but are not limited to, commercial cloud services, data backup services, and data storage services, among others.

## 9.5 Acceptable Use Policy

HIDTAs shall develop or adopt an Acceptable Use Policy (AUP) that addresses the rules and conditions pertaining to (at minimum) the following:

- o Data protection;
- o Virus protection;
- o Electronic communication;
- o Internet use;
- o Portable and remote computing;
- o Passwords;
- o Confidential/protected information;

---

[58] For reference to examples of applicable laws, regulations, and other guidance, please refer to the most recent edition of the HIDTA IT Manager's Handbook.
[59] See DOD standard 5220.22M or NIST Special Publication 800-88r1.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

- o   Privacy;
- o   Incidental use information resources; and
- o   Physical security.

Adoption of participating agency AUPs is permissible, with the approval of the Executive Board. Such approvals—and adopted policies—should be continuously maintained, with the most current version of the AUP implemented by the HIDTA at all times.

## 9.6 Procurement and Inventory

At a minimum, each HIDTA is required to follow the standards and definitions for information technology purchases and acquisitions found in 2 C.F.R. Part 200. HIDTAs must also adhere to other applicable Federal regulations, and the regulations and procedures applicable to or issued by the participating agencies.

All IT inventory is subject to the provisions outlined for property management found in Section 8.0 of this document.



OFFICE OF NATIONAL DRUG CONTROL POLICY

# 10.0 PERFORMANCE MANAGEMENT

The purpose of this section is to describe the process ONDCP will use to assess the quantitative performance of Executive Boards and the overall performance of the HIDTA Program (see section 5.13 for information on Executive Board requirements pertaining to initiative formation and performance). Using data drawn from the PMP database, ONDCP will assess the performance of each regional HIDTA Program and of the National HIDTA Program.  The information obtained from the PMP system will also assist ONDCP with performance-based funding decisions, and is a critical component of the ABR review and approval process.

## 10.1 PMP User Guide

The PMP User Guide is a companion to this document.[60] HIDTAs must observe all of the requirements for submitting performance data contained in the PMP User Guide, including definitions and deadlines for submission of PMP data.

## 10.2 HIDTA Performance Measures

Performance measures are the statistics, indicators, or other metrics used to gauge the performance of an individual HIDTA's operations.  Program performance measures include outcome measures, output measures, and efficiency measures.  Because there is no highly accurate, timely, and comprehensive information describing key elements of a HIDTA's activities (e.g., the quantity of drugs available in the area, the number of DTOs operating in a HIDTA), ONDCP uses output measures as proxies for outcome measures.

Separately, output measures and efficiency measures provide useful and complementary information about program performance.  Together, these measures convey a broad picture of how effectively and efficiently a HIDTA operates.  ONDCP is responsible for identifying performance measures that reflect the two HIDTA Program goals and ensuring the measures meet the following criteria:

- The performance measures must be meaningful and clearly related to the HIDTA Program goals.
- The performance measures must relate to something all HIDTAs do.
- The performance measures should be outcome-oriented, not just a measure of workload.
- There must be a sound methodology for collecting the information and data necessary for a performance measure.
- The performance information must be verifiable with reliable data.

ONDCP may add, delete, or revise performance measures as needed to better reflect outcomes for the HIDTA Program.

---

[60] All references to the PMP User Guide refer to the most recent version issued by the Washington-Baltimore HIDTA.



OFFICE OF NATIONAL DRUG CONTROL POLICY

## 10.3 Core Performance Measures

ONDCP has established core performance measures that all HIDTAs must report on a quarterly basis.[61] ONDCP may negotiate specific performance targets for some of these measures with each Executive Board as part of the ABR review and approval process. These measures are as follows:

1. DTOs and money laundering organizations (MLOs) Disrupted and Dismantled as Percent of Expected
2. DTOs and MLOs Disrupted and Dismantled as Percent of all DTOs/MLOs Open
3. Priority Organizations Disrupted or Dismantled
4. Quantity and Wholesale Value of Drugs Removed from the Marketplace
5. Return on Investment (ROI) for HIDTA Activities
6. Clandestine Methamphetamine Labs Dismantled
7. Training Funded and Supported by HIDTA
8. Deconflictions Processed
9. Cases Provided Analytical Support
10. Case Agent Satisfaction with Case Support Provided
11. Law Enforcement Executives Assessment of Strategic Intelligence Products Produced

In addition to these core measures, HIDTA may report threat-specific performance data or the activities of support initiatives to the Executive Board and other stakeholders, including ONDCP in the form of "other outputs" entered into PMP.

## 10.4 Establishing Annual Performance Targets

Because the identified threats, geographic size, budgets, and other factors vary from HIDTA to HIDTA, the performance targets for individual HIDTAs will reflect the specific conditions, resources, and mix of activities in each HIDTA. For example, an Executive Board may fund a larger than average number of interdiction initiatives. Consequently, it may expect to disrupt and dismantle fewer DTOs than another Executive Board that focuses on investigative work. However, that same Executive Board may expect relatively more seizures than the Executive Board that focuses on disrupting or dismantling DTOs.

Executive Boards must ensure they state their performance targets for each performance measure to ONDCP as part of the annual budget submission.[62] The targets should reflect the sum of what all HIDTA initiatives expect to accomplish in the upcoming program year, as stated in the IDBPs.

In the IDBP, each initiative must project what it expects to accomplish in the upcoming year. In determining an appropriate performance target, the target projections should consider the annual average for the previous 3 years and adjust that figure according to changes in the initiative's budget, staffing, non-HIDTA resource levels, and any changes to the initiative's priorities or drug

---

[61] HIDTAs are expected to submit quarterly PMP data within 30 days following the end of the quarter. For the final quarter of a reporting cycle, data must be submitted no later than March 1.

[62] Refer to section 5.20 for information regarding the setting of targets, and the expectations of the Executive Board for establishing and revising performance targets in coordination with ONDCP.



trafficking conditions in the HIDTA.  Executive Boards should ensure their performance targets are consistent with the guidance issued in the most recent edition of the PMP User Guide.

## 10.5 PMP Database and Utilization

The primary tool for collecting and generating the information needed to assess performance in the HIDTA Program is the PMP database.  The PMP was designed to assist ONDCP in assessing the performance of the HIDTA Program.

The PMP is a web-based system capable of generating most of the required non-financial information and documents needed for the ABR to ONDCP.  The PMP was designed to use, as much as possible, data already collected by HIDTAs and to fit seamlessly into the established cycle of annual program reporting requirements.

The PMP database is used to enter common descriptive information about each HIDTA-funded initiative and information specific to what the initiative expects to accomplish in a program year. The information entered for each initiative reflects the type of initiative (i.e., Enforcement, Intelligence, etc.).

During the year, Executive Directors must ensure performance data are entered into the PMP database at least quarterly.  Reporting in the PMP database must be consistent with the current applicable guidelines and definitions in the PMP User Guide which is available in the PMP database. Executive Directors are responsible for ensuring the accuracy of the data entered.

## 10.6 PMP Coordinator Roles and Responsibilities

Each HIDTA must designate a PMP Coordinator to serve as the primary point of contact and administrator and ensure the reliability and accuracy of data and information entered into the PMP system.[63] It is the PMP Coordinator's responsibility, under the direction of the Executive Director, to ensure compliance with the performance reporting provisions in this document, as well as the PMP User Guide. The PMP Coordinator is also required to maintain PMP certification, ensure that appropriate HIDTA personnel are trained annually on the PMP system and apprised to any changes in procedures or definitions, and assist ONDCP and independent auditors during performance audits and program reviews.

## 10.7 PMP Training and Certification

Each HIDTA PMP coordinator shall ensure that PMP training and updated PMP refresher training are provided annually to all persons responsible for collecting and/or entering data and information into the PMP system. The PMP Coordinator must determine annual training needs and provide refresher training such that any updates to this document or the PMP User Guide are communicated to the appropriate persons, and ensure that such training is provided in a timely manner.

---

[63] For additional information on roles, responsibilities, and expectations of the PMP Coordinator, refer to the PMP User Guide.



■■■■■ **OFFICE OF NATIONAL DRUG CONTROL POLICY**

At a minimum, the PMP Coordinator must complete the HIDTA PMP certification course offered by the NHAC. The PMP Coordinator is also required to re-take the certification course whenever the course or certification requirements are updated. The NHAC shall maintain a record of HIDTA PMP Coordinators and their certifications to ensure that all PMP Coordinators maintain up-to-date certifications.

## 10.8 Assessment of Performance

ONDCP's assessment of a HIDTA's program year performance includes a review of the progress towards achieving the performance targets established for that year through the ABR review and approval process.  If a core table shows that a HIDTA's actual performance for a core performance measure varied by 15 percent or more from the annual performance target, the HIDTA must explain the variance in the associated core table generated in PMP.

## 10.9 ONDCP Performance Audits

Performance audits designed to provide assurance of the accuracy and reliability of the data reported in the PMP will be conducted on a select number of HIDTAs each year.  Performance audits will be conducted by an independent auditor contracted to ONDCP.  The auditor conducting the performance audits will use the PMP User Guide as a standard for the years of the audits, including as a basis for definitions and reporting of the PMP data.  The HIDTA performance audit may be augmented with other ONDCP performance-based inquiries.  ONDCP-funded audits will comply with applicable Federal statutes and regulations and will meet Federal auditing standards.

The auditors will assess the reliability of the PMP data entered and determine if there is any associated material weakness or misstatement. An opinion letter will be provided consistent with the GAGAS stating this at the beginning of the audit report.  Additionally, the performance audit will note compliance with HIDTA PPBG and the PMP User Guide.  In the Performance Audit Report, auditors will provide recommendations to improve the reliability of the PMP data entered, with additional recommendations that do not address deficiencies but may enhance overall accuracy and reliability of future reporting submitted in the form of a management letter. The Executive Director will be responsible for implementing recommendations as appropriate and will be afforded the opportunity to respond to any findings and recommendations via writing for inclusion into the final audit report.

### 10.9.1 Role of the PMP Coordinator in Facilitating Performance Audits

PMP Coordinators are required to support all aspects of the performance audits. This may include providing source documentation and other requested information necessary to validate entries and reported totals. The PMP Coordinator will also serve as the primary point of contact for the audit team throughout the entire audit, and support the on-site requirements of the audit, and any post-audit data or information requests. Finally, the PMP Coordinator must, under the supervision of the Executive Director, implement audit recommendations and address any findings, including the drafting and implementation of a CAP if necessary.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

### 10.9.2 Performance Audit Corrective Action Plan

The performance audit contractor will incorporate edits as provided by the HIDTA and ONDCP, as applicable. The auditor will evaluate the response from the HIDTA and determine if a recommendation can be removed or modified.  The HIDTA's response will be embedded into the final audit report as applicable and where appropriate.

All HIDTAs that receive audit reports with recommendations shall file a CAP with ONDCP.  When preparing the plan, each corrective action shall be described in sufficient detail to describe clearly what corrections have occurred or are planned for the recommendations.  The audit response from the HIDTA may be used to satisfy this requirement if the response includes clearly labeled corrective actions to be taken.

The CAP shall be sent as an email attachment to ONDCP.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# APPENDICES

A: List of Acronyms and Abbreviations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

B: Glossary of Terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  71

C: Federal Register Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  75



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

# Appendix A:  List of Acronyms and Abbreviations

Acceptable Use Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  AUP
Annual Budget Request . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ABR
Annual Reporting Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ARR
Calendar Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CY
Clearance Management System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  CMS
Code for Federal Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . C.F.R.
Committee of Sponsoring Organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  COSO
Corrective Action Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CAP
Crime and Narcotics Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CNC
Criminal justice information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CJI
Criminal Justice Information Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CJIS
Department of Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOD
Department of Justice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DOJ
Department of Health and Human Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . HHS
Department of Health and Human Services Payment Management Services . . . . . . . . . . . . . . .  HHS-PMS
Department of Homeland Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DHS
Detailed Expenditure Worksheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DEW
Director of National Intelligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DNI
Drug Enforcement Administration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DEA
Drug Trafficking Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . DTO
El Paso Intelligence Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . EPIC
Executive Office of the President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  EOP
Federal Audit Clearinghouse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FAC
Federal Award Identification Number . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  FAIN
Federal Bureau of Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  FBI
Federal Cash Transaction Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FCTR
Federal Financial Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FFR
Federal Sub-award Reporting System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FSRS
Financial Crimes Enforcement Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FinCEN
Financial Management System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FMS
Fiscal Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . FY
Generally Accepted Government Auditing Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GAGAS
General Schedule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  GS
Government Accountability Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . GAO
HIDTA Directors Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . HDC
HIDTA Resource Management System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . HRMS
High Intensity Drug Trafficking Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  HIDTA
Homeland Security Information Network . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .HSIN



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

In-Sequence Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ISR
Initiative Description and Budget Proposals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IDBP
Investigative Support Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ISC
Information Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . IT
Joint Terrorism Task Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . JTTF
Law Enforcement Sensitive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . LES
Memorandum of Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . MOA
Money Laundering Organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . MLO
National Emerging Threat Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NETI
National HIDTA Assistance Center . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NHAC
National HIDTA Program Office . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NHPO
National Institute of Standards and Technology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NIST
National Marijuana Initiative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NMI
Nationwide Deconfliction Pointer Solution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NDPS
Non-Federal entity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . NFE
Office of Management and Budget . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . OMB
Office of National Drug Control Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ONDCP
Organized Crime Drug Enforcement Task Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . OCDETF
Out-of-Sequence Reviews . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . OSR
Payment Management Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PMS
Performance Management Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PMP
Personal Identifying Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PII
Program Policy and Budget Guidance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PPBG
Purchase of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P/E
Purchase of Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P/S
Purchase of Specific Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P/I
Regional Information Sharing System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . RISS
Return on Investment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ROI
System for Award Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SAM
Senior Executive Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SES
Standard Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SF
Standard Operating Procedure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SOP
United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . U.S.C.



OFFICE OF NATIONAL DRUG CONTROL POLICY

# Appendix B:  Glossary of Terms

| | |
|---|---|
| Award | Federal financial assistance that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity, and receives or administers in the form of grants. |
| Criminal Intelligence | The product of the analysis of raw information related to crimes or crime patterns with respect to an identifiable person or group of persons in an effort to anticipate, prevent, or monitor possible criminal activity. |
| Dissemination (of Intelligence) | The process of distributing analyzed intelligence in a timely fashion utilizing certain protocols in the most appropriate format to those in need of the information to facilitate their accomplishments of organizational goals. |
| Equipment | Tangible property (including software) that has a useful life more than 1 year and has a per-item cost above the lesser of: 1) $5,000, or 2) the threshold amount determined by the purchasing entity for classifying all its equipment and property. |
| Evidence-Based Prevention | Based on rigorous studies of the effects or outcomes of specific substance use prevention interventions or model programs. |
| Evidence-Informed Prevention | Utilizes approaches shown to be effective for substance use prevention that are science based, research supported, and consistent with the National Institute on Drug Abuse Principles of Prevention |
| Expenditure | An outlay of HIDTA program funds. |
| Extension | A change in the performance period to allow a longer period of time over which grant money can be spent. |
| Federal Law Enforcement Agency | For purposes of the HIDTA program, a Federal law enforcement agency includes the: Drug Enforcement Administration (DEA); Federal Bureau of Investigation (FBI); Immigration and Customs Enforcement (ICE); Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); U.S. Attorneys (USA); Customs and Border Protection (CBP); U.S. Postal Inspection Service; U.S. Coast Guard; Criminal Investigation Service of the Internal Revenue Service (IRS/CI); and law enforcement components of the U.S. Forest Service and the National Park Service. |



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

| | |
|---|---|
| Federal Register | A daily publication of the U.S. Federal government that issues proposed and final administrative regulations of Federal agencies. |
| Fiduciary | A non-Federal entity designated to handle the financial transactions (accounts receivable and accounts payable) for entities participating in a HIDTA.  A fiduciary serves as an independent "bookkeeping" office to receive and disburse HIDTA grant funds to state and local agencies, and sometimes Federal agencies.  A fiduciary is responsible for establishing and maintaining effective internal control over compliance with requirements of laws, regulations, contracts, and grants applicable to Federal programs. |
| Grant Agreement | A legal instrument of financial assistance between a Federal awarding agency or pass-through entity and a non-Federal entity that, consistent with 31 U.S.C. §§ 6302, 6304:<br><br>(a) Is used to enter into a relationship the principal purpose of which is to transfer anything of value from the Federal awarding agency or pass-through entity to the non-Federal entity to carry out a public purpose authorized by a law of the United States (see 31 U.S.C. § 6101(3)); and not to acquire property or services for the Federal awarding agency or pass-through entity's direct benefit or use;<br><br>(b) Is distinguished from a cooperative agreement in that it does not provide for substantial involvement between the Federal awarding agency or pass-through entity and the non-Federal entity in carrying out the activity contemplated by the Federal award.<br><br>Federal agencies receive "transfers." |
| Grantee | The government, institution of higher education, or other entity to which a HIDTA program grant is awarded and which is accountable for the use of the funds provided.  The grantee is the entire legal entity (e.g., city government) even if only a particular component of the entity (e.g., the police department) is designated in the grant award document.  Grantees sometimes act as a fiduciary for other participants in a HIDTA. |
| Initiative | Activities that implement portions of a HIDTA Executive Board's strategy as opposed to an organization of activities/investigative efforts. |



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

| Initiative commander or supervisor | A person appointed to lead a HIDTA initiative. |
|---|---|
| Intelligence | Information compiled and analyzed to determine its meaning and relevance for efforts to anticipate, prevent, impede, or monitor criminal activity. |
| Memorandum of Agreement (MOA) | The MOA between ONDCP and a Federal agency is the equivalent of the Grant Letter provided to the state or local grant recipient. |
| NHAC | National HIDTA Assistance Center. This center provides training, multimedia, and event planning services to HIDTA program participants, and maintains the Clearance Management System, Financial Management System, and HIDTA Resource Management System. |
| Non-Federal Entity | A state, local government, Indian tribe, institution of higher education (IHE), or nonprofit organization that carries out a Federal award as a recipient or sub-recipient. |
| Obligations | When used in connection with a non-Federal entity's utilization of funds under a Federal award, obligations means orders placed for property and services, contracts, and sub-awards made, as well as similar transactions during a given period that require payment by the non-Federal entity during the same or a future period. |
| Office of National Drug Control Policy (ONDCP) | ONDCP is the office established within the Executive Office of the President of the United States to develop and coordinate the Nation's anti-drug policy. ONDCP also administers the HIDTA program. |
| Parent agency | The employer of personnel assigned to a HIDTA initiative. |
| Participating agency | A Federal, state, or local agency or other entity that takes part in a HIDTA initiative by providing staff or in-kind resources. |
| Pass-through entity | A non-Federal entity that provides a sub-award to a sub-recipient to carry out part of a Federal program. |
| Payment Management System (PMS) | A web-based program that allows grant recipients to request payments online (although supporting documents must still be sent to ONDCP's desk audit contractor). |



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

| | |
|---|---|
| Period of Performance | The time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award. |
| Program Income | Gross income earned by the non-Federal entity that is directly generated by a supported activity or earned as a result of the Federal award during the period of performance. |
| Reimbursable agreement | An official agreement between two HIDTA participating agencies in which one agency agrees to pay a second agency for goods acquired or services provided. |
| Reprogramming | The shifting of budget amounts between previously approved activities or cost categories. |
| Recipient | A non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term recipient does not include sub-recipients. |
| Sponsoring Agency | A sponsoring agency assumes responsibility for personnel and systems supporting the HIDTA mission, specifically for intelligence initiatives. Any participating Federal, state, local or tribal agency may sponsor an ISC or ancillary intelligence initiative. Sponsorship may include (but is not limited to) providing appropriate access to information sharing systems for initiative participants, obtaining security clearances for HIDTA contractors, or providing desk space in a secure facility. |
| Sub-award | An award provided by a pass-through entity to a sub-recipient for the sub-recipient to carry out part of a Federal award received by the pass-through entity. |
| Sub-recipient | A non-Federal entity that receives a sub-award from a pass-through entity to carry out part of a Federal program. |
| Supplant | The use of HIDTA or other federal funds by a state or local agency in lieu of state or local funds that have been, or would have been provided, for the same purpose. |
| Task force | A group of law enforcement and investigative people who work together to carry out an initiative. Task force members remain employees of their respective agencies. |



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

| Transfer | To move HIDTA program funds from ONDCP to another Federal entity (e.g., DEA) to carry out HIDTA-program activities. |
|---|---|

# Appendix C:  Federal Register Notice for HIDTA Designation

**Federal Register** /Vol. 72, No. 158 /Thursday, August 16, 2007 /Notices (pages 46099 – 46101)
**EXECUTIVE OFFICE OF THE PRESIDENT**
**Office of National Drug Control Policy**
**High Intensity Drug Trafficking Areas;**
**Petitions for Designation**
**AGENCY:** Office of National Drug Control
Policy.

**ACTION:** Notice.

**SUMMARY:** Pursuant to the Office of National Drug Control Policy Reauthorization Act of 2006, Public Law 109–469, section 707(c), the Director, National Drug Control Policy is establishing regulations under which interested coalitions of law enforcement agencies from an area may petition for designation as a high intensity drug trafficking area.

*Public Comment:* On June 4, 2007 (Volume 72, Number 106, Notices Page 30862–30864), the Executive Office of the President, Office of National Drug Control published Notice of its intent to issue this regulation. A 60-day public comment period was established. The June 4 Notice stated that any written comments must be received by ONDCP via electronic mail or facsimile on or before August 3, 2007. In addition, an ONDCP staff point of contact was listed to provide additional information as appropriate. ONDCP did not receive any comments. Therefore, ONDCP is issuing this Notice of the agency's intent to publish a regulation identical to the document published on June 4, 2007.

**SUPPLEMENTARY INFORMATION:** The Anti-Drug Abuse Act of 1988, the ONDCP Reauthorization Act of 1998, and the ONDCP Reauthorization Act of 2006 authorize the Director of the Office of National Drug Control Policy (ONDCP) to designate areas within the United States that exhibit serious drug trafficking problems and harmful impact of other areas of the country as High Intensity Drug Trafficking Areas (HIDTA). The HIDTA Program provides federal resources to those areas to help eliminate or reduce drug trafficking and its harmful consequences. Law enforcement organizations within HIDTAs assess drug trafficking
problems and design specific initiatives to reduce or eliminate the production, manufacture, transportation, distribution, and use of illegal drugs and money laundering.

When designating a new HIDTA or adding counties to existing HIDTAs, the Director of ONDCP consults with the Attorney General, Secretary of Homeland Security, Secretary of Treasury, heads of national drug control agencies, and the appropriate governors, and considers the extent to which—
(1) The area is a significant center of illegal drug production, manufacturing, importation, or distribution;
(2) State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;
(3) Drug-related activities in the area are having a significant harmful impact in the area, and in other areas of the country; and
(4) A significant increase in allocation of Federal resources is necessary to respond adequately to drug-related activities in the area.

The HIDTA Program helps improve the effectiveness and efficiency of drug control efforts by facilitating cooperation among drug control organizations through resource and information sharing, collocation, and implementing joint initiatives. HIDTA
funds help Federal, State, local, and tribal law enforcement organizations invest in infrastructure and joint initiatives to confront drug trafficking organizations.



**OFFICE OF NATIONAL DRUG CONTROL POLICY**

Each HIDTA is governed by its own executive board comprised of Federal, State and local law enforcement officials from the designated HIDTA region. The executive boards facilitate interagency drug control efforts to eliminate or reduce drug threats.

HIDTA-designated counties comprise approximately 13 percent of U.S. counties, and are present in 43 states, Puerto Rico, the U.S. Virgin Islands, and the District of Columbia. The following 28 areas are designated HIDTAs:
*1990:* Houston, Los Angeles, New York/New Jersey, South Florida, and Southwest Border (California, Arizona, New Mexico, and South and West Texas).
*1994:* Washington/Baltimore (Maryland, Virginia, and District of Columbia) and Puerto Rico/U.S. Virgin Islands.
*1995:* Atlanta, Chicago, and Philadelphia/Camden.
*1996:* Rocky Mountain (Colorado, Montana, Utah, and Wyoming), Gulf Coast (Alabama, Louisiana, and Mississippi), Lake County (Indiana), Midwest (Iowa, Kansas, Missouri, Nebraska, North Dakota, and South Dakota) and Northwest (Washington).
*1997:* Michigan and Northern California.
*1998:* Appalachia (Kentucky, Tennessee, and West Virginia), Central Florida, Milwaukee, and North Texas (Texas and Oklahoma).
*1999:* Central valley California, Hawaii, New England (Connecticut, New Hampshire, Maine, Massachusetts, Rhode Island, and Vermont), Ohio, and Oregon.
*2001:* North Florida and Nevada.

To date, counties seeking HIDTA designation have communicated their interest to ONDCP in a variety of manners. Currently, no formal process or regulation exists outlining the application and selection process.
Historically, law enforcement coalitions interested in obtaining designation as HIDTAs have submitted drug-related threat assessments for their counties which typically include a narrative analysis of the drug threat and statistical information related to the four statutory criteria. The proposed rule is intended to create a better coordinated and more meaningful process for reviewing applications. The rule sets forth a general process that enables interested coalitions of law enforcement agencies to submit petition for designation as a HIDTA. The criteria by which ONDCP will evaluate the petitions are set forth in this regulation.
In addition, the proposed rule requires ONDCP to review submitted petitions on a regular basis.

**Sec. 1 General Provisions**
(a) This regulation contains the rules that the Office of National Drug Control Policy (Office) follows in processing petitions for designation as a High Intensity Drug Trafficking Area (HIDTA), in accordance with the ONDCP Reauthorization Act of 2006,
Public Law No. 109–469.
(b) Establishment—
(1) In General—There is established in the Office a program known as the High Intensity Drug Trafficking Areas Program (in this regulation referred to as the ''Program'').
(2) Purpose— The purpose of the Program is to reduce drug trafficking and drug production in the United States by—
(A) Facilitating cooperation among Federal, State, local, and tribal law enforcement agencies to share information and implement coordinated enforcement activities;
(B) Enhancing law enforcement intelligence sharing among Federal, State, local, and tribal law enforcement agencies;
(C) Providing reliable law enforcement intelligence to law enforcement agencies needed to design effective enforcement strategies and operations; and
(D) Supporting coordinated law enforcement strategies which maximize use of available resources to reduce the supply of illegal drugs in designated areas and in the United States as a whole.
(c) Designation—
(1) In General—The Director, in consultation with the Attorney General, the Secretary of the Treasury, the Secretary of Homeland Security, heads of the National Drug Control Program agencies, and the Governor of each applicable State, may designate any specified area of the United States as a high intensity drug trafficking area.
(2) Activities— After making a designation under paragraph (1) and in order to provide Federal assistance to the area so designated, the Director may—
(A) Obligate such sums as are appropriated for the Program; (B) Direct the temporary reassignment of Federal personnel to such area, subject to the approval of the head of the department or agency that employs such personnel;
(C) Take any other action authorized under the Office of National Drug Control Policy Reauthorization Act of 2006 to provide increased Federal assistance to those areas; and
(D) Coordinate activities under this section (specifically administrative, recordkeeping, and funds management activities) with State, local, and tribal officials.

**76**



OFFICE OF NATIONAL DRUG CONTROL POLICY

(3) Factors for Consideration — In considering whether to designate an area as a high intensity drug trafficking area, the Director shall consider, in addition to such other criteria as the Director considers to be appropriate, the extent to which—

(A) The area is a significant center of illegal drug production, manufacturing, importation, or distribution;

(B) State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;

(C) Drug-related activities in the area are having a significant harmful impact in the area, and in other areas of the country; and

(D) A significant increase in allocation of Federal resources is necessary to respond adequately to drug-related activities in the area.

**Sec. 2 Instructions for Petitions**

(a) A coalition of interested law enforcement agencies from an area may petition for designation as a HIDTA.

(b) Petitions must specify the geographical area for which HIDTA designation is requested. Areas are designated by county, therefore, such areas must be identified in the petition.

(c) Petitions must state specifically which law enforcement agencies are making the petition, a responsible official for each agency making the petition, and a point of contact for the coalition of interested law enforcement agencies.

(d) Petitions must include an assessment of the threat of illegal drugs in the area for which HIDTA designation is requested and must specifically respond to each of the following four requirements:

(1) The area is a significant center of illegal drug production, manufacturing, importation, or distribution;

(2) State, local, and tribal law enforcement agencies have committed resources to respond to the drug trafficking problem in the area, thereby indicating a determination to respond aggressively to the problem;

(3) Drug-related activities in the area are having a significant harmful impact in the area, and in other areas of the country; and

(4) A significant increase in allocation of Federal resources is necessary to respond adequately to drug-related activities in the area.

(e) Each of the requirements in Section 2(d) must be addressed and justified with sufficient information/documentation for each county proposed in the petition.

(f) If the petition proposes to designate additional counties to an already established HIDTA region, the petition shall include a letter from the Chairman of that HIDTA's Executive Committee indicating that the Executive Committee has reviewed the petition and sets forth its position related to the petition for designation.

(g) Petitions may be submitted to the Executive Office of the President, Office of National Drug Control Policy, Office of State, Local and Tribal Affairs, Washington, DC 20503 via facsimile at (202) 395–6721 or electronic mail at *ondcp_hidta@ondcp.eop.gov.*

**Sec. 3 Processing of Petitions**

(a) Acknowledgements of Petitions. Upon receipt of a petition, the Office shall send an acknowledgement letter to the requester to confirm receipt of the petition and provide an assigned number for further reference.

(b) Petitions will be reviewed by the Office on a regular basis. The review will include a recommendation regarding the merit of the petition to the Director by a panel of qualified, independent experts who are designated by the Director.

(c) Notification of merit of petition. After the review is completed the requestor will be notified in writing regarding the disposition of the petition.

(d) The Director, Office of National Drug Control Policy, is solely responsible for making designation and funding decisions relating to the HIDTA Program.

**Michael K. Gottlieb,**
*Assistant General Counsel, Office of National Drug Control Policy.*
[FR Doc. E7–16174 Filed 8–15–07; 8:45 am]

**BILLING CODE 3180–02–P**



# EXHIBIT G

# Los Angeles Hemisphere
## LAW ENFORCEMENT SENSITIVE



# Hemisphere Summary

- **The Hemisphere Project is coordinated from the Los Angeles Clearinghouse and is funded by ONDCP and DEA.**

- **Hemisphere provides electronic call detail records (CDRs) in response to federal, state, and local administrative/grand jury subpoenas.**

- **The Hemisphere database contains CDRs for any telephone carrier that uses an AT&T switch to process a telephone call.**

- **Hemisphere is an unclassified program.**

- **Hemisphere provides de-confliction within the Hemisphere database.**

- **4 billion CDRs populate the Hemisphere database on a daily basis.**

# **Hemisphere Summary**

- **Hemisphere results can be returned via email within an hour of the subpoenaed request and include CDRs that are less than one hour old at the time of the search**

- **The Hemisphere program has access to long distance and international CDR's data going back to 1987**

- **Hemisphere data contains roaming information that can identify the city and state at the time of the call**

- **Results are returned in several formats that aid the analyst/ investigator (*I2, Penlink, GeoTime, Target Dialed Frequency report, Common Calls report, etc*)**

# **Facts and Figures**

■ Since its inception in September 2007, the Los Angeles Hemisphere Program has processed over 4,400 requests and over 11,200 individual telephone numbers

■ As of June 2013 Hemisphere has processed 679 requests from the Northwest HIDTA

■ Hemisphere is most often used by DEA and DHS in the Northwest HIDTA to identify replacement/additional phones

■ The Northwest HIDTA has recently utilized Hemisphere to track known Canadian phones roaming in the U.S. on the AT&T network

# Unique Project Features

- **"Dropped Phones"** -  the program uses an algorithm and advanced search features to find the new number.

- **"Additional Phones"** – the program can often determine cell phones the target is using that are unknown to law enforcement.

- **"International Phones"** – the program provides CDRs for a tremendous amount of international numbers that place calls through or roam on the AT&T network. The information is provided in response to the standard Hemisphere administrative subpoena.

# Advanced Results
# Analysis
# Searching For Dropped Phones

■ Dropped Phone Requests:  A service provided by Hemisphere, requestors can ask for analysts to find possible replacement phones that are no longer active
  ❑ To do this, you must mention "Dropped Phone Request" in the special instructions on your request form

■ A dropped phone report will be returned in paragraph form and either written out in the returned email or attached with the results as a word file

# Advanced Results
# Analysis
# Searching For Dropped Phones

- The method for identifying the replacement phone for the dropped phone involves careful analysis of the developed advanced results

- By systematically grading the common calls report and scrutinizing the date ranges, candidates for the replacement phone are ranked by probability

# **Protecting The Program**

Protecting the Hemisphere program is a formidable challenge. We have taken the following steps to try and keep the program under the radar.

- **Training** – All Hemisphere training modules are inundated with instruction regarding how to protect Hemisphere data.

- **Use** -  Hemisphere requests are vetted.  Requestors must have either attended Hemisphere training or be directly connected to a HIDTA Initiative/Agency or intelligence center familiar with the program.

# Protecting The Program

Hemisphere data will likely produce a variety of different leads for an array of cases.

Hemisphere data will only indicate calls that hit an AT&T switch

Therefore, the only way to get a complete and accurate picture of the target's phone activity is to subpoena and review a complete set of the carrier's CDRs.

# Protecting The Program

When a complete set of CDRs are subpoenaed from the carrier, then all memorialized references to relevant and pertinent calls can be attributed to the carrier's records, thus "walling off" the information obtained from Hemisphere. In other words, Hemisphere can easily be protected if it is used as a pointer system to uncover relevant numbers.

**-Exigent Circumstances-**

# Protecting The Program

In special cases, we realize that it might not be possible to obtain subpoenaed phone records that will "wall off" Hemisphere.

In these special circumstances, the Hemisphere analyst should be contacted immediately. The analyst will work with the investigator and request a separate subpoena to AT&T.

-Official Reporting-

# Protecting The Program

All requestors are instructed to never refer to Hemisphere in any official document. If there is no alternative to referencing a Hemisphere request, then the results should be referenced as information obtained from an AT&T subpoena.

# What's new with Hemisphere?

- **First court order from Washington submitted in Dec 2012**
  - AT&T legal approved use of Court orders from Washington state
  - Allows Local agencies to utilize Hemisphere through court orders
- **Hemisphere began providing subscriber information in July 2012 for AT&T phones**
- **Began IMSI and IMEI searches in July 2012 if equipment is utilizing AT&T's wireless network**
- **Started offering mapping through the GeoTime software in July 2012**
- **Introduced limited pinging for some phones in May 2013**

# **Hemisphere 2012 Requests**



# Hemisphere Requests By HIDTA 2012-2013



# Hemisphere Requests By Agency
## Northwest HIDTA 2012-2013



# Request by Type
## Northwest HIDTA 2012-2013



# Hemisphere Drug Types

## Northwest HIDTA 2012-2013



**\* Fugitives, Homicides, Kidnappings, Missing Persons, Etc.**

# Northwest HIDTA

# Hemisphere SUCCESS STORIES

# DEA- Seattle 2011

•During a wire intercept conducted from Jan 2011 to April 2011, targets would continually rotate their pre-paid phones

   •Utilized Hemisphere extensively to identify dropped phones and verify targets

   •Hemisphere identified a significant amount of the new numbers

•Based on this wire intercept investigation DEA was able to seize;



   • 136 kilos of cocaine

   •2000 pounds of marijuana

   •Approximately 2.2 million dollars

   •Several residences, vehicles, and other assets.

   •"Plus, we really pissed off the Hells Angel's in Canada"

# 2012-2013

# Hemisphere SUCCESS STORIES

# Montclair PD- Los Angeles 2012

•Men wearing ski masks smashed cases inside the Ben Bridge store at Montclair Plaza and grabbed 30 Rolex watches while holding employees and customers at gunpoint

•Police officers worked with law enforcement in Henderson, Nev., after discovering two similar heists occurred there

• Through Hemisphere, detectives identified a new target number being used by the main suspect

   •Montclair PD quickly tracked the new target number and the suspect and six others were apprehended

•Seven people were arrested and officers seized two motorcycles and $180,000, believed to be bought with cash from the robberies

•They also found evidence that they were planning to rob the Glendale Galleria that day and another jewelry store in San Francisco later



# Redondo Beach PD-Los Angeles 2012

•A warrant was issued for Rene Avina's arrest Monday after authorities identified him as a second man wanted in connection with the June 2 death of 49-year-old bar bouncer Terie Colecchi
•Through Hemisphere detectives identified a target number being used by the main suspect
•He was arrested on suspicion of murder



# DEA- Los Angeles/South Carolina
# Feb 2013

•Melissa Ann Griggs made repeated bomb threats to hospitals, schools, banks and county offices in South Carolina

•The local authorities were having great difficulty finding the number being used and reached out for federal assistance

•One of the numbers presented on the caller id was the cell phone number of a local drug trafficker

   •Analysis of subpoenaed toll records indicated this phone was not making the calls.

•Hemisphere toll record analysis of the threatened businesses showed the calls were coming from a Verizon Wireless customer

   •With this knowledge, calls to destination searches were requested of Verizon Wireless revealing the actual number making the calls.

•She was arrested Feb. 14 at the Walmart in Seneca on a trespassing charge, and charged with 30 counts of making bombing threats



# DEA- Arizona
# 2013

•Numerous dropped phone searches were conducted over the course of a continuous investigation with multiple replacement phones identified

•Multiple Mexican phones roaming in the U.S. were identified

•Since early 2012 the investigation has yielded the following seizures



  •100lbs of meth

  •225 lbs of hashish

  •9kg of cocaine

  •$190,000

  •5 assault rifles

  •Bullet proof vest

•Investigation is ongoing with more seizures expected

# NCIS- San Diego
## March 2013

• Kennard Walters, allegedly impersonating a 2 Star General, was asked to show an identification card at Naval Base San Diego
    • He stated he left the card in his vehicle and drove off
• Walters physically assaulted and subsequently ran over a Naval Criminal Intelligence Service Special Agent and fled the base
• After the initial incident  the suspect changed his phone number and drove to northern California
• After a return to the Los Angeles area, he then drove to Tehama County in Northern California where he was apprehended
• Hemisphere was able determine his new telephone number, and provide cell site data leading to his arrest





**Questions?**



# EXHIBIT H

RON WYDEN
OREGON

CHAIRMAN OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5244

**United States Senate**

WASHINGTON, DC 20510–3703

COMMITTEES:

COMMITTEE ON FINANCE
COMMITTEE ON THE BUDGET
COMMITTEE ON ENERGY AND NATURAL RESOURCES
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

November 20, 2023

The Honorable Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Attorney General Garland:

I write to request that you clear for public release additional information about the Hemisphere Project. This is a long-running dragnet surveillance program in which the White House pays AT&T to provide all federal, state, local, and Tribal law enforcement agencies the ability to request often-warrantless searches of trillions of domestic phone records.

In 2013, the New York Times revealed the existence of a surveillance program in which the White House Office of National Drug Control Policy (ONDCP) pays AT&T to mine its customers' records for the benefit of federal, state, local, and Tribal law enforcement agencies. According to an ONDCP slide deck, AT&T has kept and queries as part of the Hemisphere Project call records going back to 1987, with 4 billion new records being added every day. That slide deck was apparently disclosed by a local law enforcement agency in response to a public information request and was published by the New York Times in 2013.

The scale of the data available to and routinely searched for the benefit of law enforcement under the Hemisphere Project is stunning in its scope. One law enforcement official described the Hemisphere Project as "AT&T's Super Search Engine" and ... "Google on Steroids," according to emails released by the Drug Enforcement Administration (DEA) under the Freedom of Information Act. The ONDCP slide deck and an email released by the DEA also reveal that AT&T searches records kept by its wholesale division, which carries communications on behalf of other communications companies and their customers. Another slide deck released by ONDCP and published by the press in 2014 describes the specific capabilities of Hemisphere, including that it can be used to identify alternate numbers used by a target, obtain location data and "two

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326-7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431-0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962-7691

U.S. COURTHOUSE
310 WEST 6TH ST
ROOM 118
MEDFORD, OR 97501
(541) 858-5122

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330-9142

707 13TH ST, SE
SUITE 285
SALEM, OR 97301
(503) 589-4555

HTTPS://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

levels of call detail records for one target number" (meaning the phone records of everyone who communicated with the target).

The Hemisphere Project has been supported by regular funding from the White House ONDCP since 2009, according to the attached undated white paper that ONDCP provided to my office on October 27, 2022 (Appendix A). That same document reveals that White House funding for this program was suspended by the Obama Administration in 2013, the same year the program was exposed by the press, but continued with other federal funding under a new generic sounding program name, "Data Analytical Services." ONDCP funding for this surveillance program was quietly resumed by the Trump Administration in 2017, paused again in 2021, the first year of the Biden Administration, and then quietly restarted again in 2022.

Although the Hemisphere Project is paid for with federal funds, they are delivered to AT&T through an obscure grant program, enabling the program to skip an otherwise mandatory federal privacy review. If the funds came directly from a federal agency, such as the DEA, Hemisphere would have been subjected to a mandatory Privacy Impact Assessment conducted by the Department of Justice (DOJ) Office of Privacy and Civil Liberties, the findings of which would be made public. Instead, ONDCP provides funding for the program through the Houston High Intensity Drug Trafficking Area (HIDTA), one of 33 regional funding organizations as a part of a grant program created by Congress and administered by ONDCP. The HIDTAs distribute federal anti-drug law enforcement grants to state and local agencies, and are governed by a board made up entirely of federal, state and local law enforcement officials.

ONDCP provided my staff with an undated white paper describing the program and its historical funding levels, but ONDCP directed all questions about Hemisphere to the Houston HIDTA. Officials at the Houston HIDTA provided my office with a briefing on November 7, 2022, and spoke again with my staff by phone on December 1, 2022. The Houston HIDTA officials told my staff that all Hemisphere requests are sent to a single AT&T analyst located in Atlanta, Georgia, and that any law enforcement officer working for one of the federal, state, local and Tribal law enforcement agencies in the U.S. can contact the AT&T Hemisphere analyst directly to request they run a query, with varying authorization requirements. The Houston HIDTA officials confirmed that Federal and state law enforcement agencies can request a Hemisphere search with a subpoena, which is a directive that many law enforcement agencies can issue themselves (except in California and Texas, where a court order is required by state law). They also explained that Hemisphere searches are not required to be in support of drug-related investigations.

For the past year, I have urged the DOJ to release dozens of pages of material related to the Hemisphere Project, which it first provided to my office in 2019. This information has been designated "Law Enforcement Sensitive," which is meant to restrict its public release. I have serious concerns about the legality of this surveillance program, and the

materials provided by the DOJ contain troubling information that would justifiably outrage many Americans and other members of Congress. While I have long defended the government's need to protect classified sources and methods, this surveillance program is not classified and its existence has already been acknowledged by the DOJ in federal court. The public interest in an informed debate about government surveillance far outweighs the need to keep this information secret. To that end, I urge you to promptly clear for public release the material described in Appendix B.

Thank you for your attention to this important matter. If you have any questions about this request, please contact Chris Soghoian in my office.

Sincerely,

Ron Wyden
United States Senator

CC:    Dr. Rahul Gupta, Director of National Drug Control Policy.
       Jessica Rosenworcel, Chairwoman, Federal Communications Commission.
       John Stankey, Chief Executive Officer, AT&T Inc.

**Appendix A begins on following page**

## DATA ANALYTICAL SERVICES

**DESCRIPTION**

Data Analytical Services (DAS) is a service available to High Intensity Drug Trafficking Areas (HIDTA) initiatives (task forces) through a contractual agreement with a telecommunications provider.[1] Under this agreement, the telecommunications provider furnishes investigators with information and technical assistance to precisely and accurately identify telephone numbers linked to illegal drug trafficking and related crimes.

Services provided include the following:

- Determining whether phones associated with international targets of investigation have entered the United States;
- Linking multiple devices/phone numbers to an identified target;
- Identifying devices that have had SIM (Subscriber Identity Module) cards substituted or replaced;
- Identifying and deconflicting international telephone numbers associated with targets; and
- Assisting investigators in understanding evolving telecommunications technology and ways in which that technology can be exploited by criminal organizations.

**LEGAL AUTHORITIES**

Under the terms of its agreement, the telecommunications provider requires legally compelling authority to respond to requests for information. That legal authority must comport with applicable state laws. Before responding to any request for information, the telecommunications provider reviews the material submitted and ensures that the authority required by the respective state's law accompanies the request. If the legal authority is not provided or is insufficient, the telecommunications provider will not respond to the information request.

**ONDCP'S ROLE**

The Office of National Drug Control Policy (ONDCP) has provided funding through the annual HIDTA discretionary process to support DAS. (Funding details are provided in the table below.) Because DAS is a service available only to law enforcement undertaking active investigations under legally compelling authority, ONDCP does not have access to DAS or to the services or information it provides.

Currently, ONDCP awards funding to support DAS to the Houston HIDTA, which engages in the contractual agreement with the telecommunications provider. Both the Houston HIDTA and the telecommunications provider undertake routine audits to ensure that the service is used appropriately and strictly limited to counternarcotics investigations conducted by regional HIDTA initiatives.

---

[1] From 2009 through 2013, this service was known under the title "Hemisphere."

**FUNDING INFORMATION**

The table below depicts HIDTA discretionary funding awarded by ONDCP to support DAS.

| YEAR | HIDTA DISCRETIONARY FUNDING AWARDED |
|------|-------------------------------------|
| 2009 | $1,400,000 |
| 2010 | $1,450,000 |
| 2011 | $1,000,000 |
| 2012 | $500,000 |
| 2013 | * |
| 2014 | * |
| 2015 | * |
| 2016 | * |
| 2017 | $300,000 |
| 2018 | $300,000 |
| 2019 | $485,000 |
| 2020 | $485,000 |
| 2021 | ** |
| 2022 | $270,000 |

* From 2013 through 2016, ONDCP did not allocate HIDTA discretionary funding to support DAS; however, some individual regional HIDTA programs contracted directly with the telecommunications provider to acquire these services

** In 2021, funds carried over from 2020 supported DAS services.

# EXHIBIT I

RON WYDEN
OREGON

CHAIRMAN OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5244

**United States Senate**

WASHINGTON, DC 20510–3703

COMMITTEES:

COMMITTEE ON FINANCE
COMMITTEE ON THE BUDGET
COMMITTEE ON ENERGY AND NATURAL RESOURCES
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

January 25, 2024

The Honorable Avril Haines
Director of National Intelligence
Washington, DC 20511

Dear Director Haines:

I write to request that you take action to ensure that U.S. intelligence agencies only purchase data on Americans that has been obtained in a lawful manner.

As you know, U.S. intelligence agencies are purchasing personal data about Americans that would require a court order if the government demanded it from communications companies. I first revealed in 2021 that the Defense Intelligence Agency (DIA) was purchasing, storing, and using domestic location data. Such location data is collected from Americans' smartphones by app developers, sold to data brokers, resold to defense contractors, and then resold again to the government. In addition; the National Security Agency (NSA) is buying Americans' domestic internet metadata.

Until recently, the data broker industry and the intelligence community's (IC) purchase of data from these shady companies has existed in a legal gray area, which was in large part due to the secrecy surrounding the practice. App developers and advertising companies did not meaningfully disclose to users their sale and sharing of personal data with data brokers nor seek to obtain informed consent. The data brokers that buy and resell this data are not known to consumers and several of these companies refused to answer questions from Congress regarding the companies they buy data from and the government agencies they sell it to.

The secrecy around data purchases was amplified because intelligence agencies have sought to keep the American people in the dark. It took me nearly three years to clear the public release of information revealing the NSA's purchase of domestic internet metadata. DoD first provided me with that information in March, 2021, in response to a request from my office for information identifying the DoD components buying Americans' personal data. DoD subsequently refused a request I made in May, 2021, to clear the unclassified information for public release. It was only after I placed a hold on the nominee to be the NSA director that this information was cleared for release. A copy of the NSA's letter confirming this practice is attached, as is a letter from the Under Secretary of Defense for Intelligence and Security acknowledging the purchase by

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326-7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431-0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962-7691

U.S. COURTHOUSE
310 WEST 6TH ST
ROOM 118
MEDFORD, OR 97501
(541) 858-5122

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330-9142

707 13TH ST, SE
SUITE 285
SALEM, OR 97301
(503) 589-4555

HTTPS://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

Defense and Intelligence Components of commercially available information, to include location data from U.S. phones.

Although the intelligence agencies' warrantless purchase of Americans' personal data is now a matter of public record, recent actions by the Federal Trade Commission (FTC), the primary federal privacy regulator, raise serious questions about the legality of this practice. On January 9, 2024, the FTC brought an action against the data broker X-Mode Social, which I first exposed in 2020 after the company's lawyers confirmed that it was selling data collected from phones in the United States to U.S. military customers, via defense contractors. The FTC held that such sensitive data sales are unlawful unless the data was obtained through consumer's informed consent.

The FTC notes in its complaint that the reason informed consent is required for location data is because it can be used to track people to "sensitive locations, including medical facilities, places of religious worship, places that may be used to infer an LGBTQ+ identification, domestic abuse shelters, and welfare and homeless shelters." The FTC added that the "sale of such data poses an unwarranted intrusion into the most private areas of consumers' lives." While the FTC's X-Mode social complaint and order are limited to location data, internet metadata can be equally sensitive. Such records can identify Americans who are seeking help from a suicide hotline or a hotline for survivors of sexual assault or domestic abuse, a visit to a telehealth provider focusing on specific health care need, such as those prescribing and delivering abortion pills by mail, or reveal that someone likely suffers from a gambling addiction.

According to the FTC, it is not enough for a consumer to consent to an app or website collecting such data, the consumer must be told and agree to their data being sold to "government contractors for national security purposes." I have conducted a broad probe of the data broker industry over the past seven years, and I am unaware of any company that provides such warnings to consumers before their data is collected. As such, the lawbreaking is likely industry-wide, and not limited to this particular data broker.

The FTC's order against X-Mode Social should serve as a much-needed wake-up call for the IC. The U.S. government should not be funding and legitimizing a shady industry whose flagrant violations of Americans' privacy are not just unethical, but illegal. To that end, I request that you adopt a policy that, going forward, IC elements may only purchase data about Americans that meets the standard for legal data sales established by the FTC. I also request that you direct each IC element to take the following actions:

- Conduct an inventory of the personal data purchased by the agency about Americans, including, but not limited to, location and internet metadata. As you know, the cataloging of IC acquisition of commercially available information was also a recommendation of the Senior Advisory Group Panel on Commercially Available Information in its January 2022 report.

- Determine whether each data source identified in that inventory meets the standards for legal personal data sales outlined by the FTC. This, too, is consistent with the Senior Advisory Group's recommendation to "identify and protect sensitive [Commercially Available Information] that implicates privacy and civil liberties concerns."
- Where those data purchases do not meet the FTC's standard for legal data personal data sales, promptly purge the data. Should IC elements have a specific need to retain the data, I request that such need, and a description of any retained data, be conveyed to Congress and, to the greatest extent possible, to the American public.

Sincerely,

Ron Wyden
United States Senator

CC: The Honorable Lina Khan, Chair, Federal Trade Commission

UNCLASSIFIED

**NATIONAL SECURITY AGENCY**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

11 December 2023

The Honorable Ron Wyden
United States Senate
Washington, D.C. 20510
SENATOR

Dear Senator Wyden:

(U) On December 11, 2023, Under Secretary of Defense for Intelligence and Security Moultrie wrote you to provide unclassified responses to questions you have posed to the Department of Defense (DoD) regarding the purchase and use of specific types of commercially available information (CAI). To accompany his letter, the information below provides you with additional information specific to the National Security Agency (NSA). After careful review, NSA has determined that this information is unclassified and may be released publicly.

(U) NSA understands and greatly values the congressional and public trust it has been granted to carry out its critical foreign intelligence and cybersecurity missions on behalf of the American people. To retain that trust, NSA has developed robust compliance regimes and a dedicated corporate compliance organization, and the Agency has instilled a culture of compliance within its workforce.

(U) As a Senior Advisory Group to the Office of the Director of National Intelligence recently concluded, CAI provides significant intelligence value to the U.S. Intelligence Community, including NSA. NSA's collection, acquisition, and use of CAI occurs in accordance with applicable legal and regulatory authorities to conduct lawful intelligence and cybersecurity missions. Prior to any collection, acquisition, or use of CAI, NSA ensures such activity can be done in compliance with the U.S. Constitution, as well as applicable laws, regulations, policies, procedures, and federal precedent. These include Executive Order 12333, DoD Manual 5240.01, DoD Manual S-5240.01-A, and NSA/CSS Policy 12-3 regarding the protection of civil liberties and privacy of U.S. person information when conducting NSA mission and mission-related activities. At all stages, NSA takes steps to minimize the collection of U.S. person information, to include application of technical filters. Additionally, NSA evaluates procured CAI data sets on a regular, recurring basis for uniqueness and mission value to ensure NSA continues to acquire only the most useful data relevant to mission requirements.

(U) NSA acquires various types of CAI for foreign intelligence, cybersecurity, and other authorized mission purposes, to include enhancing its signals intelligence (SIGINT) and cybersecurity missions. This may include information associated with electronic devices being used outside—and, in certain cases, inside—the United States. However, NSA does not buy and use location data collected from phones known to be used in the United States either with or without a court order. Similarly, NSA does not buy and use location data collected from automobile telematics systems from vehicles known to be located in the United States. Finally, NSA does buy and use commercially available netflow (*i.e.* non-content) data related to wholly domestic internet communications and internet communications where one side of the

UNCLASSIFIED

UNCLASSIFIED

communication is a U.S. Internet Protocol address and the other is located abroad.  For example, such information is critical to protecting the U.S. Defense Industrial Base.

(U) I hope that the information provided above addresses your concerns.  Please be assured that NSA will continue to implement the safeguards described in this letter, together with other applicable safeguards, to NSA's commercial data acquisitions to continue complying with all applicable laws, regulations, policies, procedures, and federal judicial precedent.  Should you have any questions or require additional information, please contact NSA's Office of Legislative, State and Local Affairs.

PAUL M. NAKASONE
General, U.S. Army
Director

UNCLASSIFIED



**UNDER SECRETARY OF DEFENSE**
5000 DEFENSE PENTAGON
WASHINGTON, DC  20301-5000

DEC 1 9 2023

**INTELLIGENCE
AND SECURITY**

The Honorable Ron Wyden
U.S. Senate
Washington, DC 20510

Dear Senator Wyden:

Following up on the letters regarding the Department of Defense's potential purchase and use of specific types of commercially available information that I and Director of the National Security Agency (NSA) General Paul M. Nakasone sent you on December 11, 2023, pursuant to a request made by your staff, I am providing you with the below redacted answer to a question that I answered in my August 2, 2021, correspondence to you.

> **(U) Q5.** Other than DIA, are any DoD components buying and using without a court order location data collected from phones located in the United States? If yes, please identify which components.

(U) ~~(CUI)~~ ANSWER: Among the Defense Agencies and DoD Field Activities under the authority, direction, and control of the Under Secretary of Defense (Intelligence and Security), ███████ ████████████████████████████ the National Security Agency, ████████████████, buy commercial data, which includes information associated with phones located outside and inside the United States. They use the data, or a portion of the data as necessary, in accordance with applicable legal and regulatory authorities to conduct lawful intelligence or cybersecurity missions.

The above answer reflects the collective activities of multiple Defense Agencies and DoD Field Activities.  Specific to the NSA alone, per GEN Nakasone's December 11, 2023, letter to you, "NSA does not buy and use location data collected from phones known to be used in the United States either with or without a court order."

Thank you for your support for the personnel of the Department of Defense.  If you have questions, please contact the Office of the Assistant Secretary of Defense for Legislative Affairs.

Sincerely,

*Ronald A. Moultrie*
Ronald S. Moultrie



**UNDER SECRETARY OF DEFENSE**
5000 DEFENSE PENTAGON
WASHINGTON, DC 20301-5000

DEC 11 2023

**INTELLIGENCE
AND SECURITY**

The Honorable Ron Wyden
United States Senate
Washington, DC 20510

Dear Senator Wyden:

I am following up on our previous correspondence regarding the Department of Defense's (DoD)'s potential purchase and use of specific types of commercially available information (CAI). Specifically, on August 2, 2021, I responded on behalf of the Secretary of Defense to your May 13, 2021, letter seeking unclassified responses to questions concerning CAI for which my office had provided classified responses. I share your commitment to ensuring that DoD adheres to U.S. law for appropriate access to, acquisition of, and use of this information in support of DoD's authorized missions. I assure you that the Department is fully committed to both the letter and the spirit of U.S. law, including the Fourth Amendment to the Constitution, and to the protection of privacy and civil liberties.

Since my August 2, 2021 response, there has been significant public interest in understanding DoD's access to, acquisition of, and use of CAI. As the Deputy Secretary of Defense has noted, with the widespread and rapid adoption of networked computing and other digital technologies, unprecedented amounts of personal information are being transmitted to commercial entities; this transmission is creating an expansive digital environment in which large volumes of sensitive data emitted from personal devices and other sources are aggregated and monetized. As with all of its activities, DoD will continue to provide Congress with a complete understanding of how DoD Components access, acquire, and use CAI in order to enable Congress to conduct oversight of our activities, regardless of the classification of those activities.

DoD Components acquire, access, and use information that is available to the American public and consumers worldwide to plan, inform, enable, execute, and support a wide range of DoD missions lawfully and responsibly, including the Department's foreign intelligence and cybersecurity missions, security activities, and to protect DoD personnel and information from foreign adversary threats. These activities are conducted in accordance with all applicable laws, including the Fourth Amendment to the Constitution, the Foreign Intelligence Surveillance Act, the Privacy Act, and DoD's implementing policies. I am not aware of any requirement in U.S. law or judicial opinion, including the Supreme Court's decision in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), that DoD obtain a court order in order to acquire, access, or use information, such as CAI, that is equally available for purchase to foreign adversaries, U.S. companies, and private persons as it is to the U.S. Government. DoD Components acquire and use CAI in a manner that adheres to high standards of privacy and civil liberties protections, and that accords with DoD's national security missions.

With respect to DoD personnel security, the Defense Security Components are required by law to "integrate relevant and appropriate information from various sources, including . . . publicly available, and commercial data sources, consumer reporting agencies, social media, and such other sources as determined by the Director of National Intelligence." *See* 5 U.S.C. § 11001, "Enhanced Personnel Security Programs." In addition to this affirmative statutory obligation for DoD to collect such information, individuals also provide consent for the federal government to obtain this information about themselves when they sign the Standard Form 86, "Questionnaire for National Security."

During the conduct of authorized intelligence activities, Defense Intelligence Components[1] follow U.S. Attorney General-approved procedures set forth in DoD Manual 5240.01, which governs the collection, retention, querying, and dissemination of United States Person Information (USPI), and rely on internal implementing policies, procedures, and guidance while carrying out their lawful intelligence missions. Defense Intelligence Components go to significant lengths to avoid ingesting or accessing USPI that could be included in CAI, and to verify that USPI is not inadvertently acquired or accessed. In these activities, Defense Intelligence Components evaluate their intelligence collection opportunities to assess whether those opportunities raise U.S. person privacy concerns, to include the collection opportunities that raise special circumstances based on the volume, proportion, and sensitivity of the USPI likely to be acquired, as required by Section 3.2(e) of DoD Manual 5240.01, "Special Circumstances Collection," and take additional steps, including obtaining authorization from the Defense Intelligence Component head or his designee before initiating such collection and applying more restrictions on the retention, querying, and dissemination. When making a determination that special circumstances exist, the Defense Intelligence Component head or his designee also must consider whether further "enhanced safeguards" are also appropriate, and if so, the Defense Intelligence Component must apply further retention restrictions in accordance with Section 3.3(g) of DoD Manual 5240.01.

Enhanced safeguards include stringent, prophylactic privacy protections that, as the term suggests, exceed the baseline handling requirements in DoD Manual 5240.01. For CAI, these enhanced safeguards are carefully tailored to mitigate the unique risks presented by the CAI at issue and can be implemented holistically across all phases of the intelligence cycle. Where enhanced safeguards are applied to mitigate the impact of DoD's access to, acquisition of, and use of CAI on U.S. persons, DoD honors its obligation to protect the nation's security in a manner that affirms and adheres to the fundamental values of our democracy.

In my letter to you dated August 2, 2021, I provided responses to eight questions you conveyed to DoD. I explained that responses to four of these questions—questions 4, 5, 6, and 7—were marked as Controlled Unclassified Information (CUI). Executive Order 13556

---

[1] "Defense Intelligence Component" is defined in DoD Manual 5240.01, but it refers to all DoD organizations that perform foreign intelligence or counterintelligence missions or functions, including the National Security Agency/Central Security Service, the Defense Intelligence Agency, the National Reconnaissance Office, the National Geospatial-Intelligence Agency, the foreign intelligence and counterintelligence elements of the Active and Reserve Components of the Military Departments, including the United States Coast Guard when operating as a service in the Department of the Navy.

established the CUI program, which has been implemented in Part 2002 of Title 32, Code of Federal Regulations and DoD Instruction 5200.48. CUI is unclassified information that requires safeguarding and dissemination controls in accordance with law, regulation, and government-wide policy. At the time of my response, the responses to questions 4, 5, 6 and 7 contained CUI that constituted "Operations Security" information that would reveal critical information or indicators and "General Intelligence" information that would reveal unclassified intelligence activities, sources, or methods as defined in the CUI Registry maintained by the National Archives and Records Administration. After subsequent careful review, we have determined that responses to these questions as written in the August 2, 2021, letter remain properly marked as CUI. Continuing to control the August 2, 2021, responses to questions 4, 5, 6, and 7 as CUI is therefore warranted. Further, if aggregated with other unclassified or classified information acquired by foreign adversaries either publicly or through illicit means, the responses marked as CUI may give our adversaries advantageous insights. Therefore, to further the public interest, and to respond to your specific request for additional information concerning these activities that is releasable to the public, I am providing you additional releasable information regarding DoD's access to, acquisition of, and use of CAI, including releasable answers to the questions that were answered at the CUI level in the August 2, 2021, letter.

What follows are reproduced responses to questions 1-3 and 8 as previously provided in my August 2, 2021, letter, as well as unclassified and publicly releasable answers to questions 4, 5, 6, and 7.

**Q1. The Defense Intelligence Agency (DIA) recently informed Sen. Wyden's office that they have adopted the position that the 4th Amendment, and the Supreme Court's holding in the *Carpenter* case, do not apply to data about Americans that the government buys, and only applies to data that the government acquires via compulsion. Which other components of DoD, if any, have adopted this or a similar interpretation of the law?**

ANSWER: If a DoD Intelligence Component purchases data in connection with an intelligence activity, the Component is responsible to ensure that the purchase is in accordance with existing law, regulation, and policy, including the Fourth Amendment (as understood through the *Carpenter* opinion and other relevant case law) and the Attorney General-approved procedures in DoD Manual (DoDM) 5240.01, "Procedures Governing the Conduct of DoD Intelligence Activities.

**Q2. Has the DoD General Counsel's office signed off on this legal theory and the supporting legal analysis?**

ANSWER: Each DoD Intelligence Component, supported by its respective legal counsel, is responsible for ensuring that the Component's intelligence activities are carried out in accordance with existing law (including the Fourth Amendment as understood through the *Carpenter* opinion and other relevant case law), regulation, and policy. In this case, DIA's Office of General Counsel provided the legal support for the DIA activity.

3

**Q3. Please provide us with a copy of the legal analysis supporting this theory. If individual DoD components have drafted their own legal analysis, please provide us a copy of each components' analysis.**

ANSWER: In general, the collection and retention of data by Defense Intelligence Components enable the conduct of authorized intelligence activities (specifically, foreign intelligence and counterintelligence activities), which are subject to applicable law, regulation, and policy, including the Fourth Amendment (as understood through the *Carpenter* opinion and other relevant case law) and the Attorney General-approved procedures in DoDM 5240.01. We understand that DIA has already provided Senator Wyden's staff with a document that states DIA's legal conclusions as regards the DIA activity in question. We have no other analyses to provide in response to this question.

**Q4. Please identify the DoD components that are, without a court order, buying AND using data acquired about Americans. If the DoD components do not know the identities (and citizenship) of the individuals whose information the DoD component has acquired, this question also covers the purchase and use of data about individuals / electronic devices used by individuals located in the United States.**

ANSWER: DoD Components, to include Defense Intelligence Components, buy commercial data, which includes information associated with electronic devices being used outside and possibly inside the United States, to conduct lawful DoD missions, such as intelligence, personnel security, and cybersecurity. They acquire and/or access the data, or a portion of the data as necessary, in accordance with applicable legal and regulatory authorities.

**Q5. Other than DIA, are any DoD components buying and using without a court order location data collected from phones located in the United States? If yes, please identify which components.**

ANSWER: DoD Components, to include Defense Intelligence Components, buy CAI, which includes location data from phones located in the United States, to conduct lawful intelligence or cybersecurity missions. They acquire and/or access CAI, or a portion of the CAI as necessary, to support authorized missions or functions assigned to DoD and its components, in accordance with applicable legal and regulatory authorities.

**Q6. Are any DoD components buying and using without a court order location data collected from automobile telematics systems (e.g., internet connected cars) from vehicles located in the United States? If yes, please identify which components.**

ANSWER: DoD policy requires DoD components to report the acquisition of and/or access to automobile telematics systems to the Office of the Secretary of Defense. No such notification has been made.

**Q7. Are any DoD components buying and using without a court order internet metadata, including "netflow" and Domain Name System (DNS) records, about:**

4

    a. domestic internet communications (where the sender and recipient are both U.S. PIIP addresses)

    b. internet communications where one side of the communication is a U.S. IP address and the other side is located abroad.

ANSWER: DoD Components, to include Defense Intelligence Components, acquire, access, and use commercially available netflow data concerning the communications described in subparts (a) and (b) above in order to enhance their intelligence and/or cybersecurity missions, and in doing so, may purchase CAI that contains metadata reflecting communications in which one or both Internet Protocol addresses are located within the United States.

**Q8. If the answers to 5, 6, or 7 are yes, have these activities been reviewed by the DoD inspector general? If not, has DoD notified the inspector general that they are taking place?**

ANSWER: All entities provided an answer that these activities have not been reviewed, as it is not Department policy to request a review by the Office of the Inspector General of all DoD activities.

    Thank you for your support for the personnel of the Department of Defense.

        Sincerely,

        Ronald S. Moultrie